## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

In re:                                        Case No. 24-12797-RAM

7233 LOS PINOS, LLC,                          Chapter 11

      Debtor.

_____/

### RECEIVER'S MOTION TO DISMISS BANKRUPTCY OR ABSTAIN

**The Court has scheduled a preliminary hearing on Creditor Los Pinos Acquisition, LLC's Motion to Dismiss (DE#24, 25), as well as on Debtor Counsel's Motion to Withdraw (DE#18, 19) for April 18, 2024 at 10:00 a.m. The Receiver respectfully requests that a preliminary hearing be scheduled on this motion at the same time.**

Bernice C. Lee, as Receiver ("**Receiver**") over the companies listed herein (the "**Receivership Companies**"),[1] moves to dismiss this bankruptcy case under 11 U.S.C. § 1112(b) for cause, or alternatively to abstain under 11 U.S.C. § 305. This debtor, 7233 Los Pinos, LLC ("**LPLLC**") has no business being in bankruptcy: its sole asset – real property located at 7233 Los Pinos Boulevard, Coral Gables (the "**Los Pinos Property**") – is subject to an asset freeze order entered in an SEC receivership case against LPLLC's manager, Rishi Kapoor ("**Mr. Kapoor**"), and a process for the potential sale of that asset and disposition of the proceeds has already been laid out in the receivership case. In support of dismissal or abstention, the Receiver states:

---

[1] The "Receivership Companies" include: Location Ventures, LLC, URBIN, LLC, Patriots United, LLC; Location Properties, LLC; Location Development, LLC; Location Capital, LLC; Location Ventures Resources, LLC; Location Equity Holdings, LLC; Location GP Sponsor, LLC; 515 Valencia Sponsor, LLC; LV Montana Sponsor, LLC; URBIN Founders Group, LLC; URBIN CG Sponsor, LLC; 515 Valencia Partners, LLC; LV Montana Phase I, LLC; Stewart Grove 1, LLC; Stewart Grove 2, LLC; Location Zamora Parent, LLC; URBIN Coral Gables Partners, LLC; URBIN Coconut Grove Partners, LLC; URBIN Miami Beach Partners, LLC; and URBIN Miami Beach II Phase 1, LLC. The terms "Receivership Defendants" and "Company Defendants" are also used in certain places for the same entities.

## BACKGROUND

### The SEC Receivership Case, Asset Freeze Order and Receivership Order

On December 27, 2023, the Securities and Exchange Commission ("**SEC**") filed a Complaint (unsealed at SEC DE#14)[2] (Ex. "**A**") in the United States District Court for the Southern District of Florida, Case No. 23-24903-CIV (the "**SEC Court**") against Rishi Kapoor and the Receivership Companies, and an Emergency Motion for Asset Freeze and Other Relief against Mr. Kapoor ("**Asset Freeze Motion**") (SEC DE#6) (Ex. "**B**"). The Complaint and Asset Freeze Motion asserted and evidenced that Mr. Kapoor had raised approximately $93 million from more than 50 investors for investment in residential and mixed-use real estate projects through a series of material misrepresentations and omissions in violation of the Securities Act and the Exchange Act and relevant rules promulgated thereunder. The Asset Freeze Motion describes how Mr. Kapoor, among other things: (1) misrepresented his purported $14 million cash investment in Location Ventures LLC, misrepresented the size of his real estate portfolio, and omitted material information about his prior business; (2) intentionally and materially understated construction and other estimated costs and withheld information from investors; (3) regularly commingled investor funds and transferred funds between entities despite representations that each of the entities and projects were separate and distinct investments; and (4) personally misappropriated at least $4.3 million of investor funds.

On December 28, 2023, the SEC Court entered a Sealed Order ("**Asset Freeze Order**") (SEC DE#10) (later unsealed) (Ex. "**C**") granting the Asset Freeze Motion, upon finding that the SEC had made a sufficient and proper showing by presenting a *prima facie* case showing a

---

[2] References to the docket of the SEC Court will be designated as "SEC DE#__". Several pleadings have been filed without voluminous exhibits, which can be made available to the extent the Court deems them relevant.

reasonable approximation of the likely disgorgement award against Mr. Kapoor of at least $4.3 million. The Asset Freeze Order:

(a) directs that Mr. Kapoor and his directors, officers, agents, servants, employees, attorneys, depositories, banks, insurance companies, and those persons in active concert or participation with any of them, are restrained from, directly or indirectly, transferring, setting off, or withdrawing any assets or property owned by, controlled by, or in the possession of Mr. Kapoor;

(b) directs that any other person or entity holding any assets in the name of, for the benefit of, or under the control of Mr. Kapoor, directly or indirectly, held jointly or singly, and wherever located, shall hold and retain within its control and prohibit the withdrawal, removal, transfer, disposition, pledge, encumbrance, assignment, set off, sale, liquidation, dissipation, concealment, or other disposal of any such assets;

(SEC DE#10, p. 2).[3] The Asset Freeze Order broadly applies to restrict any transfer, disposition, encumbrance or other action with respect to any asset in which Mr. Kapoor – directly or indirectly, jointly or singly – has an interest or otherwise controls.

On January 5, 2024, the SEC filed an Expedited Motion for Appointment of Receiver, Asset Freeze and Other Relief Against the Company Defendants ("**Receiver Motion**") (SEC DE#16) (Ex. "**D**"). On January 12, 2024, the SEC Court entered an order granting the Receiver Motion ("**Order Appointing Receiver**") (SEC DE#28) (Ex. "**E**"). The Order Appointing Receiver freezes all Receivership Property, directs the Receiver to take custody and control of all Receivership Property, enjoins any other person from making any claim against the Receivership Companies or Receivership Property, and directs the Receiver "to develop a plan for the fair, reasonable, and efficient recovery and liquidation of all remaining, recovered, and recoverable

---

[3] Mr. Kapoor had indicated an intention to seek dissolution of the Asset Freeze Order, and the SEC Court on February 2, 2024 issued an Order scheduling a show cause hearing for February 28, 2024 (SEC DE#66). Mr. Kapoor then moved to extend the asset freeze and to re-schedule the show cause hearing (SEC DE#81), which was rescheduled to March 25, 2024 (SEC DE#86) and has now been deferred indefinitely with Mr. Kapoor's consent following a status conference conducted on March 21, 2024.

Receivership Property …" (SEC DE#28). Receivership Property is broadly defined to include all assets that (a) are attributable to funds derived from investors or clients of the Company Defendants, (b) are held in constructive trust for the Company Defendants; (c) were fraudulently transferred by the Company Defendants; and/or (d) may otherwise be includable as assets of the estates of the Company Defendants. (SEC DE#28 at 2).

### The SEC Court's Clarification of the Asset Freeze Order and Receivership Order

In March 2023, Mr. Kapoor and his wife, Jennie Frank Kapoor purchased a 68-foot yacht (the "**Yacht**") for more than $5 million. In October 2023, a lender with a mortgage on the Yacht filed a maritime foreclosure complaint. *Unibank for Savings v. M/Y Suneeta* II, USDC SDFL Case No. 23-81411. After unsuccessfully arguing in the foreclosure case that the proceeding was stayed by the Asset Freeze Order and Receivership Order, on February 26, 2024 Mr. Kapoor filed a Motion for Clarification (SEC DE#89) in the SEC Court seeking a determination whether the maritime foreclosure was stayed by the Receivership Order, and whether sale of the Yacht (either by the lender or by Mr. Kapoor) was subject to the Asset Freeze Order. On February 27, 2024, the SEC Court entered an Order (SEC DE#90) (Ex. "**F**") clarifying that the Receivership Order stay did not apply to the maritime foreclosure action,[4] but that the Asset Freeze Order provisions did apply to any voluntary disposition of the Yacht by Mr. Kapoor and may also apply to any foreclosure sale by the lender. The SEC Court further noted and incorporated the Receiver's position that the Receiver would consent to a sale of the Yacht at fair market value, provided that

---

[4] The Receivership Order stay provisions apply to any actions involving (a) the Receiver; (b) any Receivership Property; (c) the Receivership Companies, including subsidiaries and partnerships; or (d) any of the Receivership Companies' past or present officers, directors, managers, agents, or general or limited partners in connection with any action taken by them while acting in such capacity. SEC DE#28 at 12. They did not apply to the maritime foreclosure because Mr. Kapoor did not buy the Yacht in his capacity as an officer, director, or manager of the Receivership Companies, and did not concede that the Yacht was Receivership Property.

(1) the terms of sale are fully disclosed to the Receiver and approved in advance of sale: (2) no insider is participating in such sale; and (3) any net proceeds after satisfaction of the lender's indebtedness are turned over to the receivership estate. (SEC DE#90 at 1-2).

Accordingly, the SEC Court has already clarified that dispositions of assets in which Mr. Kapoor has an interest are subject to the Asset Freeze Order, and ratified the terms on which the Receiver has agreed to consent to such dispositions.

### Kapoor's Motion to Modify the Asset Freeze Order as to the Los Pinos Property

On March 4, 2024, Mr. Kapoor filed Defendant Rishi Kapoor's Motion to Stay State Court Proceedings and Permit Sale of Asset Subject to Asset Freeze ("**Motion to Permit Sale**") (SEC DE#94) (Ex. "**G**") in the SEC Court. In the Motion to Permit Sale, Mr. Kapoor (a) acknowledged, and sought an order determining, that the Asset Freeze Order applied to the Los Pinos Property;[5] (b) sought relief from the Asset Freeze Order to permit LPLLC, the owner of the Los Pinos Property, to list the Los Pinos Property for sale, with a final sale being subject to the approval of the SEC Court; (c) sought permission to retain his wife, Jennie Frank Kapoor, as listing agent to sell the Los Pinos Property; and (d) sought to stay a pending foreclosure action against the Los Pinos Property for six months to permit LPLLC to list and sell the Los Pinos Property, subject to the SEC Court's approval. (SEC#94 at 5).[6]

---

[5] Mr. Kapoor asserts that he and his wife Jennie Frank Kapoor own, as tenants by the entireties, 100% of the membership interests in Kapoor, LLC, which owns 100% of the membership interests in 7233 Los Pinos, LLC, which owns the Los Pinos Property. Mr. Kapoor specifically states: "**Thus, Mr. Kapoor believes that the Property is an asset owned in part by Mr. Kapoor and is subject to the Asset Freeze.**" (DE#94 at 2) (emphasis added). The assertion of ultimate TBE ownership will be addressed further below.

[6] While a foreclosure action is pending in state court, no judgment has been entered and no sale has been scheduled. However, the lender had filed a motion to appoint a receiver over the Los Pinos Property in state court, and the state court had indicated an intention to grant that relief.

On March 7, 2024, the Receiver responded to Kapoor's Motion to Permit Sale (SEC DE#98) (Ex. "**H**") and set forth the Receiver's position. The Receiver requested the SEC Court (1) deny approval of the listing agreement unless (a) Mrs. Kapoor is removed as listing associate and no insider is to receive any compensation from the sale; and (b) the proposed listing price is supported to the Receiver's reasonable satisfaction; (2) authorize the listing of the Los Pinos Property for sale, subject to the consent of the Receiver and SEC or, if appropriate, the SEC Court for any final purchase offer; (3) require that all sale proceeds after payment of bona fide third-party liens be escrowed with Receiver's counsel pending a determination of entitlement thereto; and (4) stay only the scheduling and conduct of a foreclosure sale in the pending foreclosure action, for no more than 120 days. (DE#98 at 4-5). To paraphrase: sell the property, subject to SEC Court approval, with an independent broker, and escrow the proceeds pending a determination of entitlement. Indeed, since her appointment the Receiver has repeatedly and persistently encouraged Mr. Kapoor to take appropriate action to promptly market and sell the Los Pinos Property in order to preserve potential equity in the property.

In reply, Mr. Kapoor (1) continued to argue for the retention of his wife as listing agent; (2) asserted that his proposed listing price of $8.495 million was determined by Boschetti Real Estate Group, an experienced real estate broker; and (3) argued that the escrowing of excess sale proceeds after payment of liens was "neither necessary or warranted," while simultaneously claiming that "if and when a sale takes place, and if any proceeds flow to 7233 Los Pinos or Kapoor LLC, the parties and the Court can address the issue whether or to what extent … the Receiver or the Commission can assert potential claims against proceeds ultimately owned by the Kapoors as

tenants by the entirety."[7] (DE#104 at 2-3) (Ex. "**I**"). The Motion to Permit Sale is now fully briefed and pending before the SEC Court.

On March 21, 2024, the SEC Court conducted a status conference. At the status conference, the SEC Court indicated that it did not intend to decide the Motion to Permit Sale until after another motion which Mr. Kapoor had filed the day before the status conference, and which also involved the Los Pinos Property, was fully briefed. In that motion, Mr. Kapoor sought to compel the Receiver to advance him his legal fees in defending the SEC case as an administrative expense of the receivership under indemnification provisions in certain of the Receivership Companies' pre-receivership operating agreements, and proposed to secure his obligation to repay the Receivership Companies if he was found not to be entitled to indemnification by providing a second position mortgage on the Los Pinos Property. ("**Kapoor Indemnification Motion**") (SEC DE#107). The Receiver has responded and objected to the Kapoor Indemnification Motion (SEC DE#115), and Mr. Kapoor has filed his reply (SEC DE#125), so that motion is now fully briefed before the SEC Court.

### The LPLLC Bankruptcy Filing

Two business days after that status conference – after Mr. Kapoor had already submitted the process for sale of the Los Pinos Property to the SEC Court's jurisdiction through the Motion to Permit Sale – on March 25, 2024, LPLLC filed a voluntary Chapter 11 petition commencing this case. LPLLC's sole asset is the Los Pinos Property. Its Case Management Summary (DE#4) indicates that the Los Pinos Property is encumbered with a first mortgage in favor of Los Pinos Acquisition, LLC ("**LP Acquisition**") of approximately $5.3 million and various mechanics' lien

---

[7] In other words, Mr. Kapoor apparently did not object to the SEC Court determining the entitlement to the funds, only to the escrowing of the funds pending a determination.

claims of approximately $100,000, and indicates unsecured claims of approximately $40,0000. LPLLC asserts that the Los Pinos Property is worth in excess of $8 million, which if true would mean the lender is substantially oversecured. The Case Management Summary makes no mention of the Asset Freeze Order or the claims that may be asserted against the Los Pinos Property by the SEC or the Receiver.

The Receiver has reason to believe that there are substantial claims on behalf of the SEC and Receivership Companies that may be asserted against the Los Pinos Property itself and against Mr. Kapoor's interest therein. The property was acquired in November 2021 for $5.97 million, and substantial sums have been expended since then to improve the property and pay debt service. The Receiver is investigating whether payments for improvements to the Los Pinos Property were made directly by the Receivership Companies – the Receivership Companies used many of the same contractors and vendors as were providing services and materials to the Los Pinos Property, and some invoices for the Los Pinos Property were directed to Receivership Companies. And in any event, it appears extremely likely that payments for improvements and debt service were made by Mr. Kapoor from funds improperly received by him from the Receivership Companies through the material misrepresentations and omissions described in the SEC Complaint. Indeed, Mr. Kapoor's counsel has already acknowledged in the state court foreclosure proceedings against the Los Pinos Property that Mr. Kapoor made mortgage payments with funds which the SEC asserts were improperly obtained by him from the Receivership Companies:

> The [SEC] in its complaint claims that Mr. Kapoor took a few million dollars of excess compensation. That excess compensation, which was allegedly -- we don't think it was excess, we're going to defend against that claim. But the claim is that the excess compensation that he took was done during the course of his employment with these companies. And, further, the [SEC] has claimed that any use of those funds was improper because they were, quote, in effect stolen funds.

> He used those funds, Your Honor, to make mortgage payments to Mr. Akerman's client, which payments may be subject to clawbacks by the receiver.

(Transcript of February 13, 2024 Hearing P9 L24 – P10 L13) (Ex. "**J**"). Such transfers not only support clawback claims against Mr. Kapoor – they also warrant an equitable lien against the Los Pinos Property itself. *See, e.g.*, *In re Fin. Federated Title & Trust, Inc.*, 347 F.3d 880 (11th Cir. 2003); *In re Hecker*, 264 F. Appx. 786 (11th Cir. 2008); *FTC v. Am. Precious Metals, LLC*, 726 F.Appx. 729, 734 (11th Cir. 2018) (equitable lien may be imposed where fraudulently obtained funds are used for mortgage payments, insurance payments and other expenses to maintain property). And the SEC Court has already found that the SEC has made a *prima facie* case for disgorgement of in excess of $4 million from Mr. Kapoor, which may be partially satisfied from the Los Pinos Property.

After the bankruptcy filing, the Receiver advised LPLLC through its counsel that the filing appeared to be a violation of the Asset Freeze Order, that the Asset Freeze Order remained in effect with regard to the Los Pinos Property notwithstanding the bankruptcy filing, that LPLLC was prohibiting from taking any action with regard to the Los Pinos Property in the bankruptcy without first obtaining relief from the Asset Freeze Order in the SEC Court, and that the Receiver had already made clear that she would not oppose a sale of the Los Pinos Property provided that (1) the Receiver had an opportunity to approve such sale; (2) Mrs. Kapoor was removed as listing agent and no insider would receive any compensation from the sale; (3) the proposed listing price was supported to the Receiver's reasonable satisfaction; and (4) any sale proceeds after payment of bona-fide third-party liens were escrowed pending a determination of entitlement thereto. (DLR 4/1/24 email, Ex. "**K**"). The Receiver subsequently clarified:

> The Receiver will consent to the sale of the Los Pinos Property at fair market value under the following conditions:
> (1) the bankruptcy is dismissed;
> (2) the terms of any sale are fully disclosed to and approved by the Receiver in advance of sale, and/or approved by the SEC court by motion;

(3) no insider is participating in the sale in any capacity (that means Ms. Kapoor is not a listing agent and neither she nor any other insider receives any commission or other compensation from the sale);

(4) all net proceeds after satisfaction of valid non-insider liens are escrowed with Receiver's counsel pending a determination as to entitlement in the SEC action;

(5) the SEC also consents to these terms.

(DLR 4/3/24 email, Ex. "**L**"). LPLLC's counsel confirmed that LPLLC was agreeable to those terms, subject to reaching agreement with the lender on other matters. (MSR 4/4/24 email, Ex. "**M**").

On April 15, 2024, the Receiver provided LPLLC's counsel with a proposed order to be entered in the SEC Court incorporating the foregoing terms. (DLR 4/15/24 email, Ex. "**N**").  In response, Mr. Kapoor's personal counsel indicated that he would advise Mr. Kapoor to agree only if (1) a listing price was agreed upon in the order; (2) Mrs. Kapoor was allowed to participate in the sale and to seek a commission, to be determined by the SEC Court; and (3) 50% of the net proceeds of any sale would be immediately released to Mrs. Kapoor, with the balance escrowed pending a determination by the SEC Court of the SEC and Receiver's claims to the proceeds. (FAS 4/15/24 email, Ex. "**O**").

There has been no activity in the bankruptcy case since its filing. On April 15, 2024, LPLLC's counsel filed a Motion to Withdraw (DE#18). On April 16, 2024, the lender LP Acquisition filed a Motion to Dismiss, for Attorneys' Fees and Sanctions, to Abstain, and for Stay Relief (DE#24).

### **The Claim of TBE Ownership**

Mr. Kapoor has repeatedly claimed that LPLLC, the debtor here, is 100% owned by Kapoor, LLC, a Florida limited liability company, and that 100% of the membership interests in Kapoor, LLC are owned by Mr. Kapoor and his wife as tenants by the entireties. In fact, the Operating Agreement of Kapoor LLC obtained by the Receiver from the books and records of the

Receivership Companies, signed by Mr. Kapoor and effective as of October 27, 2021 (two months after Kapoor LLC's Articles of Organization were filed with the Florida Secretary of State), reflects that Mr. Kapoor was made the ***sole member*** of Kapoor LLC. (Ex. "P" – 10/27/21 Operating Agreement; Ex. "**Q**" – 8/21/21 Articles of Organization).

Mr. Kapoor has provided an Amended and Restated Operating Agreement, dated after Kapoor LLC's formation and after Mr. Kapoor was made its sole member, purporting to identify Mr. Kapoor and Jennie Frank [Kapoor], as tenants by the entireties, as the members. Nonetheless, the required unities of time and title cannot be satisfied because Mr. Kapoor and Mrs. Kapoor's interests in Kapoor LLC were not created at the same time or by the same instrument. *See Smart v. City of Miami Beach*, 51 F. Supp. 3d 1299, 1303 (S.D. Fla. 2014); *In re Aranda*, No. 08-26059, 2011 WL 87237, *2 (Bankr. S.D. Fla. Jan. 10, 2011). Moreover, equitable lien claims for Receivership Company funds improperly obtained by Mr. Kapoor and used to acquire, improve or maintain the Los Pinos Property are assertable against the Los Pinos Property without regard to any claimed interest of Mrs. Kapoor. *See, e.g.*, *Hecker*, 264 F. Appx. 786 at **4, citing *Fin. Federated*, 347 F.3d at 890 and *Palm Beach Savings & Loan Assoc. v. Fishbein*, 619 So. 2d 267 (Fla. 1993). Likewise, a disgorgement claim by the SEC may also not be subject to a "TBE defense." *See SEC v. Solow*, 682 F.Supp.2d 1312, 1325-26 (S.D. Fla. 2010) (disgorgement may reach assets otherwise protected by state law, including TBE property), *aff'd*, 396 F.Appx. 635 (11th Cir. 2010).

## ARGUMENT

Under 11 U.S.C. § 1112(b), a bankruptcy case may be dismissed "for cause." "Cause" may include a lack of good faith, such as an intent to abuse judicial process and the purposes of the reorganization provisions. *In re Bal Harbour Club, Inc.*, 316 F.3d 1192 (11th Cir. 2003); *In re*

*Phoneix Piccadilly, Ltd.*, 849 F.2d 1393, 1394 (11th Cir. 1988) (same); *In re Moog*, 159 B. R. 357 (Bankr. S.D. Fla. 1993) (petition filed by solvent debtor as litigation tactic to circumvent state court enforcement of orders was filed in "bad faith" and had to be dismissed).

In addition, under 11 U.S.C. § 305, the bankruptcy court may abstain from hearing and dismiss a case if the interests of creditors and the debtor would be better served by such dismissal. In considering abstention under § 305, courts consider (1) whether another forum is available or there is already pending action in another court; (2) whether the creditor and debtor are actively engaged in an out of court workout; (3) the purpose for which bankruptcy jurisdiction has been sought; (4) whether bankruptcy will unnecessarily interfere with state or federal regulatory schemes; and (5) the effect the bankruptcy proceeding will have on the debtor's business. *In re Forever Propane Sales & Service, Inc.*, 597 B.R. 696, 697 (Bankr. S.D. Fla. 2019).

By this motion, the Receiver seeks dismissal under § 1112(b), or alternatively, abstention and dismissal under § 305, for the following reasons:

1.     **The Bankruptcy Filing Was a Bad Faith Violation of the Asset Freeze Order.**

The Asset Freeze Order directs that any person or entity holding any assets which are in the name of, for the benefit of, or under the control of Mr. Kapoor, directly or indirectly, held jointly or singly, must hold and retain such assets within its control and prohibit any withdrawal, removal, transfer, disposition, pledge, encumbrance, assignment, set off, sale, liquidation, dissipation, concealment, or other disposal of such assets. Mr. Kapoor has already acknowledged, and indeed asked the SEC Court to rule, that the Los Pinos Property is subject to the Asset Freeze Order. He further asked the SEC Court for relief from the Asset Freeze Order in order to market and sell the Los Pinos Property, and acknowledged the SEC Court's authority and jurisdiction to approve a sale and to adjudicate disputes as to entitlement to the proceeds. Then, two business

12

days after a status conference before the SEC Court, Mr. Kapoor, as manager of LPLLC, directed

the filing of this bankruptcy case in an apparent effort to subvert the SEC Court's exercise of the

jurisdiction he himself had invoked through his Motion to Permit Sale.

In similar circumstances, courts have held that the filing of a voluntary bankruptcy with

respect to an asset subject to an asset freeze order is a violation of the order warranting dismissal

and/or contempt. *See SEC v. Wolfson*, 309 B.R. 612, 625-26 (D. Utah 2004) (filing of bankruptcy

petitions was in bad faith and a vexatious and contemptuous effort to violate the court's asset freeze

order); *SEC v. Sterns*, No. CV 91-1303, 1991 WL 204901, *1-2 (C.D. Cal. Apr. 25, 1991) (finding

voluntary bankruptcy a violation of asset freeze order and ordering defendants to withdraw the

bankruptcy petition). *But see SEC v. Goto*, No. Civ. 03-490-JD, 2004 WL 2613915, *2 (D.N.H.

Nov. 18, 2004) (finding that bankruptcy filing was not in contempt of asset freeze order).

Moreover, a bankruptcy petition that is filed without requisite authority is subject to

dismissal. *In re Arista Imaging of N. Miami, LLC*, No. 19-26519, 2020 WL 609613, *11 (Bankr.

S.D. Fla. Feb. 7, 2020). Here, the Asset Freeze Order divested LPLLC of authority to dispose of

the Los Pinos Property in any fashion, and accordingly the petition was filed without authority and

should be dismissed.

As further indicia of bad faith, it does not appear that any valid bankruptcy purpose is

served by the filing. Rather, the only purposes for the LPLLC bankruptcy filing would seem to be:

(1) to delay the appointment of a receiver in the state court foreclosure action (who would either

require the payment of rent by Mr. and Mrs. Kapoor for occupying the property, or seek their

removal); (2) to forum shop after Mr. Kapoor asked the SEC Court to approve a process for sale

of the Los Pinos Property and disposition of the proceeds; and (3) to leverage the Receiver into

agreeing to Mrs. Kapoor retaining 50% of the net proceeds from a sale without an adjudication of

the Kapoors' asserted TBE ownership, or any claims that may be asserted against the Los Pinos Property without regard to such TBE ownership; and/or (4) to subvert the SEC Court's jurisdiction to determine the Receiver's claims and the SEC's disgorgement claims against the Los Pinos Property. Notably, the debtor – LPLLC – has no financial interest in the Kapoors remaining in possession of the property without paying the mortgage or paying rent to LPLLC. Nor does the debtor – LPLLC – have any particular interest in ensuring that Mrs. Kapoor receives half the net proceeds of a sale. And this Court is certainly not any more likely than the SEC Court to approve the engagement of Mrs. Kapoor as a broker for LPLLC over the Receiver's objection, given the disinterestedness requirements of 11 U.S.C. § 327(a).

This bankruptcy case was not filed in good faith and must be dismissed.

**2.      The Asset Freeze Order Remains in Effect and Prohibits any Act with Respect to the Los Pinos Property in the Bankruptcy Case.**

In any event, it is beyond any reasonable dispute that the Asset Freeze Order – which Mr. Kapoor has already acknowledged applies to the Los Pinos Property – remains in effect and is unaffected by the bankruptcy filing. Courts have repeatedly held that such orders constitute the exercise of the SEC's police and regulatory power and therefore are excluded from the automatic stay under 11 U.S.C. § 362(b)(4). *See, e.g.*, *SEC v. eCareer Holdings, Inc.*, No. 15-80446-CIV, 2016 WL 4443576 (S.D. Fla. Mar. 8, 2016) (SEC action, including asset freeze, were exempt from automatic stay under § 362(b)(4)); *SEC v. Miller*, 808 F.3d 623, 631 (2d Cir. 2015) (asset freeze order was exempt from automatic stay as exercise of government's regulatory power); *SEC v. Wyly*, 73 F.Supp.3d 315 (S.D.N.Y. 2014), *vacated in part*, 2017 WL 4119283 (S.D.N.Y. Jun. 12, 2017) (automatic stay did not apply to SEC asset freeze); *SEC v. Morriss*, No. 4:12-CV-80, 2012 WL 2154903, *2-3 (E.D. Mo. Jun. 13, 2012) (SEC action and asset freeze order are part of the Commission's exercise of its purpose in promoting public policy and safety by ensuring fair and

equitable securities markets, and excluded from stay under § 362(b)(4); *Wolfson*, 309 B.R. at 618-622.

Accordingly, regardless of LPLLC's bankruptcy filing, the Los Pinos Property and any proposed sale, encumbrance, disposition or other transaction with regard to it (i.e., all the things that might happen in a Chapter 11 case) remain subject to the Asset Freeze Order, and consequently, to the jurisdiction and control of the SEC Court. In simple terms, nothing can happen in this bankruptcy case with regard to LPLLC's sole asset – the Los Pinos Property – without it first being presented to and authorized by the SEC Court. Moreover, Mr. Kapoor already invoked the jurisdiction of the SEC Court with regard to the Los Pinos Property by filing the Motion to Permit Sale, in which he asked that Court to approve any proposed sale and resolve any disputes as to the proceeds. And the Receiver has agreed to such a process in the SEC Court, with the only hangups apparently being that Mr. Kapoor (1) wants to engage his wife as the listing agent and pay her a commission; and (2) wants his wife to receive 50% of the net sale proceeds without any adjudication of her asserted interest.

This bankruptcy case would simply be a duplicative, inefficient, wasteful and potentially conflicting process overlaid on top of what has already been teed up in the SEC Court, which constitutes cause for dismissal or abstention. *See Sterns*, 1991 WL 204901, *2 ("the dual administration of the assets … (in both this Court and in the Bankruptcy Court) would not only be inefficient, but may result in conflicting goals. … Thus, it is the Court's conclusion that bankruptcy proceedings are at this time inappropriate."); *Wolfson*, 309 B.R. at 626 (defendant "improperly sought refuge from their wrongdoing in Bankruptcy Court," and to permit him "to be a debtor in possession of his assets, where he remains free to dissipate what might remain of his ill-gotten gains, is an entirely unacceptable state of affairs.")

There is no valid purpose for this bankruptcy case, as any proposed disposition of the Los Pinos Property and its proceeds are subject to the jurisdiction and approval of the SEC Court. The interests of creditors and of LPLLC would be better served by simply marketing and, if possible, selling the Los Pinos Property, and resolving any disputes as to the net proceeds, in accordance with the SEC Court's ruling on the Motion to Permit Sale, rather than incurring unnecessary, duplicative and wasteful administrative expense through parallel proceedings in this case. The considerations set forth in *Forever Propane* all support abstention:

(1)    there is another forum available (the SEC Court) and a proceeding already pending there (the Motion to Permit Sale);

(2)    the creditor and debtor are actively engaged in an out of court workout (the Receiver has already proposed a path for sale and resolution of claims to proceeds in the SEC Court which LPLLC found acceptable, subject to addressing certain issues with the lender);

(3)    the purpose for which bankruptcy jurisdiction was sought was to subvert the SEC Court's exercise of jurisdiction over the Los Pinos Property after Mr. Kapoor had initially invoked it;

(4)    the bankruptcy will unnecessarily interfere with federal regulatory schemes (the SEC's regulatory and enforcement powers under which the Asset Freeze Order was entered, and the pending SEC receivership proceeding); and

(5)    the effect the bankruptcy proceeding will have on the debtor's business (the debtor has no business, and the bankruptcy will only create duplicative and inefficient administrative expenses for LPLLC).

## **CONCLUSION**

If LPLLC genuinely wants to sell the Los Pinos Property and address claims to the net proceeds, the path to doing so lies in the SEC Court which issued the Asset Freeze Order freezing any disposition of the Los Pinos Property and which already has jurisdiction over Mr. Kapoor's Motion to Permit Sale. For the foregoing reasons, the Receiver respectfully requests that the Court dismiss this case for cause under 11 U.S.C. § 1112(b), or alternatively, abstain under 11 U.S.C. § 305.

Respectfully submitted,

**KOZYAK TROPIN & THROCKMORTON, LLP**
2525 Ponce de Leon Boulevard, 9th Floor
Coral Gables, FL 33134
Tel:    (305) 372-1800
Fax:    (305) 372-3508

By: */s/ David L. Rosendorf*
David L. Rosendorf
FL Bar No. 996823
dlr@kttlaw.com

Counsel for Bernice C. Lee, as Receiver

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served on April 17, 2024 by Electronic transmission to all counsel of record registered through the Court's CM/ECF system.

.

*/s/ David L. Rosendorf*
David L. Rosendorf

# EXHIBIT A

SEALED

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO.

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

RISHI KAPOOR;
LOCATION VENTURES, LLC;
URBIN, LLC;
PATRIOTS UNITED, LLC;
LOCATION PROPERTIES, LLC;
LOCATION DEVELOPMENT, LLC;
LOCATION CAPITAL, LLC;
LOCATION VENTURES RESOURCES, LLC;
LOCATION EQUITY HOLDINGS, LLC;
LOCATION GP SPONSOR, LLC;
515 VALENCIA SPONSOR, LLC;
LV MONTANA SPONSOR, LLC;
URBIN FOUNDERS GROUP, LLC;
URBIN CG SPONSOR, LLC;
515 VALENCIA PARTNERS, LLC;
LV MONTANA PHASE I, LLC;
STEWART GROVE 1, LLC;
STEWART GROVE 2, LLC;
LOCATION ZAMORA PARENT, LLC;
URBIN CORAL GABLES PARTNERS, LLC;
URBIN COCONUT GROVE PARTNERS, LLC;
URBIN MIAMI BEACH PARTNERS, LLC; and
URBIN MIAMI BEACH II PHASE 1, LLC,

Defendants.



FILED BY_____ D.C.

DEC 27 2023

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

_____/

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

## I.   INTRODUCTION

1.     The Commission brings this emergency action against Defendants Rishi Kapoor ("Kapoor"), Location Ventures, LLC ("LV"), URBIN, LLC ("URBIN"), and their subsidiaries and affiliated companies[1] (collectively, the "Defendants") for their operation of a real estate investment scheme in violation of the anti-fraud provisions of the federal securities laws. From January 2018 through March 2023 (the "Relevant Period"), Defendants raised approximately $93 million from more than 50 investors.

2.     LV purports to be a real estate company that invests in the development of single-family homes, condominiums, and mixed-use properties in South Florida. Kapoor is LV's founder and former chief executive officer. URBIN is an affiliate of LV that invests in the development of communal live/work concept properties located in, as its name suggests, urban neighborhoods.

3.     LV and URBIN earn revenue from fees they charge their real estate projects, including acquisition, development, management, marketing, and loan guarantor fees. They also own a stake in each of their projects, which entitles them and their investors to a percentage of any profits made by the projects. Importantly, LV owns 40% of URBIN, resulting in a multi-level corporate structure with a percentage of the profits at each level flowing to LV at the top.

4.     To fund the venture, Defendants offered passive investment opportunities in both LV and URBIN, as well as in each of their respective projects. To induce investors, Kapoor and his partner claimed they made a $13 million cash investment in LV through Defendant Patriots United, LLC ("Patriots United"), a company owned by Kapoor, his partner, and members of

---

[1] LV's and URBIN's subsidiaries and affiliated companies are alleged in paragraph 5 of this Complaint.

2

Kapoor's family. At no point during the Relevant Period, however, did Patriots United contribute any cash to LV.

5. Kapoor attempted to conceal the $13 million deficit within a web of companies, subsidiaries, and affiliated entities, which included among others: LV; URBIN; Patriots United; Location Properties, LLC ("L. Properties"); Location Development, LLC ("L. Development"); Location Capital, LLC ("L. Capital"); Location Ventures Resources, LLC ("L. Resources"); Location Equity Holdings, LLC ("L. Holdings"); Location GP Sponsor, LLC ("L. GP Sponsor"); 515 Valencia Sponsor, LLC ("515 Valencia Sponsor"); LV Montana Sponsor, LLC ("LV Montana Sponsor"); URBIN Founders Group, LLC ("URBIN Founders"); URBIN CG Sponsor, LLC ("URBIN CG Sponsor"); 515 Valencia Partners, LLC ("515 Valencia"); LV Montana Phase I, LLC ("LV Montana"); Stewart Grove 1, LLC ("Stewart Grove 1"); Stewart Grove 2, LLC ("Stewart Grove 2"); Location Zamora Parent, LLC ("L. Zamora Parent"); URBIN Coral Gables Partners, LLC ("URBIN Gables"); URBIN Coconut Grove Partners, LLC ("URBIN Grove"); URBIN Miami Beach Partners, LLC ("URBIN Miami Beach"); and URBIN Miami Beach II Phase 1, LLC ("URBIN Miami Beach II") (collectively, "Company Defendants").

6. Kapoor's false claims about his investment was just one in a series of material misrepresentations and omissions Defendants made to investors. For instance, as part of the offering materials provided to prospective investors, Defendants included *pro forma* budgets that projected costs for each of the projects, such as interest expense and loan fees, land purchase, and acquisition and capital formation costs. Kapoor intentionally understated construction and other estimated costs in the *pro formas* to represent higher returns to prospective investors. When actual costs for the projects greatly exceeded those forecasted in the *pro formas*, Defendants withheld that and other information from investors, directed employees to revise or remove financial data

from reports and meeting minutes, and, in some instances, continued to use the *pro formas* to raise additional capital.

7.      Kapoor also represented to investors that LV, URBIN, and each of the projects were separate and distinct investments, possessing their own members, designated capital, and corporate identities. Kapoor, however, regularly ignored corporate formalities and commingled investor funds with more than $60 million in intercompany transfers occurring during the Relevant Period. As just a few examples: $1.6 million of investor funds in the URBIN Grove project were transferred to and used by the URBIN Gables project to purchase land. Approximately $4.5 million of customer sales deposits paid by purchasers of units in the URBIN Grove and URBIN Miami Beach projects were released from escrow and used for purposes unrelated to the construction of those projects. And approximately $14 million was transferred from LV to URBIN and recorded internally as an intercompany loan without member or board approval.

8.      As Defendants shuffled investor funds among the various companies and accounts, Kapoor and other insiders misappropriated at least $6 million of investor funds—$4.3 million of which Kapoor misappropriated for himself. During the same period, Kapoor purchased a 2023 68.7-foot yacht for over $5 million, a dock at the Cocoplum Yacht Club for $695,000, leased a 2020 600LT Spider McLaren sportscar, and paid a private chef $10,000 per month.

9.      In or around July 2023, a majority of LV's members removed Kapoor as manager and CEO of LV but not before Kapoor transferred more than $19 million—and nearly all of LV's remaining cash—to LV's largest investor, who demanded to be bought out after learning that Kapoor was misappropriating and misusing investor funds. Kapoor later resigned as the manger of URBIN.

10.     Without sufficient funds, LV's and URBIN's projects have stalled, been abandoned, or are the subject of litigation. In August 2023, LV's members formally replaced Kapoor with a retired judge to wind down LV and to liquidate certain LV projects. URBIN currently is being managed by LV's chief development officer.

11.     By engaging in the conduct alleged in this Complaint, Kapoor, LV, and URBIN violated Section 17(a)(2) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)(2)], and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Exchange Act Rule 10b-5(b) [7 C.F.R. § 240.10b-5(b)]. Kapoor and the Company Defendants violated Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)], and Section 10(b) of the Exchange Act and Exchange Act Rules 10b-5(a) and (c) [17 C.F.R. § 240.10b-5(a) and (c)]. Kapoor also, directly and indirectly, violated Exchange Act Section 10(b) and Rule 10b-5 thereunder as a control person of the Company Defendants under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

12.     Among other relief, the Commission seeks permanent injunctions, disgorgement of ill-gotten gains with prejudgment interest,[2] and civil monetary penalties against the Defendants. The Commission also seeks an order against Kapoor imposing an officer and director bar. To protect investors and preserve investor assets, the Commission also seeks emergency relief, including asset freezes, the appointment of a Receiver, an order prohibiting the destruction of documents, and sworn accountings.

---

[2] The Commission's request for disgorgement is limited currently to: Kapoor, LV, URBIN, Patriots United, L. Capital, L. Development, L. Properties, L. Ventures, 515 Valencia, LV Montana, Stewart Grove 1, Stewart Grove 2, Zamora Parent, URBIN Grove, URBIN Gables, URBIN Miami Beach, and URBIN Miami Beach II.

## II.  DEFENDANTS

13.  **Kapoor** is a resident of Coral Gables, Florida. From January 2016 until a majority of LV's members removed him in July 2023, Kapoor served as the CEO and manager of LV. From May 2018 until he resigned in August 2023, Kapoor was the Managing Partner and manager of URBIN through URBIN Founders. Kapoor owns a 47.917% membership interest in LV through Patriots United[3] and a 7.14% membership interest in URBIN through Kapoor Capital, LLC ("Kapoor Capital").[4] Kapoor has business degrees in finance, marketing, and management, and a law degree but has never been a licensed attorney. At all times material to the Complaint, Kapoor managed and controlled the Company Defendants.

14.  **LV** is a Florida limited liability company formed in January 2016 with its principal place of business in Coral Gables, Florida. Kapoor managed and controlled LV until he was removed as manager by a majority of LV's members in July 2023. Kapoor and others formed LV for the purpose of investing in and developing real estate. LV is owned by certain investors in LV and Patriots United, a Florida limited liability company partly owned and controlled by Kapoor.

15.  **URBIN** is a Florida limited liability company formed in May 2018 with its principal place of business in Coral Gables, Florida. LV owns approximately 40% of URBIN. Kapoor managed and controlled URBIN through LV and URBIN Founders until he resigned in August 2023 and was replaced by LV's chief development officer. URBIN is an affiliate of LV that Kapoor and others formed for the purpose of investing in and developing real estate.

---

[3] Patriots United is owned by Kapoor, his partner, and Kapoor Capital, which is owned by Kapoor and two of his family members.

[4] Kapoor Capital is owned by Kapoor and two of his family members.

16. **Patriots United** is a Florida limited liability company formed in September 2017 with its principal place of business in Coral Gables, Florida. Patriots United is partly owned and controlled by Kapoor. Patriots United owns a 47.917% membership interest in LV based on a purported $13 million cash capital contribution by Kapoor, his partner, and two members of Kapoor's family. As detailed in the Complaint, Patriots United never made a cash capital contribution to LV.

17. **L. Properties** is a Florida limited liability company formed in January 2016 with its principal place of business in Coral Gables, Florida. L. Properties is a wholly owned subsidiary of LV through which LV operates. L. Properties is described on LV's website as a full-service real estate sales and marketing team.

18. **L. Development** is a Florida limited liability company formed in February 2016 with its principal place of business in Coral Gables, Florida. L. Development is a wholly owned subsidiary of LV through which LV operates. L. Development is described on LV's website as a company focused on developing architecturally significant living experiences in key markets in South Florida.

19. **L. Capital** is a Florida limited liability company formed in January 2016 with its principal place of business in Coral Gables, Florida. L. Capital is a wholly owned subsidiary of LV through which LV operates. LV's website describes L. Capital as a private real estate investment and asset management division that raises capital to invest in premium locations and premier developers.

20. **L. Resources** is a Florida limited liability company formed in September 2019 with its principal place of business in Coral Gables, Florida. L. Resources is a wholly owned subsidiary of LV through which LV operates and purportedly provides human resource services to LV.

21. **L. Holdings** is a Florida limited liability company formed in April 2020 with its principal place of business in Coral Gables, Florida. L. Holdings is a wholly owned subsidiary of LV through which LV operates and purportedly holds LV's projects. L. Properties, L. Development, L. Capital, L. Resources, and L. Holdings, collectively, shall be referred to as the "Operational Entities."

22. **L. GP Sponsor** is a Florida limited liability company formed in February 2020 with its principal place of business in Coral Gables, Florida. L. GP Sponsor is a wholly owned subsidiary of LV through which LV owns the sponsor entities formed to own an interest in and manage LV's projects.

23. **515 Valencia Sponsor** is a Florida limited liability company formed in February 2018 with its principal place of business in Coral Gables, Florida. 515 Valencia Sponsor is a wholly owned subsidiary of L. GP Sponsor. 515 Valencia Sponsor is the manager of the 515 Valencia project.

24. **LV Montana Sponsor** is a Florida limited liability company formed in August 2022 with its principal place of business in Coral Gables, Florida. LV Montana Sponsor is a wholly owned subsidiary of L. GP Sponsor. LV Montana Sponsor is the manager of the LV Montana project.

25. **URBIN Founders** is a Florida limited liability company formed in May 2018 with its principal place of business in Coral Gables, Florida. URBIN Founders is an affiliate of LV and the manager of URBIN.

26. **URBIN CG Sponsor** is a Florida limited liability company formed in May 2018 with its principal place of business in Coral Gables, Florida. URBIN CG Sponsor is an affiliate of URBIN and the manager of the URBIN Gables project. L. GP Sponsor, 515 Valencia Sponsor, LV

Montana Sponsor, URBIN Founders, and URBIN CG Sponsor, collectively, are referred to as the "Manager Entities."

27.     **515 Valencia** is a Florida limited liability company formed in February 2018 with its principal place of business in Miami, Florida. 515 Valencia is managed by 515 Valencia Sponsor. 515 Valencia is an affiliate of LV that Kapoor and others formed for the purpose of owning and developing real property located in Coral Gables, Florida.

28.     **LV Montana** is a Florida limited liability company formed in August 2022 with its principal place of business in Coral Gables, Florida. LV Montana is managed by LV Montana Sponsor. LV Montana is an affiliate of LV that Kapoor and others formed for the purpose of owning and developing real property located in Columbia Falls, Montana.

29.     **Stewart Grove 1** is a Florida limited liability company that was formed in March 2016 with its principal place of business in Coral Gables, Florida. Stewart Grove 1 is a wholly owned subsidiary of L. Holdings that Kapoor and others formed for the purpose of owning and developing real property located in Miami, Florida.

30.     **Stewart Grove 2** is a Florida limited liability company that was formed in March 2016 with its principal place of business in Coral Gables, Florida. Stewart Grove 2 is a wholly owned subsidiary of L. Holdings that Kapoor and others formed for the purpose of owning and developing real property located in Miami, Florida.

31.     **L. Zamora Parent** is a Florida limited liability company formed in April 2023 with its principal place of business in Coral Gables, Florida. L. Zamora Parent is a wholly owned subsidiary of L. Holdings that Kapoor and others formed for the purpose of owning and developing real property located in Miami, Florida.

32.     **URBIN Gables** is a Florida limited liability company formed in May 2018 with its principal place of business in Coral Gables, Florida. URBIN CG Sponsor is the manager of URBIN Gables. URBIN Gables is an affiliate of URBIN that Kapoor and others formed for the purpose of owning and developing real property located in Coral Gables, Florida.

33.     **URBIN Grove** is a Florida limited liability company formed in August 2018 with its principal place of business in Coral Gables, Florida. URBIN is the manager of URBIN Grove. URBIN Grove is an affiliate of URBIN that Kapoor and others formed for the purpose of owning and developing real property located in Miami, Florida.

34.     **URBIN Miami Beach** was a Florida limited liability company formed in October 2019 with its principal place of business in Coral Gables, Florida, which was converted to a Delaware limited liability company in July 2022. URBIN Miami Beach is managed by URBIN. URBIN Miami Beach is an affiliate of URBIN that Kapoor and others formed for the purpose of owning and developing real property located in Miami Beach, Florida.

35.     **URBIN Miami Beach II** is a Florida limited liability company formed in August 2022 with its principal place of business in Coral Gables, Florida. URBIN Miami Beach II is managed by URBIN. URBIN Miami Beach II is an affiliate of URBIN that Kapoor and others formed for the purpose of owning and developing real property located in Miami Beach, Florida. 515 Valencia, LV Montana, Stewart Grove 1, Stewart Grove 2, L. Zamora Parent, URBIN Gables, URBIN Grove, URBIN Miami Beach, and URBIN Miami Beach II, collectively, are referred to as the "Project Entities."

## III.  JURISDICTION AND VENUE

36.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and

22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)]; and Sections 21(d), 21(e),

and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa(a)].

37.     This Court has personal jurisdiction over the Defendants and venue is proper in the

Southern District of Florida because: (a) Kapoor resides in the District; (b) the principal place of

business of each of the Company Defendants is in the District; and (c) a substantial part of the

events or omissions giving rise to the violations of the Securities Act and the Exchange Act

occurred in the District.

38.     In connection with the conduct alleged in the Complaint, Defendants, directly and

indirectly, singly or in concert with others, made use of the means or instrumentalities of interstate

commerce, the means or instruments of transportation or communication in interstate commerce,

and of the mails.

## IV.  FACTUAL ALLEGATIONS

### A.     The Real Estate Investment Scheme

39.     LV is a real estate development and investment company that Kapoor and others

formed in January 2016 to develop new luxury single-family homes, multi-family redevelopment

projects, and boutique condominiums.

40.     In May 2018, Kapoor and others formed URBIN, an affiliate of LV, to develop

communal live/work properties in Miami Beach, Coral Gables, and Miami's Coconut Grove

neighborhood, with plans to expand into Fort Lauderdale and cities nationwide.

41.     LV and URBIN essentially are two distinct brands. LV fits squarely in South Florida's luxury real estate market, while URBIN targets young professionals desiring to live and work in city centers and urban neighborhoods.

42.     From approximately January 2018 until at least March 2023, Defendants offered investors passive real estate investments opportunities in LV, URBIN, and their respective portfolios of real estate projects.

43.     Prospective investors could invest at the "company level" by purchasing membership units in LV and/or URBIN, which earn revenue from fees they charge their real estate projects, including acquisition, development, management, marketing, and loan guarantor fees. In addition to earning fees, LV and URBIN own an interest in each of their projects, such that an investment in LV or URBIN is an indirect investment in their respective projects.

44.     Prospective investors also could invest at the "project level" by purchasing membership units directly in the companies created to own the projects,[5] which would pay investors upon the completion or sale of the projects, assuming they were profitable.

45.     LV owns 40% of URBIN, placing investors in LV at the top of a multi-level corporate structure with a percentage of the profits at each level flowing to the top, as shown in LV's organization chart on the following page.

---

[5] This includes, but is not limited to, the Project Entities.

*Figure 1 - Location Ventures' Organizational Chart*



46.     Kapoor used each of the Company Defendants in the scheme to defraud investors, including: the Operational Entities through which Kapoor operated the scheme and funneled investor funds; the Manager Entities through which Kapoor managed and controlled the companies and projects used in the scheme; and the Project Entities through which Kapoor raised money from investors, and misappropriated and misused investor funds.

47.     From at least January 2018 to March 2023, Defendants raised at least $93 million from more than 50 external investors.

48.     At all times material to the Complaint, Kapoor had the power to control the general affairs of the Company Defendants and had the requisite power to directly or indirectly control or influence the specific company policy which resulted in the Company Defendants' violations of

the anti-fraud provisions of the federal securities laws. Through the Manager Entities, Kapoor had control over the Company Defendants, their respective bank accounts and finances, and all key aspects of their business operations.

49.    The membership units Defendants sold to investors constitute investment contracts and are, therefore, securities under *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946). With respect to these investments, there was (a) an investment of money; (b) in a common enterprise; (c) based on the expectation of profits to be derived from the entrepreneurial or managerial efforts of others. *See SEC v. Friendly Power Co., LLC*, 49 F. Supp. 2d 1363, 1368 (S.D. Fla. 1999).

**B.    Defendants' Material Misrepresentations, Omissions, and Misuse of Investor Funds**

50.    Defendants solicited investors through in-person and virtual investor presentations, as well as by telephone, email, and through LV's website. Investors were provided with materials that typically included an offering memorandum with information regarding the projects, a sponsor resume with information regarding LV, as well as the operating agreements and *pro forma* budgets for their preferred investment. The operating agreements and budgets not only contained the terms upon which prospective investors agreed to invest but made a series of representations regarding capitalization, expenses, corporate governance, use of investor funds, among many others.

*(i)    Patriot United's $13 Million Cash Capital Contribution*

51.    To induce prospective investors to invest, Kapoor represented that he made an initial $13 million cash investment in LV through Patriots United, an entity owned by Kapoor, Kapoor's business partner, and two of Kapoor's family members.

52.    By contributing his own capital, Kapoor not only gained the confidence of prospective investors, many of whom are high-wealth individuals, but received a 47.917% membership interest in LV and, combined with the interest held by other insiders, effective control

over the company. LV then used the capital it raised, including Patriots United's purported $13 million, to purchase membership units in LV's projects and in URBIN.

53.     Despite Kapoor's representations to investors, Patriots United never contributed any cash to LV. Defendants attempted to conceal the $13 million deficit within a web of companies, subsidiaries, and affiliates that grew to at least 36 companies and 15 real estate projects at various stages of acquisition and development. See *Figure 1 – Location Ventures' Organizational Chart* on page 13.

<em><strong>(ii)      Pro Forma Budgets & Spending Controls</strong></em>

54.     Central to the scheme were the *pro forma* budgets Defendants provided to prospective investors, which estimated the costs to acquire, construct, manage, and sell the projects, as well as estimated investor returns.

55.     Kapoor intentionally understated construction and other estimated costs used in the *pro formas* to represent higher returns to prospective investors. When actual costs for the projects greatly exceeded those forecasted in the *pro formas*, Defendants withheld that and other information from investors, directed employees to revise or remove financial data from reports and meeting minutes, and, in some instances, continued to use the *pro formas* to raise additional capital. In the words of one LV company officer, "the budgets were a fiction."

56.     For example, certain LV board members instructed Kapoor not to use investor funds to engage in projects outside of Florida unless returns for those projects exceeded those of existing projects in South Florida. Kapoor used investor funds toward the acquisition of property in Colombia Falls, Montana, referred to herein as LV Montana. Kapoor directed the president of LV's Single Family Division to modify the estimated costs in the LV Montana's *pro forma* budget to ensure the estimated returns were as high as those in South Florida.

15

57.     As another example, LV's budget set limits to employee salaries. Kapoor's annual salary was capped at $350,000, which could increase to no more than $400,000 with board approval. In 2021, Kapoor paid himself $629,600 as compensation. In 2022, Kapoor paid himself $1,686,303 as compensation. The budget also capped LV's chief development officer's annual salary at $350,000, but she received $363,333 as compensation in 2020, $534,999 in 2021, and $743,333 in 2022. None of these payments was approved by LV's board.

58.     In addition to the budgets, the operating agreements Defendants provided to prospective investors included express controls on how investor funds could be used. For example, increases to LV's annual budget greater than 7.5% required board approval. Increases greater than 10% to URBIN Miami Beach's annual budget required approval by a majority of its members.

59.     Defendants, however, failed to seek board approval when LV's budgets for 2021 increased by 68%. And upon receiving updated cost estimates for the URBIN Miami Beach and 551 Bayshore projects exceeding 110% of their approved budgets, Kapoor caused construction to begin on those projects without obtaining member approval, despite knowing the costs were substantially greater than what investors relied upon when electing to invest.

### (iii)    *Commingling of Investor Funds*

60.     Defendants also represented to investors that LV, URBIN, and each of their projects were separate and distinct entities, with their own members, budgets, and corresponding capital, and that investor funds would be used solely for their intended project or projects. Defendants, however, regularly commingled investor funds among the various Company Defendants and other entities, with more than $60 million of intercompany transfers during the Relevant Period.

61.     For instance, LV received approximately $14.7 million from the URBIN entities, and the URBIN entities received $25.2 million from the LV entities, including a $14 million

transfer from LV to URBIN that was recorded internally as an intercompany loan (the "Intercompany Loan") without notice to, or approval from, LV's members or board of directors.

62.    Also, it was not uncommon for Kapoor to use investor funds from one project to pay for the expenses of another. For example, on January 3, 2022, URBIN Grove received $4.2 million from Investor 14,[6] and on January 4, 2022, $1 million from Investor 49. The balance in URBIN Grove's bank account prior to receiving these funds was $68,000. Between January 4, 2022, and January 6, 2022, URBIN Grove transferred $1,847,000 to URBIN, of which URBIN transferred $1.69 million to URBIN Gables, which URBIN Gables used to purchase the "Minorca Parking Lots." URBIN Gables recorded the purchase of the parking lots as a land asset on its balance sheet.

63.    Defendants' complete disregard for corporate formalities included the use of approximately $4.5 million of customer sales deposits—deposits made by customers toward the purchase of condominium units—for purposes other than the construction and development of that condominium project.

64.    For instance, on October 31, 2022, URBIN Grove received approximately $1.2 million in customer sales deposits from its escrow company.[7] A few days later, URBIN Grove transferred $1 million to URBIN, which URBIN used to pay down the Intercompany Loan.

65.    Customer sales deposits in URBIN Grove and URBIN Miami Beach were systematically transferred away from the projects and used for any number of purposes, including, but not limited to:

---

[6] The names of investors have been replaced with numbers to protect their identities. A key associating the assigned numbers with investors names will be provided to the Court *in camera* upon request.

[7] The combined balance in URBIN Grove's bank accounts prior to receiving these funds was $452,347.

        a.      $220,000 from URBIN Grove to Kapoor, personally, for purported "loan guarantor fees";

        b.      $556,000 from URBIN Miami Beach to a title company for an investment called "Pipeline Montana";

        c.      $300,000 from URBIN Miami Beach toward the "Minorca Parking Lots" purchase; and

        d.      $1 million from URBIN Miami Beach to L. Capital, after which L. Capital made a series of disbursements that were unrelated to URBIN Miami Beach.

### *(iv)* *Kapoor's Background and Experience*

66.    Kapoor also made material misrepresentations and omissions concerning his background and experience that made certain statements on LV's website and in offering materials either false or materially misleading.

67.    As of January 4, 2023,[8] LV's website included a biography page touting the experience and expertise of its officers, directors, and other key employees. Kapoor's biography stated, among other things, that "[t]o date, Rishi is responsible for leading the development of a $400M portfolio including high-end, custom single-family homes; rehabilitation of multi-family properties; development of boutique condominiums …."

68.    The size of Kapoor's portfolio increased from $400 million to $1 billion according to a 2020 version of LV's sponsor resume, similar to a brochure, that LV, Kapoor, and others regularly provided to prospective investors and that included information about LV, its projects and investment opportunities, and its team of professionals.

---

[8] Date of website capture of LV's website https://location.ventures/.

69.     Kapoor's portfolio increased again in the 2022 version[9] of the sponsor resume—this time to $4 billion.

70.     Kapoor's representation that he was responsible for leading the development of a $4 billion portfolio was false. Indeed, that he was responsible for a $1 billion portfolio is, if not false, materially misleading.

71.     In addition to inflating his portfolio, Kapoor's biography highlighted his business degrees in finance, management, and marketing, and described his day-to-day role as centering "around identifying unique opportunities, capital formation and setting the product vision for our projects while working closely with the development team on proper execution." Kapoor failed to disclose, however, that his previous marketing business incurred federal tax liens for failing to remit federal payroll taxes—a practice that continued at LV, where he failed to remit approximately $1.375 million in federal payroll taxes despite deducting those amounts from employee compensation.

## C.     Defendants' Misappropriation of Investor Funds

72.     Kapoor added to LV and URBIN's financial woes by misappropriating at least $6 million from the Company Defendants, at least $4.3 million of which went to Kapoor alone.

73.     As previously alleged, Kapoor's approved annual salary was $350,000. Kapoor paid himself $629,600 in 2021 and $1,686,303 in 2022, which collectively represented approximately $1.6 million in excess compensation. The source of these funds was derived largely from the sale of the project 800 Dixie Partners, LLC ("800 Dixie"). LV was an investor in 800 Dixie and was entitled to a distribution of any profits.[10] Rather than paying the proceeds from the

_____

[9] While dated for the year 2022, the Sponsor Resume was created in February 2023.
[10] All project level investors in 800 Dixie were paid upon the sale and received a return of capital and profit distribution.

sale to LV, on August 15, 2022, Kapoor took the entirety of the proceeds, along with additional funds belonging to LV, and paid himself $1,328,000.[11] LV recorded the payment to Kapoor in its books as compensation.

74.    Further, LV and URBIN were entitled to fees from the development of their respective projects. Rather than pay LV and URBIN, which would then determine whether distributions to their members were appropriate, in many instances Kapoor paid these fees directly to himself and others. Also, the amount of fees LV and URBIN charged the projects exceeded the amounts authorized in their respective operating agreements. In total, Kapoor paid himself and others close to $1 million in fees belonging to LV and URBIN.

75.    In addition to the above transactions, there were two significant transfers in 2021. L. Capital is a wholly owned subsidiary of LV that was used by Kapoor and others to raise capital. L. Capital's bank accounts were used to hold investor capital as well as in the operation of the business. On August 3, 2021, Kapoor transferred $1.5 million from L. Capital's bank account directly to his personal bank account for no apparent legitimate purpose. Also in 2021, Kapoor and his partner, through Patriots United, received a distribution in the amount of $1,247,931 in connection with the sale of the Leucadendra Drive project. Patriots United received this distribution despite never having made its initial $13 million cash capital contribution.

76.    During the same period as these transfers, Kapoor purchased a new 2023 68.7-foot Princess Y72 yacht for over $5 million, a dock at the Cocoplum Yacht Club for $695,000, leased a 2020 600LT Spider McLaren sportscar, and paid a private chef $10,000 per month.

---

[11] Kapoor represented to investors that the sale of 800 Dixie resulted in a profit. Based on accounting records, however, the sale of 800 Dixie resulted in a net loss to LV of approximately $411,087.

### D.      Defendants Buy Out Major Investor

77.      Sometime in 2022, a major investor in LV and three of its projects, referred to herein as "Investor 20," became concerned regarding the management of LV and its projects, including Kapoor's misappropriation and misuse of investor funds, and demanded Defendants buy out the entirety of its interest. In December 2022, Defendants paid Investor 20[12] $3 million to purchase its interest in the LV project Redlands Phase 1, LLC ("Redlands"). The source of these funds was a combination of Investor 30's capital contribution in LV and funds belonging to the URBIN Grove project and its members.

78.      Shortly after the Redlands buyout, Investor 20, LV, and Kapoor, along with certain other related parties, entered into a Global Interest Purchase Agreement (the "Buyout Agreement"), dated December 31, 2022. The Buyout Agreement required LV to purchase Investor 20's interest in LV and the two remaining projects for approximately $41 million, to be paid in installments over a five-month period. The first installment required a payment of $2 million and was due on January 13, 2023. To meet this installment payment, Defendants received $2.5 million from Investor 46 on January 13, 2023, and immediately transferred $2 million of those funds to Investor 20.

79.      Defendants made the following payments under the Buyout Agreement:

     a.   January 13, 2023, payment of $2 million;

     b.   January 31, 2023, payment of $2,378,630;

     c.   February 15, 2023, payment of $2.5 million;

     d.   February 28, 2023, payment of $2.5 million; and

---

[12] The payment was made to Investor 80, which is owned by or related to Investor 20.

e.  March 13, 2023, payment of $5 million.

80.  In addition to the above-scheduled payments, Defendants paid Investor 20 a $500,000 extension fee, and a partial payment in the amount of $1.5 million under the Buyout Agreement for a total of $16,378,630. Together with Defendants' payment to Investor 20 related to the Redlands project, the total amount paid to Investor 20 and its related entities was $19,378,630.

81.  After making these payments to Investor 20 under the Buyout Agreement, LV's funds were exhausted.

82.  On or around July 14, 2023, the members of LV entered into a resolution by written consent that removed Kapoor as manager of LV. According to the resolution, the members determined that:



83.  In or around August 2023, Kapoor resigned as manager of URBIN.

84.  Without sufficient cash, LV's and URBIN's projects have stalled, been abandoned, or are the subject of litigation.

85.  On August 30, 2023, LV's members formally replaced Kapoor as manager of LV with a retired judge, with instructions to wind down and sell substantially all the assets of LV and its projects.

86.     LV's former chief development officer replaced Kapoor as the manager of URBIN.

URBIN has not been included as part of LV's liquidation plan.

## V.   **CLAIMS FOR RELIEF**

### COUNT I

#### Violations of Section 17(a)(1) of the Securities Act
#### (Against All Defendants)

87.     The Commission repeats and realleges Paragraphs 1 through 86 of this Complaint.

88.     From approximately January 2018 until at least March 2023, Defendants, in the offer or sale of securities by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, knowingly or recklessly employed devices, schemes or artifices to defraud.

89.     By reason of the foregoing, Defendants, directly or indirectly, have violated and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

### COUNT II

#### Violations of Section 17(a)(2) of the Securities Act
#### (Against Kapoor, LV, and URBIN)

90.     The Commission repeats and realleges Paragraphs 1 through 86 of this Complaint.

91.     From approximately January 2018 until at least March 2023, Kapoor, LV, and URBIN, in the offer or sale of securities by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently obtained money or property by means of untrue statements of material facts or omissions to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

92. By reason of the foregoing, Kapoor, LV, and URBIN, directly and indirectly, have violated and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## COUNT III

### Violations of Section 17(a)(3) of the Securities Act
### (Against All Defendants)

93. The Commission repeats and realleges Paragraphs 1 through 86 of this Complaint.

94. From approximately January 2018 until at least March 2023, the Defendants, in the offer or sale of securities by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently engaged in transactions, practices and courses of business which have operated, are now operating or will operate as a fraud or deceit upon the purchasers.

95. By reason of the foregoing, the Defendants, directly and indirectly, have violated and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

## COUNT IV

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a)
### (Against All Defendants)

96. The Commission repeats and realleges Paragraphs 1 through 86 of this Complaint.

97. From approximately January 2018 until at least March 2023, the Defendants, directly or indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, knowingly or recklessly employed devices, schemes or artifices to defraud in connection with the purchase or sale of securities.

24

98.     By reason of the foregoing, the Defendants, directly and indirectly, have violated and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) [17 C.F.R. § 240.10b-5(a)] thereunder.

## COUNT V

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)
### (Against Kapoor, LV, and URBIN)

99.     The Commission repeats and realleges Paragraphs 1 through 86 of this Complaint.

100.    From approximately January 2018 until at least March 2023, Kapoor, LV, and URBIN, directly or indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

101.    By reason of the foregoing, Kapoor, LV, and URBIN, directly and indirectly, violated and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder.

## COUNT VI

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(c)
### (Against All Defendants)

102.    The Commission repeats and realleges Paragraphs 1 through 86 of this Complaint.

103.    From approximately January 2018 until at least March 2023, the Defendants, directly or indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly engaged in acts, practices and courses of business which have operated, are now operating, and will operate as a fraud upon the purchasers of such securities.

104.     By reason of the foregoing, the Defendants, directly and indirectly, violated and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(c) [17 C.F.R. § 240.10b-5(c)] thereunder.

## COUNT VII

### Violations of Section 20(a) of the Exchange Act—Control Person Liability
### (Against Kapoor)

105.     The Commission repeats and realleges Paragraphs 1 through 86 and Paragraphs 96 through 104 of this Complaint.

106.     From at least January 2016 through August 2023, Kapoor was, directly or indirectly, a control person of LV, URBIN, and/or each of the Company Defendants for purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

107.     From approximately January 2018 through March 2023, LV and URBIN violated Section 10(b) and Rule 10b-5 of the Exchange Act.

108.     As a control person of LV and URBIN, Kapoor is jointly and severally liable with and to the same extent as LV and URBIN for each of their respective violations of Section 10(b) and Rule 10b-5 of the Exchange Act.

109.     From approximately January 2018 through March 2023, the Company Defendants violated Section 10(b) and Rule 10b-5(a) and (c) of the Exchange Act.

110.     As a control person of each of the Company Defendants, Kapoor is jointly and severally liable with and to the same extent as the Company Defendants for each of their respective violations of Section 10(b) and Rule 10b-5(a) and (c) of the Exchange Act.

111.     By reason of the foregoing, Kapoor has violated and, unless enjoined, is reasonably likely to continue to violate Sections 10(b) and 20(a), and Rule 10b-5 of the Exchange Act [15 U.S.C. § 78j(b) and § 78t(a), and 17 C.F.R. § 240.10b-5].

## VI.  RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests the Court find the Defendants committed the violations alleged, and:

### A.  Permanent Injunction

Issue Permanent Injunctions enjoining LV, URBIN, and Kapoor, and their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them and each of them, from violating Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)], and Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)]; and Kapoor and the Company Defendants, and their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them and each of them, from violating Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)], and Section 10(b) of the Exchange Act and Exchange Act Rules 10b-5(a) and (c) [17 C.F.R. § 240.10b-5(a) and (c)]; and further enjoining Kapoor from violating Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

### B.  Disgorgement and Prejudgment Interest

Issue an order directing Kapoor, LV, URBIN, Patriots United, L. Capital, L. Development, L. Properties, L. Ventures, 515 Valencia, LV Montana, Stewart Grove 1, Stewart Grove 2, Zamora Parent, URBIN Grove, URBIN Gables, URBIN Miami Beach, URBIN Miami Beach II, and their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, to disgorge all ill-gotten gains received within the applicable statute of limitations, including prejudgment interest, resulting from the acts or courses of conduct alleged in this Complaint.

### C.  **Asset Freeze and Sworn Accountings**

Issue an order freezing the assets of the Defendants and requiring Defendants to file sworn accountings with the Court.

### D.  **Appointment of a Receiver**

Appoint a receiver over the Company Defendants.

### E.  **Records Preservation**

Issue an Order requiring all Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, to preserve any records related to the subject matter of this lawsuit that are in their possession, custody, or subject to their control.

### F.  **Civil Monetary Penalties**

Issue an Order directing Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

### G.  **Officer and Director Bar Against Kapoor**

Issue an Order pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], permanently prohibiting Kapoor from acting as an officer or director of any issuer whose securities are registered with the Commission pursuant to Section 12 of the Exchange Act or which is required to file reports with the Commission pursuant to Section 15(d) of the Exchange Act.

### H.  **Further Relief**

Grant such other and further relief as may be necessary and appropriate.

## I. **Retention of Jurisdiction**

Further, the Commission respectfully requests the Court retain jurisdiction over this action and over Defendants in order to implement and carry out the terms of all orders that may hereby be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

## VII. **DEMAND FOR JURY TRIAL**

The Commission hereby demands a trial by jury on any and all issues in this action so triable.

Dated:  December 27, 2023          Respectfully submitted,


By: _____
Russell R. O'Brien
Trial Counsel
Fla. Bar No.  084542
Direct Dial: (305) 982-6341
Email:  obrienru@sec.gov
*Lead Attorney*
*Attorney To Be Noticed*

John T. Houchin, Esq.
Senior Counsel
Florida Bar No. 118966
Direct Dial:  (305) 416-6292
Email:  houchinj@sec.gov

Jordan A. Cortez, Esq.
Senior Counsel
Special Bar No. A5502524
Direct Dial:  (305) 982-6355
Email: cortezjo@sec.gov

**ATTORNEYS FOR PLAINTIFF**
**SECURITIES AND EXCHANGE**
**COMMISSION**
801 Brickell Avenue, Suite 1950
Miami, FL 33131

Telephone:  (305) 982-6300
Facsimile:  (305) 536-4154

# EXHIBIT B



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO.:

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.



RISHI KAPOOR;
LOCATION VENTURES, LLC;
URBIN, LLC;
PATRIOTS UNITED, LLC;
LOCATION PROPERTIES, LLC;
LOCATION DEVELOPMENT, LLC;
LOCATION CAPITAL, LLC;
LOCATION VENTURES RESOURCES, LLC;
LOCATION EQUITY HOLDINGS, LLC;
LOCATION GP SPONSOR, LLC;
515 VALENCIA SPONSOR, LLC;
LV MONTANA SPONSOR, LLC;
URBIN FOUNDERS GROUP, LLC;
URBIN CG SPONSOR, LLC;
515 VALENCIA PARTNERS, LLC;
LV MONTANA PHASE I, LLC;
STEWART GROVE 1, LLC;
STEWART GROVE 2, LLC;
LOCATION ZAMORA PARENT, LLC;
URBIN CORAL GABLES PARTNERS, LLC;
URBIN COCONUT GROVE PARTNERS, LLC;
URBIN MIAMI BEACH PARTNERS, LLC; and
URBIN MIAMI BEACH JJ PHASE 1, LLC,

Defendants.

_____/

**SECURITIES AND EXCHANGE COMMISSION'S EMERGENCY**
***EX PARTE* MOTION FOR ASSET FREEZE AND OTHER**
**RELIEF AGAINST DEFENDANT RISHI KAPOOR**
**AND MEMORANDUM OF LAW**

1

## I.     INTRODUCTION

Plaintiff Securities and Exchange Commission ("Commission") files this emergency motion for an asset freeze and other relief (the "Motion") against Defendant Rishi Kapoor ("Kapoor") to ensure that a disgorgement award can be satisfied and to prevent further dissipation of investor funds. As alleged in the Complaint, from approximately January 2018 through March 2023 (the "Relevant Period"), Kapoor—through Location Ventures, LLC ("LV"), URBIN, LLC ("URBIN"), and their subsidiaries and affiliated entities[1] (collectively, "Defendants")—raised approximately $93 million from more than 50 investors purportedly to invest in residential and mixed-use real estate projects in South Florida. To induce investors, Kapoor represented that he and his partner made a $13 million cash investment in LV through Patriots United, LLC ("Patriots United), a company owned by Kapoor, his partner, and members of Kapoor's family. At no point during the Relevant Period, however, did Patriots United contribute any cash to LV.

Kapoor's false claims about his investment was just one in a series of material misrepresentations and omissions Defendants made to investors. For instance, as part of the offering materials provided to prospective investors, Defendants included *pro forma* budgets that projected costs for each of the projects. Kapoor intentionally understated construction and other

---

[1] Patriots United; Location Properties, LLC ("L. Properties"); Location Development, LLC ("L. Development"); Location Capital, LLC ("L. Capital"); Location Ventures Resources, LLC ("L. Resources"); Location Equity Holdings, LLC ("L. Holdings"); Location GP Sponsor, LLC ("L. GP Sponsor"); 515 Valencia Sponsor, LLC ("515 Valencia Sponsor"); LV Montana Sponsor, LLC ("LV Montana Sponsor"); URBIN Founders Group, LLC ("URBIN Founders"); URBIN CG Sponsor, LLC ("URBIN CG Sponsor"); 515 Valencia Partners, LLC ("515 Valencia"); LV Montana Phase I, LLC ("LV Montana"); Stewart Grove 1, LLC ("Stewart Grove 1"); Stewart Grove 2, LLC ("Stewart Grove 2"); Location Zamora Parent, LLC ("L. Zamora Parent"); URBIN Coral Gables Partners, LLC ("URBIN Gables"); URBIN Coconut Grove Partners, LLC ("URBIN Grove"); URBIN Miami Beach Partners, LLC ("URBIN Miami Beach"); and URBIN Miami Beach II Phase 1, LLC ("URBIN Miami Beach II") (together with LV and URBIN, the "Company Defendants").

estimated costs used in the *pro formas* to represent higher returns to prospective investors. When actual costs for the projects greatly exceeded those forecasted in the *pro formas*, Kapoor withheld that and other information from investors, directed employees to revise or remove financial data from reports and meeting minutes, and, in some instances, continued to use the *pro formas* to raise additional capital.

In addition, Defendants represented to investors that LV, URBIN, and each of the projects were separate and distinct investments, possessing their own members, designated capital, and corporate identities. Defendants, however, regularly ignored corporate formalities and commingled investor funds. More than $60 million in intercompany transfers occurred during the Relevant Period, which included a $14 million transfer from LV to URBIN recorded internally as an intercompany loan.

As Defendants shuffled investor funds among the various companies and accounts, Kapoor and other insiders misappropriated at least $6 million of investor funds—$4.3 million of which Kapoor misappropriated for himself. During the same period, Kapoor purchased a 2023 68-foot yacht for over $5 million, a dock at the Cocoplum Yacht Club for $695,000, leased a 2020 600LT Spider McLaren sportscar, and paid a private chef $10,000 per month.

Through their fraudulent conduct, Kapoor, LV, and URBIN violated Section 17(a)(2) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)(2)], and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Exchange Act Rule 10b-5(b) [7 C.F.R. § 240.10b-5(b)]. Kapoor and the Company Defendants violated Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)], and Section 10(b) of the Exchange Act and Exchange Act Rules 10b-5(a) and (c) [17 C.F.R. § 240.10b-5(a) and (c)]. Kapoor also, directly and indirectly, violated Exchange Act Section 10(b) and Rule 10b-5 thereunder as a

3

control person of the Company Defendants under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

Kapoor misappropriated at least \$4.3 million from investors for his own benefit. To prevent him from dissipating or moving what is remaining of those funds and potentially other assets out of the Court's reach, the Commission seeks an asset freeze and other emergency relief against Kapoor.

## II.    DEFENDANTS

1.    Kapoor is a resident of Coral Gables, Florida. Kapoor is the founder of LV.[2] From January 2016 until a majority of LV's members removed him in July 2023,[3] Kapoor served as the CEO and manager of LV.[4] From May 2018 until he resigned in August 2023, Kapoor was the Managing Partner[5] and manager of URBIN through URBIN Founders.[6] Kapoor owns a 47.917% membership interest in LV through Patriots United and a 7.14% membership interest in URBIN through Kapoor Capital, LLC ("Kapoor Capital").[7] Kapoor has business degrees in finance, marketing, and management, and a law degree but has never been a licensed attorney.[8] During the Relevant Period, Kapoor claimed to be responsible for leading the development of a \$4 billion real estate portfolio.[9] At all times material to the Complaint, Kapoor managed and controlled the Company Defendants.[10]

---

[2] Index of Investigatory Evidence ("**Exhibit 1**") (Ex. W at p. 33).

[3] *Id.* (Ex. EE); Declaration of Clifford Losh ("**Exhibit 2**") ¶ 14.

[4] **Ex. 1** (Ex. W at p. 33).

[5] *Id.*

[6] **Ex. 2** ¶ 3.

[7] **Ex. 1** (Exs. GG, HH).

[8] *Id.* (Ex. W at p. 33).

[9] Declaration of Marguerite Cook ("**Exhibit 3**") ¶ 6(j).

[10] **Ex. 1** (Exs. GG - ZZ); **Ex. 3** ¶ 5; Declaration of Greg Brooks ("**Exhibit 4**") ¶¶ 3, 5.

2.     LV is a Florida limited liability company formed in January 2016 with its principal place of business in Coral Gables, Florida.[11] Kapoor and others formed LV for the purpose of investing in and developing real estate.[12] LV is owned by certain investors in LV and Patriots United, a Florida limited liability company partly owned and controlled by Kapoor.[13]

3.     URBIN is a Florida limited liability company formed in May 2018 with its principal place of business in Coral Gables, Florida.[14] LV owns approximately 40% of URBIN.[15] Kapoor managed and controlled URBIN through LV and URBIN Founders[16] until he resigned in August 2023 and was replaced by LV's chief development officer.[17] URBIN is an affiliate of LV that Kapoor and others formed for the purpose of investing in and developing real estate.[18]

4.     Patriots United is a Florida limited liability company formed in September 2017 with its principal place of business in Coral Gables, Florida.[19] Patriots United is partly owned and controlled by Kapoor.[20] Patriots United owns a 47.917% membership interest in LV[21] based on a purported $13 million cash capital contribution by Kapoor, his partner, and two members of Kapoor's family.[22] As detailed in the Complaint, Patriots United never made a cash capital contribution to LV.[23]

---

[11] **Ex. 1** (Ex. A).
[12] Declaration of Melissa Davis ("**Exhibit 5**") (App. 1 at Article 2.1).
[13] *Id*. at App. 1 at bate number LV00010565.
[14] **Ex. 1** (Ex. B).
[15] **Ex. 5** ¶ 30.
[16] *Id*.
[17] **Ex. 2** ¶ 14.
[18] **Ex. 5** (App. 10 at Article 2.1).
[19] **Ex. 1** (Ex. C).
[20] **Ex. 5** p. 8, *Figure 1* – Ownership Structure of LV.
[21] *Id*.
[22] *Id*. at ¶ 33.¶
[23] *Id*. at ¶ 52.

5.       L. Properties is a Florida limited liability company formed in January 2016 with its principal place of business in Coral Gables, Florida.[24] L. Properties is a wholly owned subsidiary of LV through which LV operates.[25] L. Properties is described on LV's website as a full-service real estate sales and marketing team.[26]

6.       L. Development is a Florida limited liability company formed in February 2016 with its principal place of business in Coral Gables, Florida.[27] L. Development is a wholly owned subsidiary of LV through which LV operates.[28] L. Development is described on LV's website as a company focused on developing architecturally significant living experiences in key markets in South Florida.[29]

7.       L. Capital is a Florida limited liability company formed in January 2016 with its principal place of business in Coral Gables, Florida.[30] L. Capital is a wholly owned subsidiary of LV through which LV operates.[31] LV's website describes L. Capital as a private real estate investment and asset management division that raises capital to invest in premium locations and premier developers.[32]

8.       L. Resources is a Florida limited liability company formed in September 2019 with its principal place of business in Coral Gables, Florida.[33] L. Resources is a wholly owned

---

[24] **Ex. 1** (Ex. D).
[25] **Ex. 5** ¶ 27(b).
[26] **Ex. 1** (Ex. W at p. 1).
[27] *Id*. at Ex. E.
[28] **Ex. 5** ¶ 27(c).
[29] **Ex. 1** (Ex. W at p. 1).
[30] *Id*. at Ex. F.
[31] **Ex. 5** ¶ 27(a).
[32] **Ex. 1** (Ex. W at p. 1).
[33] *Id*. at Ex. G.

subsidiary of LV through which LV operates and purportedly provides human resource services to LV.[34]

9.  L. Holdings is a Florida limited liability company formed in April 2020 with its principal place of business in Coral Gables, Florida.[35] L. Holdings is a wholly owned subsidiary of LV through which LV operates and purportedly holds LV's projects.[36] L. Properties, L. Development, L. Capital, L. Resources, and L. Holdings, collectively, shall be referred to as the "Operational Entities."

10.  L. GP Sponsor is a Florida limited liability company formed in February 2020 with its principal place of business in Coral Gables, Florida.[37] L. GP Sponsor is a wholly owned subsidiary of LV through which LV owns the sponsor entities formed to own an interest in and manage LV's projects.[38]

11.  515 Valencia Sponsor is a Florida limited liability company formed in February 2018 with its principal place of business in Coral Gables, Florida.[39] 515 Valencia Sponsor is a wholly owned subsidiary of L. GP Sponsor.[40] 515 Valencia Sponsor is the manager of the 515 Valencia project.[41]

12.  LV Montana Sponsor is a Florida limited liability company formed in August 2022 with its principal place of business in Coral Gables, Florida.[42] LV Montana Sponsor is a wholly

---

[34] **Ex. 5** ¶ 27(d).
[35] **Ex. 1** (Ex. H).
[36] *Id*. at Ex. FF at bate number LV00010749.
[37] *Id*. at I.
[38] *Id*. at Ex. FF at bate number LV00010749.
[39] *Id*. at Ex. J.
[40] *Id*. at Ex. OO; **Ex. 5** (App. 1 at bate number LV00010572).
[41] **Ex. 5** (App. 4 at Article 7.1).
[42] **Ex. 1** (Ex. K).

owned subsidiary of L. GP Sponsor.[43] LV Montana Sponsor is the manager of the LV Montana project.[44]

13.     URBIN Founders is a Florida limited liability company formed in May 2018 with its principal place of business in Coral Gables, Florida.[45] URBIN Founders is an affiliate of LV and the manager of URBIN.[46]

14.     URBIN CG Sponsor is a Florida limited liability company formed in May 2018 with its principal place of business in Coral Gables, Florida.[47] URBIN CG Sponsor is an affiliate of URBIN and the manager of the URBIN Gables project.[48] L. GP Sponsor, 515 Valencia Sponsor, LV Montana Sponsor, URBIN Founders, and URBIN CG Sponsor, collectively, are referred to as the "Manager Entities."

15.     515 Valencia is a Florida limited liability company formed in February 2018 with its principal place of business in Miami, Florida.[49] 515 Valencia is managed by 515 Valencia Sponsor.[50] 515 Valencia is an affiliate of LV that Kapoor and others formed for the purpose of owning and developing real property located in Coral Gables, Florida.[51]

16.     LV Montana is a Florida limited liability company formed in August 2022 with its principal place of business in Coral Gables, Florida.[52] LV Montana is managed by LV Montana

---

[43] *Id*. at Ex. FF at bate number LV00010749.
[44] *Id*. at Ex. RR at Article 1.47 and 1.72).
[45] *Id*. at Ex. L.
[46] **Ex. 5** (App. 10 at Article 7.1).
[47] **Ex. 1** (Ex. M).
[48] **Ex. 5** (App. 16 at Article 7.1).
[49] **Ex. 1** (Ex. N).
[50] **Ex. 5** (App. 4 at Article 7.1).
[51] *Id*. at Article 2.
[52] **Ex. 1** (Ex. O).

8

Sponsor.[53] LV Montana is an affiliate of LV that Kapoor and others formed for the purpose of owning and developing real property located in Columbia Falls, Montana.[54]

17.     Stewart Grove 1 is a Florida limited liability company that was formed in March 2016 with its principal place of business in Coral Gables, Florida.[55] Stewart Grove 1 is a wholly owned subsidiary of L. Holdings that Kapoor and others formed for the purpose of owning and developing real property located in Miami, Florida.[56]

18.     Stewart Grove 2 is a Florida limited liability company that was formed in March 2016 with its principal place of business in Coral Gables, Florida.[57] Stewart Grove 2 is a wholly owned subsidiary of L. Holdings that Kapoor and others formed for the purpose of owning and developing real property located in Miami, Florida.[58]

19.     L. Zamora Parent is a Florida limited liability company formed in April 2023 with its principal place of business in Coral Gables, Florida.[59] L. Zamora Parent is a wholly owned subsidiary of L. Holdings that Kapoor and others formed for the purpose of owning and developing real property located in Miami, Florida.

20.     URBIN Gables is a Florida limited liability company formed in May 2018 with its principal place of business in Coral Gables, Florida.[60] URBIN CG Sponsor is the manager of

---

[53] *Id*. at Ex. RR at Article 7.1.

[54] *Id*. at Ex. RR at Article 2.

[55] *Id*. at Ex. P.

[56] *Id*. at Ex. SS at Articles 7.1 and 2.

[57] *Id*. at Ex. Q.

[58] *Id*. at Ex. TT at Articles 7.1 and 2.

[59] *Id*. at Ex. R.

[60] *Id*. at Ex. S.

URBIN Gables.[61] URBIN Gables is an affiliate of URBIN that Kapoor and others formed for the purpose of owning and developing real property located in Coral Gables, Florida.[62]

21.     URBIN Grove is a Florida limited liability company formed in August 2018 with its principal place of business in Coral Gables, Florida.[63] URBIN is the manager of URBIN Grove.[64] URBIN Grove is an affiliate of URBIN that Kapoor and others formed for the purpose of owning and developing real property located in Miami, Florida.[65]

22.     URBIN Miami Beach was a Florida limited liability company formed in October 2019 with its principal place of business in Coral Gables, Florida, which was converted to a Delaware limited liability company in July 2022.[66] URBIN Miami Beach is managed by URBIN.[67] URBIN Miami Beach is an affiliate of URBIN that Kapoor and others formed for the purpose of owning and developing real property located in Miami Beach, Florida.[68]

23.     URBIN Miami Beach II is a Florida limited liability company formed in August 2022 with its principal place of business in Coral Gables, Florida.[69] URBIN Miami Beach II is managed by URBIN.[70] URBIN Miami Beach II is an affiliate of URBIN that Kapoor and others formed for the purpose of owning and developing real property located in Miami Beach, Florida.[71] 515 Valencia, LV Montana, Stewart Grove 1, Stewart Grove 2, L. Zamora Parent, URBIN Gables,

---

[61] **Ex. 5** (App. 16 at Article 7.1).
[62] *Id*. at Article 2.
[63] **Ex. 1** at Ex. T.
[64] **Ex. 5** (App. 12 at Article 7.1).
[65] *Id*. at Article 2.
[66] **Ex. 1** at Ex. U.
[67] **Ex. 5** (App. 14 at Article 7.1).
[68] *Id*. at Article 2.
[69] **Ex. 1** Ex. V.
[70] *Id*. at Ex. V at Article 7.1.
[71] *Id*. at Ex. V Article 2.

URBIN Grove, URBIN Miami Beach, and URBIN Miami Beach II, collectively, are referred to as the "Project Entities."

## III.  JURISDICTION AND VENUE

24.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§77t(b), 77t(d), and 77v(a)]; and Sections 21(d), 21(e), and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa(a)].

25.     This Court has personal jurisdiction over the Defendants and venue is proper in the Southern District of Florida because: (a) Kapoor resides in the District; (b) the principal place of business of each of the Company Defendants is in the District; and (c) a substantial part of the events or omissions giving rise to the violations of the Securities Act and the Exchange Act occurred in the District.

## IV.  FACTUAL ALLEGATIONS

### A.  The Real Estate Investment Scheme

26.     LV is a real estate development and investment company that Kapoor and others formed in January 2016 to develop new luxury single-family homes, multi-family redevelopment projects, and boutique condominiums.[72]

27.     In May 2018, Kapoor and others formed URBIN, an affiliate of LV, to develop communal live/work properties in Miami Beach, Coral Gables, and Miami's Coconut Grove neighborhood, with plans to expand into Fort Lauderdale and cities nationwide.[73]

---

[72] **Ex. 1** (Ex. W at p. 3).
[73] *Id*. at Ex. W at p. 9.

28.     LV and URBIN essentially are two distinct brands.[74] LV fits squarely in South Florida's luxury real estate market, while URBIN targets young professionals desiring to live and work in city centers and urban neighborhoods.[75]

29.     From approximately January 2018 until at least March 2023, Defendants offered investors passive real estate investment opportunities in LV, URBIN, and their respective portfolios of real estate projects.[76]

30.     Prospective investors could invest at the "company level" by purchasing membership units in LV and/or URBIN, which earn revenue from fees they charge their real estate projects, including acquisition, development, management, marketing, and loan guarantor fees.[77] In addition to earning fees, LV and URBIN own an interest in each of their projects, such that an investment in LV or URBIN is an indirect investment in their respective projects.[78]

31.     Prospective investors also could invest at the "project level" by purchasing membership units directly in the companies created to own the projects, which would pay investors upon the completion or sale of the projects, assuming they were profitable.[79]

32.     LV owns 40% of URBIN, placing investors in LV at the top of a multi-level corporate structure with a percentage of the profits at each level flowing to the top.[80]

---

[74] *Id*. at Ex. W, *generally*.
[75] *Id*.
[76] **Ex. 1** (Ex. X at page/line 107;6-13); **Ex. 4** ¶ 6.
[77] **Ex. 4** ¶¶ 5-6
[78] *Id*.
[79] *Id*.
[80] **Ex. 1** (Ex. X at page/line 171:19 – 173:6); **Ex. 5** (App. 10 at bate number LV00010882).

**Figure 1 - Location Ventures' Organizational Chart**



33.     Kapoor used each of the Company Defendants in the scheme to defraud investors,

including: the Operational Entities through which Kapoor operated the scheme and funneled

investor funds; the Manager Entities through which Kapoor managed and controlled the companies

and projects used in the scheme; and the Project Entities through which Kapoor raised money from

investors, and misappropriated and misused investor funds.[81]

34.     At all times material to the Complaint, Kapoor had the power to control the general

affairs of the Company Defendants and had the requisite power to directly or indirectly control or

influence the specific company policy which resulted in the Company Defendants' violations of

the anti-fraud provisions of the federal securities laws.[82] Through the Manager Entities, Kapoor

---

[81] **Ex. 1** (Exs. GG - ZZ); **Ex. 3** ¶ 5; **Ex. 5**, generally.
[82] *Id.*

13

had control over the Company Defendants, their respective bank accounts and finances, and all key aspects of their business operations.[83] From approximately January 2018 to July 2023, Defendants raised at least $93 million from more than 50 external investors.[84]

**B.    Defendants' Material Misrepresentations, Omissions, and Misuse of Investor Funds**

35.    Defendants solicited investors through in-person and virtual investor presentations, as well as by telephone, email, and through LV's website.[85] Investors were provided with materials that typically included an offering memorandum with information regarding the projects, a sponsor resume with information regarding LV, as well as the operating agreements and *pro forma* budgets for their preferred investment.[86] The operating agreements and budgets not only contain the terms upon which prospective investors agreed to invest but made a series of representations regarding capitalization, expenses, corporate governance, use of investor funds, among many others.[87]

*(i)    Patriot United's $13 Million Cash Capital Contribution*

36.    To induce prospective investors to invest, Kapoor represented to investors that made an initial $13 million cash investment in LV through Patriots United, an entity owned by Kapoor, Kapoor's business partner, and two of Kapoor's family members.[88]

37.    By contributing his own capital, Kapoor not only gained the confidence of prospective investors, many of whom are high-wealth individuals, but received a 47.917% membership interest in LV and, combined with the interest held by other insiders, effective control

---

[83] *Id.*
[84] **Ex. 4** ¶ 7; **Ex. 5** ¶¶ 32-45.
[85] **Ex. 1** (Ex. W at p. 3; Ex. X at page/line 44:24 – 45:25, 58:8 – 59:22); **Ex. 2** at ¶ 10; **Ex. 6** ¶¶ 5-7.
[86] **Ex. 4** ¶ 6; **Ex. 6** ¶ 6.
[87] **Ex. 1** (Exs. GG - ZZ; Ex. X at page/line 193:3-10); **Ex. 2** ¶¶ 5-6; **Ex. 3** ¶ 6(c); **Ex. 5** (Apps. 1-2, 4, 6, 8, 10, 12, 14, 16); **Ex. 6** ¶¶ 6-7.
[88] **Ex. 4** ¶ 7(A); **Ex. 5** (App. 1 at bate number LV-00010565).

over the company.[89] LV then used the capital it raised, including Patriots United's purported $13 million, to purchase membership units in LV's projects and in URBIN.[90]

38.     Despite Kapoor's representations to investors, Patriots United never contributed any cash to LV.[91] Defendants attempted to conceal the $13 million deficit within a web of companies, subsidiaries, and affiliates that grew to at least 36 companies and 15 real estate projects at various stages of acquisition and development.[92] See *Figure 1 – Location Ventures' Organizational Chart* on page 13.

***(ii)     Pro Forma Budgets & Spending Controls***

39.     Central to the scheme were the *pro forma* budgets Defendants provided to prospective investors, which estimated the costs to acquire, construct, manage, and sell the projects, as well as estimated investor returns.[93]

40.     Kapoor intentionally understated construction and other estimated costs used in the *pro formas* to represent higher returns to prospective investors.[94] When actual costs for the projects greatly exceeded those forecasted in the *pro formas*, Defendants withheld that and other information from investors, directed employees to revise or remove financial data from reports and meeting minutes, and, in some instances, continued to use the *pro formas* to raise additional capital.[95] In the words of one LV company officer, "the budgets were a fiction."[96]

---

[89] **Ex. 1** (Ex. X at page/line 99:5-14); **Ex. 5** ¶¶ 25-26.
[90] **Ex. 1** (Exs. GG - ZZ); **Ex. 5** (Apps. 1-2, 4, 6, 8, 10, 12, 14, 16).
[91] **Ex. 4** ¶ 7(A); **Ex. 5** ¶¶ 46-62.
[92] **Ex. 1** (Ex. FF at bate number LV00011015).
[93] **Ex. 6** ¶ 6.
[94] **Ex. 3** ¶ 6(c).
[95] *Id.*
[96] *Id.*

41.     For example, certain LV board members instructed Kapoor not to use investor funds to engage in projects outside of Florida unless returns for those projects exceeded those of existing projects in South Florida.[97] Kapoor used investor funds toward the acquisition of property in Colombia Falls, Montana, referred to herein as LV Montana.[98] Kapoor directed the president of LV's Single Family Division to modify the estimated costs in the LV Montana's *pro forma* budget to ensure the estimated returns were as high as those in South Florida.[99]

42.     As another example, LV's budget set limits to employee salaries.[100] Kapoor's annual salary was capped at $350,000, which could increase to no more than $400,000 with board approval.[101] In 2021, Kapoor paid himself $629,600 as compensation.[102] In 2022, Kapoor paid himself $1,686,303 as compensation.[103] The budget also capped LV's chief development officer's annual salary at $350,000, but she received $363,333 as compensation in 2020, $534,999 in 2021, and $743,333 in 2022.[104] None of these payments was approved by LV's board.[105]

43.     In addition to the budgets, the operating agreements Defendants provided to prospective investors included express controls on how investor funds could be used.[106] For example, increases to LV's annual budget greater than 7.5% required board approval.[107] Increases

---

[97] *Id*. at ¶ 6(e).
[98] *Id*.
[99] *Id*.
[100] **Ex. 4** ¶ 7(D); **Ex. 5** ¶¶ 105-106.
[101] **Ex. 5** ¶¶ 105-106.
[102] *Id*.
[103] *Id*.
[104] *Id*.
[105] **Ex. 4** ¶ 7(D).
[106] **Ex. 1** (Exs. GG - ZZ); **Ex. 5** (Apps. 1-2, 4, 6, 8, 10, 12, 14, 16).
[107] **Ex. 5** ¶ 102.

greater than 10% to URBIN Miami Beach's annual budget required approval by a majority of its members.[108]

44.　　Defendants, however, failed to seek board approval when LV's budgets for 2021 increased by 68%.[109] And upon receiving updated cost estimates for the URBIN Miami Beach and 551 Bayshore projects exceeding 110% of their approved budgets, Kapoor caused construction to begin on those projects without obtaining member approval, despite knowing the costs were substantially greater than what investors relied upon when electing to invest.[110]

### *(iii)　Commingling of Investor Funds*

45.　　Defendants also represented to investors that LV, URBIN, and each of their projects were separate and distinct entities, with their own members, budgets, and corresponding capital, and that investor funds would be used solely for their intended project or projects.[111] Defendants, however, regularly commingled investor funds among the various Company Defendants and other entities, with more than $60 million of intercompany transfers during the Relevant Period.[112]

46.　　For instance, LV received approximately $14.7 million from the URBIN entities, and the URBIN entities received $25.2 million from the LV entities, including a $14 million transfer from LV to URBIN that was recorded internally as an intercompany loan (the "Intercompany Loan") without notice to, or approval from, LV's members or board of directors.[113]

47.　　Also, it was not uncommon for Kapoor to use investor funds from one project to pay for the expenses of another.[114] For example, on January 3, 2022, URBIN Grove received $4.2

---

[108] **Ex. 4 ¶** 7(J).

[109] *Id*. at ¶ 7(D); **Ex. 5 ¶¶** 102-104.

[110] **Ex. 4 ¶** 7(J).

[111] **Ex. 1** (Ex. X at page/line 99:17-22, 123:22 – 124:4); **Ex. 5** (Apps. 1-2, 4, 6, 8, 10, 12, 14, 16).

[112] **Ex. 5 ¶¶** 63-66.

[113] *Id*.; **Ex. 1** (Ex. X at page/line 120:18 – 121:8); **Ex. 4 ¶** 7(M).

[114] **Ex. 5 ¶¶** 83-98.

million from Investor 14, and on January 4, 2022, $1 million from Investor 49.[115] The balance in URBIN Grove's bank account prior to receiving these funds was $68,000.[116] Between January 4, 2022, and January 6, 2022, URBIN Grove transferred $1,847,000 to URBIN, of which URBIN transferred $1.69 million to URBIN Gables, which URBIN Gables used to purchase the "Minorca Parking Lots."[117] URBIN Gables recorded the purchase of the parking lots as a land asset on its balance sheet.[118]

48.     Defendants' complete disregard for corporate formalities included the use of approximately $4.5 million of customer sales deposits—deposits made by customers toward the purchase of condominium units—for purposes other than the construction and development of that condominium project.[119]

49.     For instance, on October 31, 2022, URBIN Grove received approximately $1.2 million[120] in customer sales deposits from its escrow company.[121] A few days later, URBIN Grove transferred $1 million to URBIN, which URBIN used to pay down the Intercompany Loan.[122]

50.     Customer sales deposits in URBIN Grove and URBIN Miami Beach were systematically transferred away from the projects and used for any number of purposes, including, but not limited to:

---

[115] **Ex. 5** ¶ 84.
[116] *Id*.
[117] *Id*. at ¶¶ 86-87.
[118] *Id*.
[119] **Ex. 4** ¶ 7(K); **Ex. 5** ¶¶ 67-82.
[120] The combined balance in URBIN Grove's bank accounts prior to receiving these funds was $452,347.
[121] **Ex. 5** ¶ 71.
[122] *Id*.

        a.     $220,000 from URBIN Grove to Kapoor, personally, for purported "loan guarantor fees";[123]

        b.     $556,000 from URBIN Miami Beach to a title company for an investment called "Pipeline Montana";[124]

        c.     $300,000 from URBIN Miami Beach toward the "Minorca Parking Lots" purchase;[125] and

        d.     $1 million from URBIN Miami Beach to L. Capital, after which L. Capital made a series of disbursements that were unrelated to URBIN Miami Beach.[126]

### (iv)    *Kapoor's Background and Experience*

51.    Kapoor also made material misrepresentations and omissions concerning his background and experience that made certain statements on LV's website and in offering materials either false or materially misleading.[127]

52.    As of January 4, 2023,[128] LV's website included a biography page touting the experience and expertise of its officers, directors, and other key employees.[129] Kapoor's biography stated, among other things, that "[t]o date, Rishi is responsible for leading the development of a $400M portfolio including high-end, custom single-family homes; rehabilitation of multi-family properties; development of boutique condominiums ...."[130]

---

[123] *Id.* at ¶ 75.
[124] *Id.* at ¶¶ 76-78.
[125] *Id.* at ¶¶ 79-80.
[126] *Id.* at ¶¶ 81-82.
[127] **Ex. 1** (Ex. at p. 33)
[128] Date of website capture of LV's website https://location.ventures/.
[129] *Id.*
[130] *Id.*

53.      The size of Kapoor's portfolio increased from $400 million to $1 billion according to a 2020 version of LV's sponsor resume, which is similar to a brochure, that LV, Kapoor, and others regularly provided to prospective investors and that included information about LV, its projects and investment opportunities, and its team of professionals.[131]

54.      Kapoor's portfolio increased again in the 2022 version of the sponsor resume—this time to $4 billion.[132]

55.      Kapoor's representation that he was responsible for leading the development of a $4 billion portfolio was false.[133] Indeed, that he was responsible for a $1 billion portfolio is, if not false, materially misleading.[134]

56.      In addition to inflating his portfolio, Kapoor's biography highlighted his business degrees in finance, management, and marketing, and described his day-to-day role as centering "around identifying unique opportunities, capital formation and setting the product vision for our projects while working closely with the development team on proper execution."[135] Kapoor failed to disclose, however, that his previous marketing business incurred federal tax liens for failing to remit federal payroll taxes—a practice that continued at LV, where he failed to remit approximately $1.375 million in federal payroll taxes despite deducting those amounts from employee compensation.[136]

---

[131] **Ex. 6** (Ex. C).
[132] **Ex. 3** ¶ 6(j).
[133] *Id*.
[134] **Ex. 5** ¶¶ 32-45.
[135] **Ex. 1** (Ex. W at p. 33).
[136] *Id*.; **Ex. 4** ¶ 7(F).

C.      **Defendants' Misappropriation of Investor Funds**

57.      Kapoor added to LV and URBIN's financial woes by misappropriating at least $6 million from the Company Defendants, at least $4.3 million of which went to Kapoor alone.[137]

58.      As previously alleged, Kapoor's approved annual salary was $350,000.[138] Kapoor paid himself $629,600 in 2021 and $1,686,303 in 2022, which collectively represented approximately $1.6 million in excess compensation.[139] The source of these funds was derived largely from the sale of the project 800 Dixie Partners, LLC ("800 Dixie").[140] LV was an investor in 800 Dixie and was entitled to a distribution of any profits.[141] Rather than paying the proceeds from the sale to LV, on August 15, 2022, Kapoor took the entirety of the proceeds, along with additional funds belonging to LV, and paid himself $1,328,000.[142] LV recorded the payment to Kapoor in its books as compensation.[143]

59.      Further, LV and URBIN were entitled to fees from the development of their respective projects.[144] Rather than pay LV and URBIN, which would then determine whether distributions to their members were appropriate, in many instances Kapoor paid these fees directly to himself and others.[145] Also, the amount of fees LV and URBIN charged the projects exceeded the amounts authorized in their respective operating agreements.[146] In total, Kapoor paid himself and others close to $1 million in fees belonging to LV and URBIN.[147]

---

[137] *Id*. at 99.
[138] *Id*. at ¶ 105.
[139] *Id*. at ¶¶ 105-07.
[140] *Id*. at ¶¶ 107-12.
[141] *Id*.
[142] *Id*.
[143] *Id*.
[144] **Ex. 4** ¶ 5; **Ex. 5** ¶ 113.
[145] **Ex. 1** (Ex. W at page/line 132:6 – 133:1); **Ex. 5** ¶¶ 114-16.
[146] **Ex. 5** ¶ 113.
[147] *Id*. at ¶ 116.

60.    In addition to the above transactions, there were two significant transfers in 2021.[148] L. Capital is a wholly owned subsidiary of LV that was used by Kapoor and others to raise capital.[149] L. Capital's bank accounts were used to hold investor capital as well as in the operation of the business.[150] On August 3, 2021, Kapoor transferred $1.5 million from L. Capital's bank account directly to his personal bank account for no apparent legitimate purpose.[151] Also in 2021, Kapoor and his partner, through Patriots United, received a distribution in the amount of $1,247,931 in connection with the sale of the Leucadendra Drive project.[152] Patriots United received this distribution despite never having made its initial $13 million cash capital contribution.[153]

61.    During the same period as these transfers, Kapoor purchased a new 2023 68.7-foot Princess Y72 yacht for over $5 million, a dock at the Cocoplum Yacht Club for $695,000, leased a 2020 600LT Spider McLaren sportscar, and paid a private chef $10,000 per month.[154]

### D.    Defendants Buy Out Major Investor

62.    Sometime in 2022, a major investor in LV and three of its projects, referred to herein as "Investor 20,"[155] became concerned regarding the management of LV and its projects, including Kapoor's misappropriation and misuse of investor funds, and demanded Defendants buy

---

[148] Id. at ¶ 99.
[149] See FN 31-32.
[150] **Ex. 5** (Ex. B).
[151] Id. at ¶ 31(f)(i)(2).
[152] Id. at ¶¶ 99-101.
[153] Id. at ¶ 46.
[154] **Ex. 1** (Exs. AA, BB); **Ex. 4** ¶ 7(O).
[155] The names of investors have been replaced with numbers to protect their identities. A key associating the assigned numbers with investors names will be provided to the Court *in camera* upon request.

out the entirety of its interest.[156] In December 2022, Defendants paid Investor 20[157] $3 million to purchase its interest in the LV project Redlands Phase 1, LLC ("Redlands").[158] The source of these funds was a combination of Investor 30's capital contribution in LV and funds belonging to the URBIN Grove project and its members.[159]

63.     Shortly after the Redlands buyout, Investor 20, LV, and Kapoor, along with certain other related parties, entered into a Global Interest Purchase Agreement (the "Buyout Agreement"), dated December 31, 2022.[160] The Buyout Agreement required LV to purchase Investor 20's interest in LV and the two remaining projects for approximately $41 million, to be paid in installments over a five-month period.[161] The first installment required a payment of $2 million and was due on January 13, 2023.[162] To meet this installment payment, Defendants received $2.5 million from Investor 46 on January 13, 2023, and immediately transferred $2 million of those funds to Investor 20.[163]

64.     Defendants made the following payments under the Buyout Agreement:

a.  January 13, 2023, payment of $2 million;

b.  January 31, 2023, payment of $2,378,630;

c.  February 15, 2023, payment of $2.5 million;

d.  February 28, 2023, payment of $2.5 million; and

e.  March 13, 2023, payment of $5 million.[164]

---

[156] **Ex. 1** (Ex. X at page/line 205:16 – 213:13).
[157] The payment was made to Investor 80, which is owned by or related to Investor 20.
[158] **Ex. 5** ¶¶ 89-94.
[159] *Id.*
[160] **Ex. 1** (Ex. CC).
[161] *Id.*
[162] *Id.*
[163] **Ex. 5** ¶¶ 95-98.
[164] **Ex. 1** (Ex. X at page/line 205:16 – 213:13).

23

65.     In addition to the above-scheduled payments, Defendants paid Investor 20 a $500,000 extension fee, and a partial payment in the amount of $1.5 million under the Buyout Agreement for a total of $16,378,630.[165] Together with Defendants' payment to Investor 20 related to the Redlands project, the total amount paid to Investor 20 and its related entities was $19,378,630.[166]

66.     After making these payments to Investor 20 under the Buyout Agreement, LV's funds were exhausted.[167]

67.     On or around July 14, 2023, the members of LV entered into a resolution by written consent that removed Kapoor as manager of LV.[168] According to the resolution, the members determined that:

> Rishi Kapoor ("Rishi") has taken certain actions or omitted to take certain actions, including, without limitation, the following (a) Rishi has put his personal interests before the interests of the Members and the Company by taking millions of dollars from the Company and/or Company Affiliates in fees, compensation and/or other remuneration in violation of the Operating Agreement and not otherwise authorized in any Approved Budget and, in certain instances, he has admitted to taking some of these actions to some of the Members; (b) Rishi has misappropriated and misused assets of the Company and/or Company Affiliates; (c) Rishi has caused the Company and Company Affiliates to be under investigation by the United States Federal Bureau of Investigation and the United States Securities and Exchange Commission.[169]

---

[165] *Id.*

[166] *Id.*

[167] *Id.*

[168] **Ex. 1** (Ex. EE).

[169] *Id.*

68. In or around August 2023, Kapoor resigned as manager of URBIN.[170]

69. Without sufficient cash, LV's and URBIN's projects have stalled, been abandoned, or are the subject of litigation.

70. On August 30, 2023, LV's members formally replaced Kapoor as manager of LV with a retired judge, with instructions to wind down and sell substantially all the assets of LV and its projects.[171]

71. LV's former chief development officer replaced Kapoor as the manager of URBIN.[172] URBIN has not been included as part of LV's liquidation plan.[173]

## V. MEMORANDUM OF LAW

### A. Standard for Obtaining an Asset Freeze

The Court may order an asset freeze "as a means of preserving funds for the equitable remedy of disgorgement." *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 734 (11th Cir. 2005). The Commission's "burden for showing the amount of assets subject to disgorgement (and, therefore available for freeze) is light: a reasonable approximation of a defendant's ill-gotten gains" is all that is required. "Exactitude is not a requirement . . . ." *Id.* at 735 (citation and quotation omitted); *see also FTC v. IAB Mktg. Assocs., LP*, 746 F.3d 1228, 1234 (11th Cir. 2014). The Commission's burden to demonstrate the potential for dissipation of funds is even lighter. *FTC v. IAB Mktg. Assocs.*, LP, 972 F. Supp. 2d 1307, 1313 n.3 (S.D. Fla. 2013) ("There does not need to be evidence that assets will likely be dissipated in order to impose an asset freeze.") (citing *ETS Payphones*, 408 F.3d at 734, and *SEC v. Lauer*, 445 F. Supp. 2d 1362, 1367, 1370 (S.D. Fla. 2006)). "[T]he

---

[170] **Ex. 2** ¶ 14.
[171] **Ex. 1** (Ex. EE).
[172] **Ex. 2** ¶ 14.
[173] **Ex. 1** (Ex. EE).

25

SEC must demonstrate only . . . a concern that defendants will dissipate their assets . . . ." *SEC v. Gonzalez de Castilla*, 145 F. Supp. 2d 402, 415 (S.D.N.Y. 2001).

The Commission's evidence in this case warrants entry of the requested asset freeze and other relief. The declarations, bank records, and other exhibits attached to this Motion demonstrate that Kapoor and the Company Defendants have violated the antifraud provisions of the federal securities law.

> **B.** **The SEC has Established *Prima Facie* Violations of the Securities Laws**

The Commission has established a *prima facie* showing of violations of the antifraud provisions of the securities laws as alleged in the Complaint and this Motion. As an initial matter, the alleged violations all require that the investment in question be a "security" and that interstate commerce (or the mails) have been used.

> **1.** **The Real Estate Investments are Investment Contracts and, Therefore, Securities Under *Howey***

The Complaint is premised on the allegations that Defendants offered or sold membership units in LV, URBIN, and their respective real estate projects (the "Real Estate Investments") that were "investment contracts" and therefore "securities" under both Securities Act Section 2(a)(1) [15 U.S.C. § 77b] and Exchange Act Section 3(a)(10) [15 U.S.C. § 78c]. Under the Supreme Court's *Howey* test, an investment contract exists if there is: (a) an investment of money; (b) in a common enterprise; (c) based on the expectation of profits to be derived from the entrepreneurial or managerial efforts of others. *See SEC v. Friendly Power Co., LLC*, 49 F. Supp. 2d 1363, 1368 (S.D. Fla. 1999).

The Real Estate Investments satisfy all three elements of the *Howey* test. First, there was an investment of money.[174] *See SEC v. Unique Fin. Concepts, Inc.,* 119 F. Supp. 2d 1332, 1337 (S.D. Fla. 1998), *aff'd,* 196 F.3d 1195 (11th Cir. 1999) ("All that is required is that the investor give up some tangible and definable consideration."). Defendants raised more than $93 million from over 50 investors who invested in LV, URBIN, and/or their respective real estate projects.[175]

Second, there was a common enterprise. *Howey*'s common enterprise prong may be satisfied by either vertical or horizontal commonality. Vertical commonality exists where "the fortunes of investors are interwoven with and dependent on the efforts and success of those seeking the investment or of third parties." *Unique,* 196 F.3d at 1199-1200 (internal quote omitted). Horizontal commonality exists where each investor's fortune is tied to the fortune of other investors by the pooling of interests or profits in the transaction. *Revak v. SEC Realty Corp.,* 18 F.3d 81, 87 (2d Cir. 1994). The Eleventh Circuit has held that "broad vertical commonality" is sufficient to satisfy *Howey*'s common enterprise element, finding it more "flexible" and less "stringent" than horizontal commonality. *Unique,* 196 F.3d at 1200 n.4. Broad vertical commonality requires only a finding that investors' fortunes are linked to the efforts of the promoter or third parties. *Id.*; *see also ETS Payphones, Inc.*, 408 F.3d at 732.

Here, broad vertical commonality exists because the fortunes of investors are entirely dependent on the efforts of Defendants.[176] Specifically, LV markets itself as providing comprehensive investment, development, management, marketing, and sales for residential and mixed-use properties in the South Florida market and beyond.[177] Kapoor and the Company

---

[174] Section IV.A.

[175] *Id.*

[176] *Id*.

[177] *Id*.

27

Defendants represented to investors that they possessed the necessary expertise and experience to develop the projects and generate returns for investors.[178] *See Unique*, 196 F.3d at 1199-1200 (finding commonality where defendant's clients "were not in a position to assume or maintain any substantial degree of control over their investment."). The role of investors here was limited to simply investing money into the venture.[179]

Third, investors had a reasonable expectation of profits based on offering materials that included estimated investor returns.[180] Since *Howey*, the law has been clarified that profits need not be derived *solely* from the efforts of others. Instead, the inquiry is "whether the efforts made by others are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Unique*, 196 F.3d at 1201. Investors here expected a return on their investment based on Defendants' efforts and expertise in identifying, acquiring, developing, marketing, and ultimately selling the projects.[181] Defendants' efforts alone determined the failure or succuss of the enterprise.[182]

### 2. Defendants are Using Interstate Commerce

The interstate commerce requirement is satisfied by Defendants' use of the Internet to solicit investors.[183] *SEC v. Spinosa*, 2014 WL 2938487, \*4 (S.D. Fla. June 30, 2014) (use of Internet satisfied interstate commerce requirement).

---

[178] Section IV.B.(iv).
[179] Section IV.A.
[180] *Id.*
[181] *Id.*
[182] *Id.*
[183] *Id.*

3.     **Defendants are Violating Section 17(a) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act**

Section 17(a) of the Securities Act and Section 10(b) and Rule 10b-5(a)-(c) of the Exchange Act prohibit essentially the same type of conduct. *U.S. v. Naftalin*, 441 U.S. 768, 773 n. 4 (1979); *Unique*, 119 F. Supp. 2d at 1339. The language of these provisions is "expansive" and "capture a wide range of conduct." *Lorenzo v. SEC*, 139 S. Ct. 1094, 1101-02 (2019). In *Lorenzo*, the Supreme Court recognized that there is "considerable overlap among the subsections of" Rule 10b-5 and Section 17(a), and thus the same underlying conduct may establish a violation of more than one subsection.

Section 17(a) of the Securities Act makes it unlawful in the "offer or sale" of securities to: (a) "employ any device, scheme, or artifice to defraud;" (b) "obtain money or property by means of any untrue statement of a material fact or any [material] omission;" or (c) "engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a)(1)-(3). A showing of scienter is required under Section 17(a)(1), but Sections 17(a)(2) and (a)(3) require only a showing of negligence. *Aaron v. SEC*, 446 U.S. 680, 697 (1980).

Section 10(b) of the Exchange Act and Rule 10b-5 render it unlawful, "in connection with the purchase or sale" of securities, to: (a) employ any device, scheme, or artifice to defraud; (b) make any untrue statement or omission of material fact; or (c) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit on any person. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. A showing of scienter is required under Section 10(b) and Rule 10b-5 thereunder. *SEC v. Corporate Relations Group*, No. 6:99-cv-1222, 2003 WL 25570113 at *7 (M.D. Fla. Mar. 28, 2003).

29

Unlike private securities actions, the SEC need not prove reliance or injury under Section 17(a), Section 10(b), or Rule 10b-5. *SEC v. Morgan Keegan & Co., Inc.*, 678 F.3d 1233, 1244 (11th Cir. 2012).

### a) *Misrepresentations and Omissions*

Kapoor obtained at least $93 million from more than 50 investors by making material misrepresentations and omissions of material facts to investors.[184] For instance, to induce prospective investors, Kapoor misrepresented that he and his partner made a $13 million cash capital contribution to LV.[185] Also, to induce prospective investors, Kapoor intentionally understated estimated construction and other costs in *pro forma* budgets included as part of the offering materials provided to prospective investors to forecast higher investor returns.[186] Kapoor also misrepresented to investors that LV, URBIN, and each of the projects were separate and distinct investments, possessing their own members, designated capital, and corporate identities.[187] Defendants, however, regularly ignored corporate formalities and commingled investor funds, with more than $60 million in intercompany transfers occurring during the Relevant Period.[188] In addition, Kapoor misrepresented the size of his real estate portfolio and omitted that his prior marketing business incurred tax liens for failing to remit payroll taxes, a practice that continued at LV, where he failed to remit approximately $1.375 million in federal payroll taxes despite deducting those amounts from employee compensation.[189]

---

[184] Section IV.B.
[185] Section IV.B.(i).
[186] Section IV.B.(ii).
[187] Section IV.B.(iii).
[188] *Id*.
[189] Section IV.B.(iv)

Finally, Kapoor represented to investors that the money they invested would be used to invest in real estate projects. However, Kapoor transferred approximately $6 million to insiders, $4.3 million of which he misappropriated for himself.[190]

### b)    *The Misrepresentations and Omissions were Material*

A false statement or omission must be material for a defendant to be liable for it. The test for materiality is "whether a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action." *SEC v. Merch. Capital, LLC*, 483 F.3d 747, 766 (11th Cir. 2007) (citation omitted). In other words, information is material if a reasonable investor would consider it significant to making an investment decision. *Basic v. Levinson*, 485 U.S. 224, 230 (1988).

"Misrepresentations regarding the use of investors' funds are material." *SEC v. LottoNet Operating Corp.*, 2017 WL 6949289, *13 (S.D. Fla. Mar. 31, 2017) (report and recommendation), *adopted* 2017 WL 6989148 (S.D. Fla. Apr. 6, 2017); *SEC v. Smart*, 678 F.3d.850, 857 (10th Cir. 2012) (the fact money was not being used as represented would be material to a reasonable investor). Misappropriation of funds by the issuer's principal are material. *U.S. v. Lochmiller*, 521 Fed. Appx. 687, 691-92 (10th Cir. Apr. 15, 2013) (upholding conspiracy to commit securities fraud conviction because, among other things, defendant made material misrepresentations when he told investors he would use money for low-income housing but instead used it for personal gain) (citing *Lottonet*, 2017 WL 6949289, *13).

Misrepresentations regarding Kapoor's $13 capital contribution are material. Indeed, LV's largest investor stated that one of the reasons he decided to invest in LV was because Kapoor had invested $13 million, had "skin in the game," and would be incentivized to generate profits for

---

[190] Section IV.C.

31

investors.[191] Misrepresentations regarding estimated investor returns contained in the *pro forma* budgets were also material because investors decided to invest partly, if not almost entirely, on the expectations of profits.[192] Finally, how Kapoor and the Company Defendants used investor funds, including Kapoor's and others misappropriation of those funds, is material. *See LottoNet Operating Corp.*, 2017 WL 6949289, at \*13; *Lochmiller*, 521 Fed. Appx. at 691-92.

### c) *Defendants' Scheme to Defraud*

Kapoor perpetuated the scheme to defraud investors through his material misstatements and omissions discussed above.[193] *See Lorenzo*, 139 S. Ct. at 1101-02 (knowing dissemination of misrepresentations with an intent to deceive violates Rule 10b-5(a) and (c) and Section 17(a)(1)); *see also Malouf v. SEC*, 933 F.3d 1248, 1260 (10th Cir. 2019) (applying *Lorenzo* to Section 17(a)(3) because it "is virtually identical to Rule 10b-5(c)").

Further, Kapoor used each of the Company Defendants in the scheme to defraud investors, including: the Operational Entities through which Kapoor operated the scheme and funneled investor funds; the Manager Entities through which Kapoor managed and controlled the companies and projects used in the scheme; and the Project Entities through which Kapoor raised money from investors, and misappropriated and misused investor funds.[194]

### d) *Defendants' Acted with Scienter*

Scienter is a state of mind embracing intent to deceive, manipulate, or defraud. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976). The Commission may establish scienter for violations of Section 17(a)(1) of the Securities Act and Rule 10b-5 of the Exchange Act by "a

---

[191] **Ex. 1** (Ex. X at page/line 99:5-14).
[192] **Ex. 2** ¶ 6.
[193] Section IV.B.
[194] Section IV.A.

showing of knowing misconduct or severe recklessness." *SEC v. Monterosso*, 756 F.3d 1326, 1335 (11th Cir. 2014) (quoting *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1324 (11th Cir. 1982)). As noted above, Section 17(a)(2) and (3) of the Securities Act require a showing of negligence.

Kapoor knew or was reckless in not knowing that the representations to investors were false. Specifically, Kapoor knew that he did not contribute $13 million in cash to LV.[195] He also knew that the *pro forma* budgets misrepresented construction and other costs associated with the projects because he directed those at LV and URBIN to understate those costs to inflate estimated investor returns.[196] Kapoor also knew that the Company Defendants commingled investor funds because they were commingled at his direction.[197] He also knew funds were being misappropriated and misused because he misappropriated $4.3 million for his own benefit, and had control over how funds were used, including in ways that were not supported by the Company Defendant's operating agreements.[198]

##### C. An *Ex Parte* Total Asset Freeze is Appropriate

A total asset freeze is warranted when the assets to be frozen are worth less than the likely disgorgement award. *See SEC v. Lauer*, 478 F. App'x 550, 554 (11th Cir. 2012) (unpublished) ("[I]f potential disgorgement is greater than the value of the defendant's assets, the district court can order a full asset freeze"); *ETS Payphones*, 408 F.3d at 735-36 (affirming order that "froze all of [defendant's] assets" when estimated disgorgement and value of frozen assets were comparable); *IAB Marketing*, 972 F. Supp. 2d at 1313 (denying defendants' motion to "unfreeze" funds for living expenses where "Defendants' monetary liability greatly exceeds the frozen

---

[195] Section IV.B.(i).
[196] Section IV.B.(ii).
[197] Section IV.B.(iii).
[198] *Id.*; Section IV.C.

funds"). Furthermore, Defendants should not be permitted to use ill-gotten gains they have received to pay attorney's fees or living expenses. *See FTC v. RCA Credit Services, LLC*, 2008 WL 5428039, *4 (M.D. Fla. Dec. 31, 2008) (defendants "may not use their victims' assets to hire counsel to help them retain the fruits of their violations"); *CFTC v. United Investors Group, Inc.*, 2005 WL 3747596, *1 n.1 (S.D. Fla. June 9, 2005) (refusing to except living expenses and counsel fees from asset freeze), *aff'd on other grounds sub nom. Levy*, 541 F.3d at 1102.

Based on the information available to the Commission, a likely disgorgement award of at least $4.3 million is in excess of Kapoor's total assets. On August 22, 2023, Kapoor appeared before the Commission in response to a subpoena for testimony. When the Commission asked Kapoor regarding all sources of income he received, Kapoor declined to answer invoking his Fifth Amendment privilege.[199] Further, Kapoor entered into the Buyout Agreement, in which LV and Kapoor personally agreed to pay Investor 20 approximately $41 million. LV and Kapoor defaulted under the terms of the Buyout Agreement on or around March 2023, with more than $20 million due and owing to Investor 20 under the agreement.[200] In addition, Kapoor testified that he owns one residence located at 7233 Los Pinos Boulevard, Coral Gables, Florida.[201] That residence, however, is the subject of a foreclosure action in Miami-Dade County Circuit Court.[202] Finally, the U.S. Marshal arrested Kapoor's yacht on or around October 31, 2023, pursuant to a civil action filed by Unibank for Savings against the vessel, Kapoor, and his wife.[203]

---

[199] **Ex. 1** (Ex. Y at page/line 25:18 – 27:1).
[200] Section IV.D.
[201] **Ex. 1** (Ex. Y at page/line 11:17 – 12:3).
[202] *Los Pinos Acquisition, LLC v. 7233 Los Pinos, LLC, et al.*, Case No. 23-ca-023102 (Fla. 11th Cir. Sep. 15, 2023).
[203] *Unibank for Savings v. M/Y Suneeta II, et al.*, Case No. 23-cv-81411-DMM (S.D. Fla. Oct. 20, 2023).

A total freeze is appropriate. If, in fact, Kapoor has liquid assets in excess of the disgorgement amount, the freeze can be adjusted accordingly.

### E.    The Court Should Require Kapoor to Provide Sworn Accountings

The Court should require Kapoor to provide a sworn accounting, which will enable the Commission and the Court to determine Kapoor's profits, the present location of proceeds, and Kapoor's ability to repay. *See SEC v. Tannenbaum*, No. 99-CV-6050, 2007 WL 2089326, *4 (E.D.N.Y. July 19, 2007); *SEC v. Lybrand*, No. 00Civ.1387(SHS), 2000 WL 913894, *12 (S.D.N.Y. July 6, 2000); *SEC v. Margolin*, No. 92 Civ 6307 (PKL), 1992 WL 279735, at *7 (S.D.N.Y. Sept. 30, 1992).

### F.    The Court Should Prohibit the Destruction of Records

An Order against Kapoor prohibiting the destruction of records is appropriate to prevent the destruction of documents before this Court can adjudicate the Commission's claims, and to ensure that whatever equitable relief might ultimately be appropriate is available. *SEC v. Shiner*, 268 F. Supp. 2d 1333, 1345-46 (S.D. Fla. 2003).

## VI.    CONCLUSION

For the forgoing reasons, the Court should grant the Commission's Emergency *Ex-Parte* Motion for Asset Freeze and Other Relief and enter the accompanying proposed Order.

### LOCAL RULE 7.1(D) CERTIFICATION

After reviewing the facts and researching applicable legal principles, I certify that this Motion in fact presents a true emergency (as opposed to a matter that may need only expedited treatment) and requires an immediate ruling because the Court would not be able to provide meaningful relief to a critical, non-routine issue after the expiration of seven days. I understand that an unwarranted certification may lead to sanctions.

Dated:  December 27, 2023        Respectfully submitted,

By: _____

Russell R. O'Brien
Trial Counsel
Fla. Bar No.  084542
Direct Dial: (305) 982-6341
Email:  obrienru@sec.gov

**ATTORNEYS FOR PLAINTIFF**
**SECURITIES AND EXCHANGE**
**COMMISSION**
801 Brickell Avenue, Suite 1950
Miami, FL 33131
Telephone:  (305) 982-6300
Facsimile:  (305) 536-4154

# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 23-24903-CV-ALTONAGA**

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff,

v.

**RISHI KAPOOR**, *et al*.,

      Defendants.

_____/

**<u>SEALED ORDER</u>**

THIS CAUSE came before the Court upon Plaintiff, Securities and Exchange
Commission's Emergency *Ex Parte* Motion for Asset Freeze and Other Relief Against Defendant
Rishi Kapoor and Memorandum of Law [ECF No. 6], which seeks the following orders:

    1.    an order freezing the assets of Defendant Rishi Kapoor ("Kapoor");

    2.    an order requiring a sworn accounting by Kapoor; and

    3.    an order prohibiting the destruction of documents by Kapoor.

The Court has considered the Complaint, the Motion, and the declarations and exhibits
submitted in support of this Motion.  The Court finds the Commission has made a sufficient and
proper showing in support of the relief granted herein by presenting a *prima facie* case showing a
reasonable approximation of the likely disgorgement award against Kapoor, which exceeds the
amount of assets to be frozen.  Accordingly, the Court finds good cause to believe that, unless it
imposes an asset freeze, Kapoor could dissipate, conceal, or transfer from the jurisdiction of this
Court assets that are likely subject to an order of disgorgement.

Accordingly, the Motion is **GRANTED**. The Court hereby orders the following:

CASE NO. 23-24903-CV-ALTONAGA

# I.

## ORDER FREEZING ASSETS

**IT IS ORDERED** that

A.     Kapoor and his directors, officers, agents, servants, employees, attorneys, depositories, banks, insurance companies, and those persons in active concert or participation with any one or more of them, and each of them, who receive notice of this Order by personal service, mail, facsimile transmission or otherwise, be and hereby are, restrained from, directly or indirectly, transferring, setting off, receiving, changing, selling, pledging, assigning, liquidating, or otherwise disposing of, or withdrawing any assets or property, including, but not limited to, cash, free credit balances, fully paid for securities, crypto assets, and/or property pledged or hypothecated as collateral for loans, or charging upon or drawing from any lines of credit owned by, controlled by, or in the possession of Kapoor; and

B.     Any financial or brokerage institution, or other person or entity holding any such funds or other assets, in the name of, for the benefit of, or under the control of Kapoor, directly or indirectly, held jointly or singly, and wherever located, and which receives actual notice of this Order by personal service, facsimile, or otherwise, shall hold and retain within its control and prohibit the withdrawal, removal, transfer, disposition, pledge, encumbrance, assignment, set off, sale, liquidation, dissipation, concealment, or other disposal of any such funds or other assets, including, but not limited to, the following presently known accounts:

| Financial Institution | Name of Account | Account Number |
|---|---|---|
| Bank of America | Rishi Kapoor | X3191 |
| Bank of America | Rishi Kapoor | X0440 |
| JPMorgan Chase Bank | Rishi Kapoor and Jennie Frank | X0006 |
| Ally Bank | Rishi Kapoor | X5554 |
| Ally Bank | Rishi Kapoor | X8655 |

## II.

## SWORN ACCOUNTINGS

**IT IS FURTHER ORDERED** that within fifteen (15) days of the issuance of this Order, Kapoor shall:

A.      make a sworn accounting to the Court and the Commission of all funds, whether in the form of compensation, commissions, income (including payments for assets, shares, or property of any kind), and other benefits (including the provision of services of a personal or mixed business and personal nature) received, directly or indirectly, by any of the Company Defendants[1];

B.      make a sworn accounting to the Court and the Commission of all assets, funds, or other properties, whether real or personal, held by Kapoor or the Company Defendants, jointly or individually, or for his or their direct or indirect beneficial interest, or over which he maintains control, wherever situated, stating the location, value, and disposition of each such asset, fund, and other property; and

C.      provide the Court and the Commission a sworn identification of all accounts (including, but not limited to, bank accounts, savings accounts, securities accounts, and deposits of any kind and wherever situation) in which Kapoor and/or the Company Defendants, whether solely or jointly, directly or indirectly (including through a corporation, partnership,

---

[1] The Company Defendants include: Location Ventures, LLC; URBIN, LLC, Patriots United, LLC; Location Properties, LLC; Location Development, LLC; Location Capital, LLC; Location Ventures Resources, LLC; Location Equity Holdings, LLC; Location GP Sponsor, LLC; 515 Valencia Sponsor, LLC; LV Montana Sponsor, LLC; URBIN Founders Group, LLC; URBIN CG Sponsor, LLC; 515 Valencia Partners, LLC; LV Montana Phase I, LLC; Stewart Grove 1, LLC; Stewart Grove 2, LLC; Location Zamora Parent, LLC; URBIN Coral Gables Partners, LLC; URBIN Coconut Grove Partners, LLC; URBIN Miami Beach Partners, LLC; and URBIN Miami Beach II Phase 1, LLC.

relative, friend or nominee), either has an interest or over which it has the power or right to exercise control.

### III.

### <u>RECORDS PRESERVATION</u>

**IT IS FURTHER ORDERED** that Kapoor, his directors, officers, agents, servants, employees, attorneys, depositories, banks, and those persons in active concert or participation with any one or more of them, and each of them, be and they hereby are restrained and enjoined from, directly or indirectly, destroying, mutilating, concealing, altering, disposing of, or otherwise rendering illegible in any manner, any of the books, records, documents, correspondence, brochures, manuals, papers, ledgers, accounts, statements, obligations, files and other property of or pertaining to any of the Defendants, wherever located and in whatever form, electronic or otherwise, until further Order of the Court.

### IV.

### <u>OTHER RELIEF</u>

**IT IS FURTHER ORDERED** that this Order shall not apply to a receiver appointed by this Court over any of the Company Defendants for the purposes of marshaling and preserving any and all assets of the Company Defendants, and those assets of the Company Defendants that: (i) are attributable to funds derived from investors or clients of the Company Defendants; (ii) are held in constructive trust for the Company Defendants; (iii) were fraudulently transferred by the Company Defendants; and/or (iv) may otherwise be includable under such receivership as assets of the Company Defendants. In addition, this Order does not apply to property of an entity that has filed for bankruptcy and is not a Defendant.

**V.**

**RETENTION OF JURISDICTION**

    **IT IS FURTHER ORDERED** that the Court shall retain jurisdiction over this matter, Kapoor, and the Company Defendants in order to implement and carry out the terms of all orders and decrees that may be entered and/or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court and will order other relief that the Court deems appropriate under the circumstances.

    **DONE AND ORDERED** in Miami, Florida, this 27th day of December, 2023.

_Cecilia M. Altonaga_
**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc:      counsel of record

# EXHIBIT D

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-CV-24903-CMA

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

RISHI KAPOOR;
LOCATION VENTURES, LLC;
URBIN, LLC;
PATRIOTS UNITED, LLC;
LOCATION PROPERTIES, LLC;
LOCATION DEVELOPMENT, LLC;
LOCATION CAPITAL, LLC;
LOCATION VENTURES RESOURCES, LLC;
LOCATION EQUITY HOLDINGS, LLC;
LOCATION GP SPONSOR, LLC;
515 VALENCIA SPONSOR, LLC;
LV MONTANA SPONSOR, LLC;
URBIN FOUNDERS GROUP, LLC;
URBIN CG SPONSOR, LLC;
515 VALENCIA PARTNERS, LLC;
LV MONTANA PHASE I, LLC;
STEWART GROVE 1, LLC;
STEWART GROVE 2, LLC;
LOCATION ZAMORA PARENT, LLC;
URBIN CORAL GABLES PARTNERS, LLC;
URBIN COCONUT GROVE PARTNERS, LLC;
URBIN MIAMI BEACH PARTNERS, LLC; and
URBIN MIAMI BEACH II PHASE 1, LLC,

Defendants.

_____/

## PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
## EXPEDITED MOTION FOR APPOINTMENT OF RECEIVER, ASSET FREEZE,
## AND OTHER RELIEF AGAINST THE COMPANY DEFENDANTS
## <u>AND MEMORANDUM OF LAW</u>

## INTRODUCTION

Plaintiff Securities and Exchange Commission (the "Commission") moves on an expedited basis for an Order appointing a Receiver over the Company Defendants[1] and freezing their assets, among other expedited relief (the "Motion"). As detailed in the Commission's Emergency *Ex Parte* Motion for Asset Freeze against Defendant Rishi Kapoor ("Motion for Asset Freeze against Kapoor") (ECF No. 6), which the Court granted on December 27, 2023 (ECF No. 10), from approximately January 2018 through at least March 2023 (the "Relevant Period"), Defendant Rishi Kapoor ("Kapoor") and the Company Defendants (collectively, the "Defendants") operated a real estate investment scheme in violation of the anti-fraud provisions of the federal securities laws. During the Relevant Period, Defendants raised approximately $93 million from more than 50 investors. Investor funds that were not misappropriated, misused, or spent in the operation of the scheme were used by Defendants to acquire and develop real estate projects located primarily in South Florida, some of which remain active. The Court should appoint a receiver with full and exclusive power, duty, and authority to fully investigate the manner in which the financial and business affairs of the Company Defendants were conducted and (after obtaining leave of this Court) to institute such actions and legal proceedings for the benefit of investors; identify potential

---

[1] Location Ventures, LLC ("LV"), URBIN, LLC ("URBIN"), Patriots United, LLC ("Patriots United"); Location Properties, LLC ("L. Properties"); Location Development, LLC ("L. Development"); Location Capital, LLC ("L. Capital"); Location Ventures Resources, LLC ("L. Resources"); Location Equity Holdings, LLC ("L. Holdings"); Location GP Sponsor, LLC ("L. GP Sponsor"); 515 Valencia Sponsor, LLC ("515 Valencia Sponsor"); LV Montana Sponsor, LLC ("LV Montana Sponsor"); URBIN Founders Group, LLC ("URBIN Founders"); URBIN CG Sponsor, LLC ("URBIN CG Sponsor"); 515 Valencia Partners, LLC ("515 Valencia"); LV Montana Phase I, LLC ("LV Montana"); Stewart Grove 1, LLC ("Stewart Grove 1"); Stewart Grove 2, LLC ("Stewart Grove 2"); Location Zamora Parent, LLC ("L. Zamora Parent"); URBIN Coral Gables Partners, LLC ("URBIN Gables"); URBIN Coconut Grove Partners, LLC ("URBIN Grove"); URBIN Miami Beach Partners, LLC ("URBIN Miami Beach"); and URBIN Miami Beach II Phase 1, LLC ("URBIN Miami Beach II").

stakeholders and orderly transition the remaining projects; administer and manage the Company

Defendants' affairs, funds, tangible and intangible assets, choses in action, and any other property;

marshal and safeguard their assets; and take whatever other actions are necessary for the protection

of defrauded investors in this case. To aid the receiver and prevent further dissipation of investor

funds, the Court should freeze the assets of the Company Defendants, require sworn accountings,

and prohibit them from destroying documents.

Pursuant to Local Rule 7.1(d)(2), the Commission has filed this Motion on an expedited

basis because, among other things, LV's contract with the liquidation manager currently in control

of LV and its related entities expires on January 16, 2024. The Commission seeks a ruling on the

Motion on or before January 16, 2024, or as soon thereafter as the Court deems reasonable under

the circumstances. The Commission has obtained effective service of process on Kapoor and each

of the Company Defendants.

## FACTUAL BACKGROUND

The Commission incorporates the factual discussion, legal arguments, and evidence in

support of its Motion for Asset Freeze against Kapoor as if fully set forth herein.[2]

## MEMORANDUM OF LAW

I.  APPOINTMENT OF A RECEIVER

A.  Standard for Appointing a Receiver

A receivership is an equitable remedy that federal courts routinely enlist to effectuate the

remedial purposes of the securities laws. *See, e.g., SEC v. First Fin. Group of Texas*, 645 F.2d 429,

---

[2] To avoid refiling voluminous documents with the Court, unless otherwise stated, annotations
contained in this Motion cite to the Motion for Asset Freeze against Kapoor and corresponding
exhibits, filed on December 27, 2023. (ECF Nos. 6, 6-2, 6-3, 6-7, 6-8, 6-9, 6-10, and 6-12).

438 (5th Cir. 1981) ("the appointment of a receiver is a well-established equitable remedy available to the SEC in its civil enforcement proceedings"); *see generally* Section 21(d)(5) of the Securities Exchange Act of 1934 [15 U.S.C. §78u(d)(5)] ("In any action . . . brought . . . by the Commission under any provision of the securities laws, the Commission may seek, and any Federal Court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."). Appointing a receiver is particularly appropriate in cases where a defendant, through its management, has defrauded members of the investing public. *First Fin.,* 645 F.2d at 438. In such cases, without the appointment of a receiver to maintain the status quo, the investor assets will be subject to diversion and waste to the detriment of those who were induced to invest in the scheme. *Id.*; *see also SEC v. R.J. Allen & Assocs., Inc.*, 386 F. Supp. 866, 878 (S.D. Fla. 1974). A receiver is appropriate to protect the public interest when it is obvious that those in control of an entity who have inflicted serious detriment in the past must be ousted. *SEC v. Bowler*, 427 F.2d 190, 198 (4th Cir. 1970).

### B.     The Appointment of a Receiver is Appropriate

#### 1.     A Receiver is Necessary to Preserve Investor Assets

The declarations, bank records, and other exhibits in support of the Motion for Asset Freeze against Kapoor demonstrate that Defendants have violated the antifraud provisions of the federal securities laws in their operation of a complex real estate investment scheme, which raised at least $93 million from over 50 investors.[3] As part of the scheme, Defendants made material misrepresentations to investors, commingled and misused investor funds, and misappropriated at least $6 million of which $4.3 million were transferred to Kapoor for his benefit.[4] Kapoor and others operated the scheme through the Company Defendants, which own and hold LV's and

---

[3] *See*, *generally*, Motion for Asset Freeze against Kapoor.
[4] *Id*. at Sections IV(B) and IV(C).

URBIN's assets, including bank accounts, contracts, choses in action, as well as real estate projects 515 Valencia, LV Montana, Stewart Grove, Stewart Grove 2, L. Zamora Parent, URBIN Gables, URBIN Grove, URBIN Miami Beach, and URBIN Miami Beach II.[5]

A Court-appointed receiver over the Company Defendants is necessary to: fully investigate the manner in which the financial and business affairs of the Company Defendants were conducted and (after obtaining leave of this Court) institute such actions and legal proceedings for the benefit of investors; identify potential stakeholders and attempt to complete any projects that remain viable; liquidate or abandon those projects that are not viable; trace and recover investor funds; marshal assets of the company, including those improperly diverted to Kapoor, insiders, and other third parties; pay creditors; and fairly distribute investor funds. Also, the appointment of a receiver, assuming this Court grants the Commission's request, will result in a stay of litigation against the Company Defendants, allowing a receiver to take the above actions while ensuring that the property of the receivership estate is preserved for the benefit of investors rather than diminished by the expense of litigation. *See SEC v. Byers*, 609 F.3d 87, 89 (2d Cir. 2010); *see also SEC v. Onix Capital*, LLC, No. 16-24678-CIV, 2017 WL 6728814, at *4 (S.D. Fla. Jul. 24, 2017) ("That the receivership is not 'substantially underway' is not a compelling factor to lift a stay against litigation when balanced against the Receiver's interest in preventing ancillary litigation during the early stages of the receivership."); *Liberte Capital Grp., LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006) ("[T]he receivership court may issue a blanket injunction, staying litigation against the named receiver and the entities under his control unless leave of that court is first obtained.").

---

[5] *Id*. at Section IV(A).

## 2. A Receiver is Necessary Despite Kapoor's Ouster

On or around July 14, 2023, LV's members removed Kapoor as manager of LV and replaced him with Retired Judge Alan Fine ("Judge Fine").[6] Subsequently, LV's members approved a resolution authorizing and directing Judge Fine to wind down LV and to liquidate certain LV projects (the "Liquidation Plan").[7] Importantly, URBIN and its projects are not under Judge Fine's control and not included in the Liquidation Plan.[8] In August 2023, Kapoor resigned as manager of URBIN and was replaced with LV's former chief development officer (the "CDO").[9] The the CDO remains in control of URBIN and its projects. As discussed below, notwithstanding Kapoor's ouster from LV and URBIN, the appointment of a receiver over the Company Defendants is in the best interest of investors because of the limited powers of the liquidation manager and to take control over URBIN and its related entities.

### (i) The Liquidation Manager Does Not Possess the Powers or Authority of a Court-Appointed Receiver

The Court should appoint a receiver over the Company Defendants despite Judge Fine's role as the liquidation manager of LV, which is set to expire on January 16, 2024.[10] Judge Fine does not possess the powers or the authority of a Court-appointed Receiver. Instead, he is bound by the contours of the Liquidation Plan, which is narrowly tailored and does not permit him to, among other things, investigate actions taken by Kapoor and other insiders, initiate lawsuits to recover investor funds that may have been misappropriated, misused, or improperly transferred to third parties, or exercise any authority or control over URBIN or its projects. This includes investigating the Global Interest Purchase Agreement, dated December 31, 2022 (the "Buyout

---

[6] *Id*. at Section IV(D).
[7] *Id*.
[8] *Id*.
[9] *Id*.
[10] *Id*. at Ex. 1 (Ex. EE at bate number LV00011189).

Agreement"), whereby Kapoor caused the Company Defendants to transfer almost $20 million to LV's largest investor ("Investor 20").[11] At least a portion of the funds used to pay Investor 20 originated from URBIN and its projects.[12] This includes $12 million of debt Kapoor caused URBIN Grove to incur, $10 million of which was used toward the Buyout Agreement.[13]

### (ii) URBIN is Part and Parcel of Location Ventures

The Commission's analysis of the Company Defendants' accounting records and bank account activity, performed by forensic accounting firm Kapila Mukamal, dispels any notion that LV and URBIN are separate and distinct corporate entities.[14] As detailed in the Asset Freeze Motion against Kapoor, more than $60 million of investor funds were transferred back and forth between LV, URBIN, and their respective projects.[15] For instance, LV received approximately $14.7 million from the URBIN entities, and the URBIN entities received $25.2 million from the LV entities, including a $14 million transfer from LV to URBIN that was recorded internally as an intercompany loan without notice to, or approval from, LV's members or board of directors.[16] Given the extent of commingling of investor funds (both in terms of dollar amount and frequency), and because there is considerable overlap among the investors in the LV entities and the investors in the URBIN entities, any action taken for the benefit of all the investors—be that the Liquidation Plan or otherwise—should include URBIN and its projects.

Further, the CDO remains in control of URBIN.[17] The CDO owns a 2.111% membership interest in LV by virtue of a purported $450,000 initial cash capital contribution.[18] Based on Kapila

---

[11] *Id*. at Section IV(D).
[12] *Id*.
[13] *Id*. at Ex. 4 ¶ 7(N).
[14] *Id*. at Ex. 5.
[15] *Id*. at Section IV(B)(iii).
[16] *Id*.
[17] *Id*. at Section IV(D).
[18] *Id*. at Ex. 5 ¶¶ 46-62.

Mukamal's analysis, like Kapoor, there is no evidence that the CDO contributed any capital in exchange for her membership interest in LV.[19] Also, LV's approved budget capped the CDO's annual compensation in 2020 to $300,000, and to $350,000 2021 and 2022.[20] For the years 2020 to 2022, however, the CDO received $641,000 in excess compensation.[21] Lastly, Kapoor and the CDO had a professional relationship prior to her joining LV.[22] Until Kapoor was removed, the CDO had reliably voted her 2.111% membership interest with Kapoor's 47.917%, giving Kapoor majority control of LV.[23] Given their prior history and Kapoor's potential influence, the Court should appoint a receiver over the Company Defendants, which includes URBIN and its projects.

### C.  The Commission's Receiver Recommendation

In an effort to facilitate the Court's appointment of a Receiver, the Commission's staff has solicited expressions of interest from three potential receiver candidates it believes are well-suited to handle this matter and attaches the credentials of these candidates as Exhibits "A," "B," and "C" to this Motion. Each of these candidates has checked for potential conflicts of interest and none has any. Moreover, all have indicated that they are ready and able to immediately take on the duties and responsibilities if appointed by this Court as receiver in this case. After considering these candidates, the Commission's staff believes that the interests of defrauded investors would best be served by the appointment of Andres Rivero, Esq. Mr. Rivero, whose credentials are attached as Exhibit A, is the founder and a partner of the law firm of Rivero Mestre, LLP.

Mr. Rivero specializes in complex civil financial and fraud litigation, including SEC regulatory and criminal fraud matters, as well as receiverships. Mr. Rivero has represented

---

[19] *Id*. at Ex. 5 ¶ 106.
[20] *Id*.
[21] *Id*.
[22] *Id*. at Ex. 3 ¶ 6(k).
[23] *Id*. at Ex. 1 (Ex. X at page/line 51:5-11).

Bankruptcy trustees and receivers, including the receiver in *SEC v. Internet Cap. Holdings, Inc., et al.,* Case No. 00-9028-CIV-HURLEY (S.D. Fla.), and has experience in non-SEC enforcement actions, including *FTC v. Ameritel Payphone Distribs., Inc. et al.,* Case No. 00-514-CIV-Gold (S.D. Fla.), *Alvarez v. Martinez,* Case No. 07-37278 CA (S.D. Fla), *In re: Blue Trust Cap. LLC,* Case No. 06-24280 CA (Fla. 11th Cir. Ct.); *In Re: ByeByenow.com, Inc.,* Case No. 01-20536-BKC-Ray (S.D. Fla.). Mr. Rivero previously served for five years as a federal prosecutor in the Southern District of Florida in the Economic Crimes and Public Corruption sections.

If appointed as Receiver, Mr. Rivero will utilize attorneys at Rivero Mestre, relying primarily on partners Jorge A. Mestre and Amanda L. Fernandez. Mr. Mestre and Ms. Fernandez have experience litigating securities actions, banking controversies, accounting malpractice claims, and director and officer liability lawsuits.

Mr. Rivero has agreed to significantly discount his current hourly rate to $350 an hour, which represents a 65% discount from the $1,000 rate he typically charges to regular clients. Mr. Rivero also has agreed to discount the billing rates for his professionals. Mr. Mestre will bill at $395 an hour, discounted from his regular rate of $950, and Ms. Fernandez will bill at $325 an hour, discounted from her regular rate of $450. Additionally, Mr. Rivero has agreed to reduce hourly rates for associate attorneys to between $200 and $300, and for paralegals to $100.

Accordingly, the Commission recommends Mr. Rivero, who has the capability and experience necessary to carry out the tasks of the Receiver and has indicated a willingness to serve. As indicated previously, the Commission has identified two other well-qualified candidates who have no conflicts of interest. Accordingly, if the Court does not agree with the Commission's recommendation, the Commission urges the Court consider the alternative candidates whose credentials are also attached.

## II. ASSET FREEZE AND OTHER RELIEF

On December 27, 2023, the Commission filed its Motion for Asset Freeze against Kapoor,[24] which the Court granted on the same date. At that time, the Commission did not seek an asset freeze against the Company Defendants to allow this Court to consider, together, the Commission's request for the appointment of a receiver *and* an asset freeze against the Company Defendants. Further, the Commission did not file this Motion *ex parte* to allow the Defendants to share their respective positions with the Court to the extent they oppose the Commission's request.

Should the Court grant the Commission's request for the appointment of a receiver, an asset freeze remains necessary to prevent potential further dissipation of investors funds while the receiver endeavors to take control over 22 entities and account for all of their assets. The proposed Order attached specifically excludes the receiver from the freeze.

As such, for the same reasons the Court granted the Motion for Asset Freeze against Kapoor and the additional considerations stated herein, the Court should enter an Order freezing the assets of the Company Defendants, requiring sworn accountings, and prohibiting the destruction of records. *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 734 (11th Cir. 2005); *see also FTC v. IAB Mktg. Assocs., LP*, 746 F.3d 1228, 1234 (11th Cir. 2014); *see also SEC v. Gonzalez de Castilla*, 145 F. Supp. 2d 402, 415 (S.D.N.Y. 2001).

---

[24] As stated above, the Commission incorporates the arguments in support of the Motion for Asset Freeze against Kapoor as if fully set forth herein.

## CONCLUSION

For the foregoing reasons, the Commission respectfully requests that the Court grant the Commission's Expedited Motion for Appointment of Receiver, Asset Freeze, and Other Relief, and enter the accompanying proposed Order.

## LOCAL RULE 7.1(a)(3) CERTIFICATION OF PRE-FILING CONFERENCE

Counsel for the Commission hereby certifies that he has made reasonable efforts to confer with all parties or non-parties who may be affected by the relief sought in the Motion. Defendant Rishi Kapoor has no objection. Counsel for the Company Defendants stated that the managers of LV and URBIN lack the necessary authority to take a position with respect to the requested relief until they advise and obtain consent from LV's and URBIN's respective members. As such, the Company Defendants do not take a position at this time.

Dated: January 5, 2024      Respectfully submitted,


/s/ Russell R. O'Brien
Russell R. O'Brien
Trial Counsel
Florida Bar No. 084542
Direct Dial: (305) 982-6341
Email: obrienru@sec.gov

Attorney for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
801 Brickell Avenue, Suite 1950
Miami, Florida 33131

# EXHIBIT E

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 23-24903-CIV-ALTONAGA

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff,

v.

RISHI KAPOOR, *et al.*,

      Defendants.

_____/

### ORDER GRANTING PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S EXPEDITED MOTION FOR APPOINTMENT OF RECEIVER, ASSET FREEZE, AND OTHER RELIEF AGAINST THE COMPANY DEFENDANTS

**THIS CAUSE** came before the Court on Plaintiff, the Securities and Exchange Commission's Expedited Motion for Appointment of Receiver, Asset Freeze, and Other Relief Against the Company Defendants[1] [ECF No. 16]. Plaintiff seeks: (a) the appointment of a receiver over the Company Defendants, with full and exclusive power, duty, and authority to administer and manage the business affairs, funds, assets, causes in action, and any other property of the Company Defendants; marshal and safeguard all of their assets; and take whatever actions are necessary for the protection of the investors; (b) an asset freeze against the Company Defendants; (c) an order requiring sworn accountings by the Company Defendants; and (d) an order prohibiting

---

[1] The Company Defendants include: Location Ventures, LLC ("LV"), URBIN, LLC ("URBIN"), Patriots United, LLC ("Patriots United"); Location Properties, LLC ("L. Properties"); Location Development, LLC ("L. Development"); Location Capital, LLC ("L. Capital"); Location Ventures Resources, LLC ("L. Resources"); Location Equity Holdings, LLC ("L. Holdings"); Location GP Sponsor, LLC ("L. GP Sponsor"); 515 Valencia Sponsor, LLC ("515 Valencia Sponsor"); LV Montana Sponsor, LLC ("LV Montana Sponsor"); URBIN Founders Group, LLC ("URBIN Founders"); URBIN CG Sponsor, LLC ("URBIN CG Sponsor"); 515 Valencia Partners, LLC ("515 Valencia"); LV Montana Phase I, LLC ("LV Montana"); Stewart Grove 1, LLC ("Stewart Grove 1"); Stewart Grove 2, LLC ("Stewart Grove 2"); Location Zamora Parent, LLC ("L. Zamora Parent"); URBIN Coral Gables Partners, LLC ("URBIN Gables"); URBIN Coconut Grove Partners, LLC ("URBIN Grove"); URBIN Miami Beach Partners, LLC ("URBIN Miami Beach"); and URBIN Miami Beach II Phase 1, LLC ("URBIN Miami Beach II").

the destruction of records by the Company Defendants.  (*See generally* Mot.).

Based on the record, the appointment of a receiver in this action is necessary and appropriate for the purposes of marshaling and preserving all assets of the Company Defendants ("Receivership Assets") that: (a) are attributable to funds derived from investors or clients of the Company Defendants; (b) are held in constructive trust for the Company Defendants; (c) were fraudulently transferred by the Company Defendants; and/or (d) may otherwise be includable as assets of the estates of the Company Defendants (collectively, the "Recoverable Assets").

Plaintiff has made a sufficient and proper showing in support of the relief granted herein by presenting a *prima facie* case showing a reasonable approximation of a likely disgorgement award against the Company Defendants, which exceeds the amount of assets to be frozen.  The Court therefore finds good cause to believe that, unless it imposes an asset freeze, the Company Defendants could dissipate, conceal, or transfer from the jurisdiction of this Court assets that are likely subject to an order of disgorgement.  (*See* Emergency *Ex Parte* Mot. for Asset Freeze & Other Relief Against Def. Rishi Kapoor [ECF No. 6] 33–36; *see generally* Compl. [ECF No. 1]; Mot.).

No Defendants oppose the relief requested.  (*See* Mot. 11 (indicating Defendant Rishi Kapoor does not oppose the Motion); Def., Patriots United, LLC's, Resp. to Pl.'s Expedited Mot. for Appointment of Receiver, Asset Freeze and Other Relief [] [ECF No. 24] (indicating Defendant Patriots United does not oppose the Motion); Notice of Filing Am. Certification of Pre-Filing Conference [ECF No. 26] 2 (noting counsel for the remaining Defendants indicated they did not object or oppose the requested relief); and Notice of Compliance [ECF No. 27] (same)).  Therefore, it is

**ORDERED AND ADJUDGED** that the Motion **[ECF No. 16]** is **GRANTED** as follows:

1.       The Court takes exclusive jurisdiction and possession of the assets of whatever kind and wherever situated, of the Company Defendants (the "Receivership Defendants").

2.       Plaintiff has presented three excellent candidates who have expressed interest in and willingness in serving as receiver in this matter.  (*See* Mot. [ECF Nos. 16-1–16-3]).  After careful review, and until further Order of the Court, Bernice C. Lee is appointed to serve without bond as receiver (the "Receiver") for the estate of the Receivership Defendants, including any of its divisions, subsidiaries, affiliates, successors, and assigns; and any fictitious business entities or business names created or used by the Receivership Defendants, their divisions, subsidiaries, affiliates, successors, and assigns.  The Receiver is given authority to retain Kozyak Tropin & Throckmorton as counsel.

**I.   Asset Freeze**

3.       Except as otherwise specified herein, all Receivership Assets and Recoverable Assets are frozen until further order of the Court.  Accordingly, all persons and entities with direct or indirect control over any Receivership Assets and/or any Recoverable Assets, other than the Receiver, are restrained and enjoined from directly or indirectly transferring, setting off, receiving, changing, selling, pledging, assigning, liquidating, or otherwise disposing of or withdrawing such assets.  This freeze shall include, but is not limited to, Receivership Assets and/or Recoverable Assets that are on deposit with financial institutions such as banks, brokerage firms, and mutual funds, including, but not limited to, the following presently known accounts:

| Financial Institution | Name of Account | Account Number |
|---|---|---|
| Bank of America | 515 Valencia Partners, LLC | X2161 |
| Bank of America | Location Capital, LLC | X8410 |
| Bank of America | Location Development, LLC | X5835 |
| Bank of America | Location Properties, LLC | X8258 |
| Bank of America | Stewart Grove 1, LLC | X2744 |
| Bank of America | URBIN Coconut Grove Partners, LLC | X3302 |
| Bank of America | URBIN Coral Gables Partners, LLC | X3014 |
| Bank of America | URBIN Miami Beach Partners, LLC | X5493 |
| Bank of America | URBIN, LLC | X3263 |
| First Citizens Bank | 515 Valencia Partners, LLC | X7583 |
| First Citizens Bank | URBIN Coconut Grove Partners, LLC | X0033 |
| First Citizens Bank | URBIN Coral Gables Partners, LLC | X6536 |
| First Citizens Bank | URBIN, LLC | X6544 |
| Professional Bank | URBIN Coral Gables Partners, LLC | X 1346 |
| Woodforest National Bank | 515 Valencia Partners, LLC | X1377 |
| Woodforest National Bank | 515 Valencia Partners, LLC | X1583 |
| Woodforest National Bank | Location Capital, LLC | X1450 |
| Woodforest National Bank | Location Development, LLC | X1393 |
| Woodforest National Bank | Location Properties, LLC | X1385 |
| Woodforest National Bank | Location Ventures Resources, LLC | X1459 |
| Woodforest National Bank | Stewart Grove 1, LLC | X6319 |
| Woodforest National Bank | URBIN Coconut Grove Partners, LLC | X0725 |
| Woodforest National Bank | URBIN Commodore Residential II SPE, LLC | X2879 |
| Woodforest National Bank | URBIN Miami Beach Partners, LLC | X1236 |
| Woodforest National Bank | URBIN, LLC | X6400 |

## II. <u>General Powers and Duties of Receiver</u>

4.      The Receiver shall have all powers, authorities, rights, and privileges heretofore possessed by the officers, directors, managers, and general and limited partners of the Receivership Defendants under applicable state and federal laws, and by any governing charters, by-laws, articles, and/or agreements; in addition to all powers and authority of a receiver at equity, and all powers conferred upon a receiver by the provisions of 28 U.S.C. sections 754, 959, and 1692, and Federal Rule of Civil Procedure 66.

5.      The trustees, directors, officers, managers, employees, investment advisors, accountants, attorneys, and other agents of the Receivership Defendants are dismissed; and the

powers of any general partners, directors, and/or managers are suspended. Such persons and entities shall have no authority with respect to the Receivership Defendants' operations or assets, except to the extent as may hereafter be expressly granted by the Receiver. The Receiver shall assume and control the operation of the Receivership Defendants and shall pursue and preserve all of their claims.

6. No person holding or claiming any position of any sort with the Receivership Defendants shall possess any authority to act by or on behalf of the Receivership Defendants.

7. Subject to the specific provisions in Sections III through XIV, below, the Receiver has the following general powers and duties:

A. To use reasonable efforts to determine the nature, location, and value of all property interests of the Receivership Defendants, including, but not limited to, monies, funds, securities, credits, effects, goods, chattels, lands, premises, leases, claims, rights, and other assets, together with all rents, profits, dividends, interest, or other income attributable thereto, of whatever kind, which the Receivership Defendants own, possess, have a beneficial interest in, or control directly or indirectly ("Receivership Property" or, collectively, the "Receivership Estates");

B. To take custody, control, and possession of all Receivership Property and records relevant thereto from the Receivership Defendants; to sue for and collect, recover, receive, and take into possession from third parties all Receivership Property and records relevant thereto;

C. To manage, control, operate, and maintain the Receivership Estates and hold in her possession, custody, and control all Receivership Property, pending further Order of the Court;

D. To use Receivership Property for the benefit of the Receivership Estates, making payments and disbursements and incurring expenses as may be necessary or advisable in the ordinary course of business in discharging her duties as Receiver;

E. To take any action which, prior to the entry of this Order, could have been taken by the officers, directors, partners, managers, trustees, and agents of the Receivership Defendants;

F. To engage and employ persons in her discretion to assist her in carrying out

her duties and responsibilities, including, but not limited to, accountants, attorneys, securities traders, registered representatives, financial or business advisers, liquidating agents, real estate agents, forensic experts, brokers, traders, or auctioneers;

G.    To take such action as necessary and appropriate for the preservation of Receivership Property or to prevent the dissipation or concealment of Receivership Property;

H.    To issue subpoenas for documents and testimony consistent with the Federal Rules of Civil Procedure;

I.    To bring such legal actions based on law or equity in any state, federal, or foreign court as the Receiver deems necessary or appropriate in discharging her duties as Receiver;

J.    To pursue, resist, and defend all suits, actions, claims, and demands which may now be pending or which may be brought by or asserted against the Receivership Estates;

K.    To Engage persons in the Receiver's discretion to assist the Receiver in carrying out the Receiver's duties and responsibilities, including, but not limited to, the United States Marshals Service or a private security firm;

L.    To expand the Receivership to include other entities, as permitted by law; and

M.    To take such other action as may be approved by the Court.

### III.  Access to Information

8.    The Receivership Defendants and the past and/or present officers, directors, agents, managers, general and limited partners, trustees, attorneys, accountants, and employees of the Receivership Defendants, as well as those acting in their place, are ordered and directed to preserve and turn over to the Receiver forthwith all paper and electronic information of, and/or relating to, the Receivership Defendants and/or all Receivership Property; such information shall include but not be limited to books, records, documents, accounts, and all other instruments and papers.

9.    The Receivership Defendants and the Receivership Defendants' past and/or present officers, directors, agents, attorneys, managers, shareholders, employees, accountants, debtors,

creditors, managers, and general and limited partners, and other appropriate persons or entities shall answer under oath to the Receiver all questions which the Receiver may put to them and produce all documents as required by the Receiver regarding the business of the Receivership Defendants, or any other matter relevant to the operation or administration of the Receivership or the collection of funds due to the Receivership Defendants.  In the event that the Receiver deems it necessary to require the appearance of the aforementioned persons or entities, the Receiver shall make her discovery requests in accordance with the Federal Rules of Civil Procedure.

10.     The Receivership Defendants are required to assist the Receiver in fulfilling her duties and obligations.  As such, they must respond promptly and truthfully to all requests for information and documents from the Receiver.

### IV.  <u>Access to Books, Records, and Accounts</u>

11.     The Receiver is authorized to take immediate possession of all assets, bank accounts, or other financial accounts, books and records, and all other documents or instruments relating to the Receivership Defendants.  All persons and entities having control, custody, or possession of any Receivership Property are directed to turn such property over to the Receiver.

12.     The Receivership Defendants, as well as their agents, servants, employees, attorneys, any persons acting for or on behalf of the Receivership Defendants, and any persons receiving notice of this Order by personal service, facsimile or electronic mail transmission, or otherwise, having possession of the property, business, books, records, accounts, or assets of the Receivership Defendants are directed to deliver the same to the Receiver, her agents, and/or employees.

13.     All banks, brokerage firms, financial institutions, and other persons or entities that have possession, custody, or control of any assets or funds held by, in the name of, or for the

benefit, directly or indirectly, of the Receivership Defendants that receive actual notice of this Order by personal service, facsimile or electronic mail transmission, or otherwise shall:

A.     Not liquidate, transfer, sell, convey, or otherwise transfer any assets, securities, funds, or accounts in the name of or for the benefit of the Receivership Defendants except upon instructions from the Receiver;

B.     Not exercise any form of set-off, alleged set-off, lien, or any form of self-help whatsoever, or refuse to transfer any funds or assets to the Receiver's control without the permission of the Court;

C.     Within five (5) business days of receipt of that notice, file with the Court and serve on the Receiver and counsel for Plaintiff a certified statement setting forth, with respect to each such account or other asset, the balance in the account or description of the assets as of the close of business on the date of receipt of the notice; and,

D.     Cooperate expeditiously in providing information and transferring funds, assets, and accounts to the Receiver or at the direction of the Receiver.

**V.  <u>Access to Real and Personal Property</u>**

14.    The Receiver is authorized to take immediate possession of all personal property of the Receivership Defendants, wherever located, including, but not limited to, electronically stored information, computers, laptops, hard drives, external storage drives, and any other such memory, media, or electronic storage devices, books, papers, data processing records, evidence of indebtedness, bank records and accounts, savings records and accounts, brokerage records and accounts, certificates of deposit, stocks, bonds, debentures, and other securities and investments, contracts, mortgages, furniture, office supplies, and equipment.

15.    The Receiver is authorized to take immediate possession of all real property of the Receivership Defendants, wherever located, including, but not limited to, all ownership and leasehold interests and fixtures. Upon receiving actual notice of this Order by personal service, facsimile or electronic mail transmission, or otherwise, all persons other than law enforcement officials acting within the course and scope of their official duties, are (without the express written

permission of the Receiver) prohibited from: (a) entering such premises; (b) removing anything from such premises; or (c) destroying, concealing, or erasing anything on such premises.

16.    In order to execute the express and implied terms of this Order, the Receiver is authorized to change door locks to the premises described above.  The Receiver shall have exclusive control of the keys.  The Receivership Defendants, or any other person acting or purporting to act on their behalf, are ordered not to change the locks in any manner, nor to have duplicate keys made, nor shall they have keys in their possession during the term of the Receivership.

17.    The Receiver is authorized to open all mail directed to or received by or at the offices or post office boxes of the Receivership Defendants, and to inspect all mail opened prior to the entry of this Order, to determine whether items or information therein fall within the mandates of this Order.

## VI.  **Notice to Third Parties**

18.    The Receiver shall promptly give notice of her appointment to all known officers, directors, agents, employees, shareholders, creditors, debtors, managers, and general and limited partners of the Receivership Defendants as the Receiver deems necessary or advisable to effectuate the operation of the Receivership.

19.    All persons and entities owing any obligation, debt, or distribution with respect to an ownership interest to the Receivership Defendants shall, until further ordered by the Court, pay all such obligations in accordance with the terms thereof to the Receiver; and her receipt of such payments shall have the same force and effect as if the Receivership Defendants had received such payment.

20.    In furtherance of her responsibilities, the Receiver is authorized to communicate

with and/or serve a copy of this Order upon any person, entity, or government office that she deems appropriate to inform them of the status of this matter and/or the financial condition of the Receivership Estate. All government offices which maintain public files of security interests in real and personal property shall, consistent with such office's applicable procedures, record this Order upon the request of the Receiver or Plaintiff.

21. The Receiver is authorized to instruct the United States Postmaster to hold and/or reroute mail which is related, directly or indirectly, to the business, operations, or activities of the Receivership Defendants (the "Receiver's Mail"), including all mail addressed to, or for the benefit of, the Receivership Defendants. The Postmaster shall not comply with, and shall immediately report to the Receiver, any change of address or other instruction given by anyone other than the Receiver concerning the Receiver's Mail. The Receivership Defendants shall not open any of the Receiver's Mail and shall immediately turn over such mail, regardless of when received, to the Receiver. All personal mail of the Receivership Defendants, and/or any mail appearing to contain privileged information, and/or any mail not falling within the mandate of the Receiver, shall be released to the named addressee by the Receiver. The foregoing instructions apply to any proprietor, whether individual or entity, of any private mailbox, depository, business or service, or mail courier or delivery service, hired, rented, or used by the Receivership Defendants. The Receivership Defendants shall not open a new mailbox or take any steps or make any arrangements to receive mail in contravention of this Order, whether through the U.S. mail, a private mail depository, or courier service.

22. Subject to payment for services provided, any entity furnishing water, electric, telephone, sewage, garbage, or trash removal services to the Receivership Defendants shall maintain such service and transfer any such accounts to the Receiver unless instructed to the

contrary by the Receiver.

**VII.  Injunction Against Interference with Receiver**

23.     The Receivership Defendants and all persons receiving notice of this Order by personal service, facsimile, electronic mail, or otherwise, are restrained and enjoined from directly or indirectly taking any action, or causing any action to be taken, without the express written agreement of the Receiver, which would:

A.     Interfere with the Receiver's efforts to take control, possession, or management of any Receivership Property; such prohibited actions include but are not limited to using self-help or executing or issuing or causing the execution or issuance of any court attachment, subpoena, replevin, execution, or other process for the purpose of impounding or taking possession of or interfering with or creating or enforcing a lien upon any Receivership Property;

B.     Hinder, obstruct, or otherwise interfere with the Receiver in the performance of her duties; such prohibited actions include but are not limited to concealing, destroying, or altering records or information;

C.     Dissipate or otherwise diminish the value of any Receivership Property; such prohibited actions include but are not limited to releasing claims or disposing, transferring, exchanging, assigning, or in any way conveying any Receivership Property, enforcing judgments, assessments, or claims against any Receivership Property or the Receivership Defendants, attempting to modify, cancel, terminate, call, extinguish, revoke, or accelerate (the due date) any lease, loan, mortgage, indebtedness, security agreement, or other agreement executed by the Receivership Defendants or which otherwise affects any Receivership Property; or,

D.     Interfere with or harass the Receiver or interfere in any manner with the exclusive jurisdiction of the Court over the Receivership Estates.

24.     The Receivership Defendants shall cooperate with and assist the Receiver in the performance of her duties.

25.     The Receiver shall promptly notify the Court and Plaintiff's counsel of any failure or apparent failure of any person or entity to comply in any way with the terms of this Order.

## VIII. **Stay of Litigation**

26.     As set forth in detail below, the following proceedings, excluding the instant proceeding and all police or regulatory actions and actions of Plaintiff related to the above-captioned enforcement action, are stayed until further Order of the Court:

> All civil legal proceedings of any nature, including, but not limited to, bankruptcy proceedings, arbitration proceedings, foreclosure actions, default proceedings, or other actions of any nature involving: (a) the Receiver, in her capacity as Receiver; (b) any Receivership Property, wherever located; (c) the Receivership Defendants, including subsidiaries and partnerships; or (d) any of the Receivership Defendants' past or present officers, directors, managers, agents, or general or limited partners sued for, or in connection with, any action taken by them while acting in such capacity of any nature, whether as plaintiff, defendant, third-party plaintiff, third-party defendant, or otherwise (such proceedings are hereinafter referred to as "Ancillary Proceedings").

27.     The parties to any and all Ancillary Proceedings are enjoined from commencing or continuing any such legal proceeding, or from taking any action in connection with any such proceeding, including, but not limited to, the issuance or employment of process.

28.     All Ancillary Proceedings are stayed in their entirety, and all courts having any jurisdiction thereof are enjoined from taking or permitting any action until further order of this Court. Further, as to a cause of action accrued or accruing in favor of the Receivership Defendants against a third person or party, any applicable statute of limitations is tolled during the period in which this injunction against commencement of legal proceedings is in effect as to that cause of action.

## IX. **Managing Assets**

29.     For the Receivership Estate, the Receiver shall establish one or more custodial accounts at a federally insured bank to receive and hold all cash equivalent Receivership Property (the "Receivership Funds").

30.     The Receiver's deposit account shall be titled in her name as Receiver, together

with a reference to Location Ventures, LLC.

31.     The Receiver may, without further Order of the Court, transfer, compromise, or otherwise dispose of any Receivership Property, other than real estate, in the ordinary course of business, on terms and in the manner the Receiver deems most beneficial to the Receivership Estate, and with due regard to the realization of the true and proper value of such Receivership Property.

32.     Subject to Paragraph 33 immediately below, the Receiver is authorized to locate, list for sale or lease, engage a broker for sale or lease, cause the sale or lease, and take all necessary and reasonable actions to cause the sale or lease of all real property in the Receivership Estate, either at public or private sale, on terms and in the manner the Receiver deems most beneficial to the Receivership Estate, and with due regard to the realization of the true and proper value of such real property.

33.     Upon further Order of the Court, pursuant to such procedures as may be required by the Court and additional authority such as 28 U.S.C. sections 2001 and 2004, the Receiver is authorized to sell, and transfer clear title to, all real property in the Receivership Estate.

34.     The Receiver is authorized to take all actions to manage, maintain, and/or wind-down business operations of the Receivership Estate, including making legally required payments to creditors, employees, and agents of the Receivership Estate and communicating with vendors, investors, governmental and regulatory authorities, and others as appropriate.

35.     The Receiver shall take all necessary steps to enable the Receivership Funds to obtain and maintain the status of a taxable "Settlement Fund" within the meaning of Section 468B of the Internal Revenue Code and of the regulations, when applicable.

## X. **Investigate and Prosecute Claims**

36.     Subject to the requirement, in Section VIII above, that leave of Court is required to resume or commence certain litigation, the Receiver is authorized, empowered, and directed to investigate, prosecute, defend, intervene in or otherwise participate in, compromise, and/or adjust actions in any state, federal, or foreign court or proceeding of any kind as may in her discretion, and in consultation with Plaintiff's counsel, be advisable or proper to recover and/or conserve Receivership Property.

37.     Subject to her obligation to expend Receivership funds in a reasonable and cost-effective manner, the Receiver is authorized, empowered, and directed to investigate the manner in which the financial and business affairs of the Receivership Defendants were conducted and (after obtaining leave of Court) institute such actions and legal proceedings, for the benefit and on behalf of the Receivership Estate, as the Receiver deems necessary and appropriate; the Receiver may seek, among other legal and equitable relief, the imposition of constructive trusts, disgorgement of profits, asset turnover, avoidance of fraudulent transfers, rescission and restitution, collection of debts, and such other relief from the Court as may be necessary to enforce this Order.  Where appropriate, the Receiver should provide prior notice to counsel for Plaintiff before commencing investigations and/or actions.

38.     The Receiver holds, and is therefore empowered to waive, all privileges, including the attorney-client privilege, held by the Receivership Defendants.

39.     The Receiver has a continuing duty to ensure that there are no conflicts of interest between the Receiver, her Retained Personnel (as that term is defined below), and the Receivership Estate.

## XI.  Bankruptcy Filing

40.     The Receiver may seek authorization to file voluntary petitions for relief under Title 11 of the United States Code (the "Bankruptcy Code") for the Receivership Defendants.  If the Receivership Defendants are placed in bankruptcy proceedings, the Receiver may become, and may be empowered to operate each of the Receivership Estate as, a debtor in possession.  In such a situation, the Receiver shall have all of the powers and duties as provided a debtor in possession under the Bankruptcy Code to the exclusion of any other person or entity.  Pursuant to Paragraph 4 above, the Receiver is vested with management authority for the Receivership Defendants and may therefore file and manage a Chapter 11 petition.

41.     The provisions of Section VII above bar any person or entity, other than the Receiver, from placing the Receivership Defendants in bankruptcy proceedings.

## XII.  Liability of Receiver

42.     Until further Order of the Court, the Receiver is not required to post bond or give an undertaking of any type in connection with her fiduciary obligations in this matter.

43.     The Receiver and her agents, acting within the scope of such agency ("Retained Personnel"), are entitled to rely on all outstanding rules of law and Orders of the Court and shall not be liable to anyone for their own good-faith compliance with any order, rule, law, judgment, or decree.  In no event shall the Receiver or Retained Personnel be liable to anyone for their good-faith compliance with their duties and responsibilities as Receiver or Retained Personnel; nor shall the Receiver or Retained Personnel be liable to anyone for any actions taken or committed by them except upon a finding by the Court that they acted or failed to act as a result of malfeasance, bad faith, gross negligence, or in reckless disregard of their duties.

44.     The Court retains jurisdiction over any action filed against the Receiver or Retained

Personnel based upon acts or omissions committed in their representative capacities.

45.     In the event the Receiver decides to resign, the Receiver shall first give written notice to Plaintiff's counsel of record and the Court of her intention, and the resignation shall not be effective until the Court appoints a successor.  The Receiver shall then follow such instructions as the Court may provide.

**XIII.  Recommendations and Reports**

46.     The Receiver is authorized, empowered, and directed to develop a plan for the fair, reasonable, and efficient recovery and liquidation of all remaining, recovered, and recoverable Receivership Property (the "Liquidation Plan").

47.     Within thirty (30) days after the end of each calendar quarter, the Receiver shall file and serve a full report and accounting of the Receivership Estate (the "Quarterly Status Report"), reflecting (to the best of the Receiver's knowledge as of the period covered by the report) the existence, value, and location of all Receivership Property; and of the extent of liabilities, both those claimed to exist by others and those the Receiver believes to be legal obligations of the Receivership Estate.

48.     The Quarterly Status Reports shall contain the following:

A.     A summary of the operations of the Receiver;

B.     The amount of cash on hand, the amount and nature of accrued administrative expenses, and the amount of unencumbered funds in the estate;

C.     A schedule of all the Receiver's receipts and disbursements (attached as Exhibit A to the Quarterly Status Report), with one column for the quarterly period covered and a second column for the entire duration of the Receivership;

D.     A description of all known Receivership Property, including approximate or actual valuations, anticipated or proposed dispositions, and reasons for retaining assets where no disposition is intended;

E.      A description of liquidated and unliquidated claims held by the Receivership Estate, including the need for forensic and/or investigatory resources; approximate valuations of claims; and anticipated or proposed methods of enforcing such claims (including likelihood of success in: (i) reducing the claims to judgment; and (ii) collecting such judgments);

F.      A list of all known creditors with their addresses and the amounts of their claims;

G.      The status of Creditor Claims Proceedings after such proceedings have been commenced; and

H.      The Receiver's recommendations for a continuation or discontinuation of the Receivership and the reasons for the recommendations.

49.      On the request of Plaintiff, the Receiver shall provide Plaintiff with any documentation that Plaintiff deems necessary to meet its reporting requirements, that is mandated by statute or Congress, or that is otherwise necessary to further Plaintiff's mission.

**XIV.  Fees, Expenses, and Accountings**

50.      Subject to Paragraphs 52–58 immediately below, the Receiver need not obtain Court approval prior to the disbursement of Receivership Funds for expenses in the ordinary course of the administration and operation of the Receivership. Further, prior Court approval is not required for payments of applicable federal, state, or local taxes.

51.      Subject to Paragraph 53 immediately below, the Receiver is authorized to solicit persons and entities ("Retained Personnel") to assist her in carrying out the duties and responsibilities described in this Order. The Receiver shall not engage any Retained Personnel without first obtaining an order of the Court authorizing such engagement.

52.      The Receiver and Retained Personnel are entitled to reasonable compensation and expense reimbursement from the Receivership Estate as described in the "Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission" (the

"Billing Instructions") agreed to by the Receiver. Such compensation shall require the Court's approval.

53.     Beginning in the first quarter of 2024, and within forty-five (45) days after the end of each calendar quarter, the Receiver and Retained Personnel shall apply to the Court for compensation and expense reimbursement from the Receivership Estates (the "Quarterly Fee Applications"). At least thirty (30) days prior to filing each Quarterly Fee Application with the Court, the Receiver will serve upon counsel for Plaintiff a complete copy of the proposed Application, together with all exhibits and relevant billing information in a format to be provided by Plaintiff's staff.

54.     All Quarterly Fee Applications will be interim and will be subject to cost benefit and final reviews at the close of the Receivership. At the close of the Receivership, the Receiver will file a final fee application, describing in detail the costs and benefits associated with all litigation and other actions pursued by the Receiver during the course of the Receivership.

55.     Quarterly Fee Applications may be subject to a holdback in the amount of 20% of the amount of fees and expenses for each application filed with the Court. The total amounts held back during the course of the Receivership will be paid out at the discretion of the Court as part of the final fee application submitted at the close of the Receivership.

56.     Each Quarterly Fee Application shall:

A.     Comply with the terms of the Billing Instructions agreed to by the Receiver; and

B.     Contain representations (in addition to the Certification required by the Billing Instructions) that: (i) the fees and expenses included therein were incurred in the best interests of the Receivership Estate; and (ii) with the exception of the Billing Instructions, the Receiver has not entered into any agreement, written or oral, express or implied, with any person or entity concerning the amount of compensation paid or to be paid from the Receivership Estate, or any sharing thereof.

18

57.     At the close of the Receivership, the Receiver shall submit a Final Accounting in a format to be provided by Plaintiff's staff, as well as the Receiver's final application for compensation and expense reimbursement.

### XV.  **Sworn Accounting**

58.     Within forty-five (45) days of the issuance of this Order, the Receivership Defendants shall:

> A.     make a sworn accounting to the Court and Plaintiff of all assets, funds, or other properties, whether real or personal, held by the Receivership Defendants, jointly or individually, or for their direct or indirect beneficial interest, or over which they maintain control, wherever situated, stating the location, value, and disposition of each such asset, fund, and other property; and

> B.     provide the Court and Plaintiff a sworn identification of all accounts (including, but not limited to, bank accounts, savings accounts, securities accounts, and deposits of any kind and wherever situation) in which the Receivership Defendants, whether solely or jointly, directly or indirectly (including through a corporation, partnership, relative, friend or nominee), either have an interest or over which they have the power or right to exercise control.

### XVI.  **Records Preservation**

59.     The Receivership Defendants, their directors, officers, agents, servants, employees, attorneys, depositories, banks, and those persons in active concert or participation with any one or more of them, and each of them, are restrained and enjoined from, directly or indirectly, destroying, mutilating, concealing, altering, disposing of, or otherwise rendering illegible in any manner, any of the books, records, documents, correspondence, brochures, manuals, papers, ledgers, accounts, statements, obligations, files and other property of or pertaining to any of the Defendants, wherever located and in whatever form, electronic or otherwise, until further Order of the Court.

### XVII.  **Other Relief**

60.     This Order shall not apply to property of an entity that has filed for bankruptcy and

is not a Receivership Defendant.

**XVIII.  Retention of Jurisdiction**

61.     The Court retains jurisdiction over this matter, Defendants, and the Receivership Defendants in order to implement and carry out the terms of all orders and decrees that may be entered and/or to entertain any suitable application or motion for additional relief within the jurisdiction of the Court, and will order other relief that the Court deems appropriate under the circumstances.

**DONE AND ORDERED** in Miami, Florida this 12th day of January, 2024.

_Cecilia M. Altonaga_

**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc:      counsel of record

# EXHIBIT F

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 23-24903-CIV-ALTONAGA/Reid**

**SECURITIES AND EXCHANGE**
**COMMISSION**,

       Plaintiff,

v.

**RISHI KAPOOR**; *et al.*,

       Defendants.

_____/

**<u>ORDER</u>**

**THIS CAUSE** came before the Court upon Defendant, Rishi Kapoor's Motion for Clarification [ECF No. 89], filed on February 26, 2024. Defendant seeks clarification of the January 12, 2024 Order Granting Plaintiff Securities and Exchange Commission's Expedited Motion for Appointment of Receiver, Asset Freeze, and Other Relief Against the Company Defendants (the "Receivership Order") [ECF No. 28].

The Receivership Order stayed all ancillary proceedings. (*See* Receivership Order 12). A prior Order of the Court froze Defendant's assets. (*See* Sealed Order ("Asset Freeze Order") [ECF No. 10] 2). Now, Defendant reports that a non-party, Unibank for Savings, filed a cause of action against Defendant's vessel, Defendant, and his wife, seeking foreclosure on a maritime lien. (*See* Mot. 2). Defendant seeks clarification of whether Unibank and Defendant are prohibited from selling the vessel and the effect of the Receivership Order and Asset Freeze Order on the ancillary proceeding. (*See id.* 4). The Court provides the requested clarification.

The Receivership Order stay does not apply to the maritime foreclosure action, as there is no reason to believe the boat was bought in Defendant's capacity as an officer or manager of the

Receivership Defendants, and Defendant does not acknowledge that the vessel is Receivership Property. While the provisions of the Asset Freeze Order arguably might apply to a creditor's action against Defendant's property — and certainly apply to any voluntary disposition of such property by Defendant — Defendant may sell the vessel at fair market value, provided that (1) the terms of sale are fully disclosed to the Receiver and approved in advance of sale; (2) no insider is participating in such sale; and (3) any net proceeds after satisfaction of the lender's indebtedness are turned over to the receivership estate. The Court notes that failing such a sale by Defendant, Receiver does not expect to oppose a foreclosure sale by the lender, providing such sale is appropriately noticed and marketed and that any net proceeds are turned over to the receivership estate.

Accordingly, it is

**ORDERED AND ADJUDGED** that Defendant, Rishi Kapoor's Motion for Clarification **[ECF No. 89]** is **GRANTED**.

**DONE AND ORDERED** in Miami, Florida, this 27th day of February, 2024.

**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc:     counsel of record

2

# EXHIBIT G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-cv-24903-CMA

SECURITIES AND EXCHANGE
COMMISSION,

              Plaintiff,

v.

RISHI KAPOOR, etc., et al,

              Defendants.

_____/

## DEFENDANT RISHI KAPOOR'S MOTION TO STAY STATE COURT PROCEEDINGS AND PERMIT SALE OF ASSET SUBJECT TO ASSET FREEZE

Defendant Rishi Kapoor ("Mr. Kapoor"), through undersigned counsel, files this Motion to Stay State Court Proceedings and Permit Sale of Asset Subject to Asset Freeze and in support hereof states:

1.      On December 27, 2023, the Court issued an order freezing Mr. Kapoor's assets and granting other requested relief (the "Asset Freeze") [ECF 10]. Pursuant to the Asset Freeze, Mr. Kapoor is restrained from "directly or indirectly, transferring, setting off, receiving, changing, selling, pledging, assigning, liquidating, or otherwise disposing of, or withdrawing any assets or property, including, but not limited to, cash …" In addition, any "person or entity holding any such funds or other assets, in the name of, for the benefit of … Kapoor, shall hold and retain within its control and prohibit the withdrawal, removal … or other disposal of any such funds …"

2.      Kapoor and his wife, Jennie Frank Kapoor, as tenants by the entireties, own one hundred percent of the membership interests in Kapoor LLC, a Florida limited liability company, which in turn owns one hundred percent of the membership interests in 7233 Los Pinos, LLC, a Florida limited liability company. 7233 Los Pinos, LLC owns real property located at 7233 Los

Pinos Blvd., Coral Gables, FL 33143, consisting of the home where Mr. Kapoor and his wife reside (the "Property"). Thus, Mr. Kapoor believes that the Property is an asset owned in part by Mr. Kapoor and is subject to the Asset Freeze.

3.      The Property is the subject of a mortgage foreclosure action now pending in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Case No. 2023-023102-CA-01, *Los Pinos Acquisition, LLC v. 7233 Los Pinos, LLC, Rishi K. Kapoor, etc., et al.* (the "Foreclosure Action"). The Foreclosure Action currently is being defended by Julie Feigeles, Esq., of Shahady & Wurtenberger, P.A.

4.      On January 10, 2024, in the Foreclosure Action, Mr. Kapoor filed a Motion to Stay Proceedings and for Extension of Time to respond to the foreclosure complaint ("Motion to Stay") pending further rulings of this Court, as Mr. Kapoor believes that the Property is governed by the Asset Freeze. A copy of the Motion to Stay is attached hereto as **Exhibit A**. At the time of filing the Motion to Stay, the Order Appointing Receiver had not yet been entered by this Court, and Mr. Kapoor was uncertain as to whether the Property also would be considered Receivership property. Accordingly, he represented in the Motion to Stay that the Foreclosure Action may be considered an Ancillary Proceeding that would be stayed.

5.      The Plaintiff in the Foreclosure Action objects to any stay of the proceedings, argues that the Property is not Receivership Property and not subject to this Court's Orders, and has filed a Motion to Appoint a Receiver (other than Receiver Lee) and a Motion for an Order to Show Cause why a final judgment of foreclosure should not be entered.

6.      To the knowledge of Mr. Kapoor and undersigned counsel, as of the filing of this motion, neither Plaintiff Securities and Exchange Commission (the "Commission") nor the Receiver has taken the position that the Property or the equity therein is Receivership Property,

whether in whole or in part. The Receiver has not sought to stay the Foreclosure Action as an Ancillary Proceeding to the Receivership, nor has she otherwise taken action to interfere with the mortgage lender's proposed foreclosure of the Property. However, the Receiver's counsel has informed Mr. Kapoor's counsel that the Receiver is amenable to a private sale of the Property only if the sales process is reasonably anticipated to yield equity above the debt and if there is an agreement by the owner that the equity in the Property will be contributed to the receivership estate or to the Commission in satisfaction of anticipated restitution / disgorgement obligations.

7.      As explained above, the ultimate owner of the equity in the Property is Kapoor LLC, owned one hundred percent by Mr. and Mrs. Kapoor as tenants by the entirety. Accordingly, in the absence of a determination that the Property is Receivership Property, unless Mr. and Mrs. Kapoor were to transfer all or part of their undivided interest in the shares of Kapoor LLC to a third party—whether to the Receiver, the Commission or to Mr. Kapoor or Mrs. Kapoor individually—that undivided interest would not be subject to claw back by the Receiver nor would it be subject to disgorgement by the Commission. *See, In re Romanogli*, 631 B.R. 807 (Bankr. S.D. Fla. 2021). Moreover, even if Mr. and Mrs. Kapoor, as tenants by the entirety, were to transfer fifty percent of the shares of Kapoor LLC to Mr. Kapoor individually, Mrs. Kapoor—who is neither named as a defendant in this case nor suggested to be otherwise involved in the allegations giving rise to this Court's appointment of the Receiver—would, as a matter of law and equity, retain her fifty percent of the shares of Kapoor LLC. And, those shares would not be subject to claw back by the Receiver nor to disgorgement by the Commission.

8.      In summary, the Receiver has asserted no ownership interest in the Property yet seeks to restrict both Mr. and Mrs. Kapoor's ability to reclaim their undivided interest in the Property's equity. Meanwhile, the Commission's potential interest in the Property's equity via

disgorgement is limited to any *reachable* equity interest belonging to *Mr. Kapoor*; and any such interest would best be served by a private sale maximizing a return of equity to Kapoor LLC, owned by the Kapoors as tenants by the entirety. This would, at minimum, allow for the possibility that the Kapoors' equity would be available for settlement purposes if they chose to transfer all or part of it to the Commission and/or the Receiver.

9.     7233 Los Pinos, LLC has entered into an agreement to list the Property for sale with Boschetti Real Estate Group ("Boschetti), a Florida licensed realtor and the Property's listing agent when it was purchased by 7233 Los Pinos, LLC. The listing agreement is attached as **Exhibit B**. Jennie Frank Kapoor, who is a Florida-licensed real estate sales agent now associated with Boschetti, is the listing associate and, pursuant to her agreement with Boschetti, is entitled to a portion of the commission on a sale. The total commission per the agreement is the standard six (6) percent. Jennie Frank Kapoor, based upon her agreement with Boschetti, would receive one-half of the selling broker's share of the commission, *i.e.*, 1.5 percent.  **The listing price of the Property is $8.495 million, suggesting an** approximate $3 million in equity in the Property over and above the mortgage debt. The Receiver does not object to the Listing Agreement with Boschetti; however, she objects to Jennie Frank Kapoor acting as the listing associate and participating in the commission on the sale.

10.     A private sale of the Property would result in greater proceeds than what will result from a forced  foreclosure sale and would benefit all potentially interested parties. In addition, the appointment of another receiver, as suggested by the Plaintiff in the Foreclosure Action, would deplete the equity in the Property to the disadvantage of all potentially interested parties. Finally, there is no basis to deprive Jennie Frank Kapoor from participating financially or otherwise in the sale of the Property. To the contrary, as a co-guarantor (along with Mr. Kapoor) of the mortgage

4

loan on the Property, as the current resident of the Property, and as a licensed agent, she is uniquely qualified and motivated to advocate for a sale beneficial to all potential interests. Depriving her of the ability to earn a living, particularly in the face of the freeze on all of her husband's assets, serves no purpose and is unjustifiably punitive.

11.     The Motion to Stay is set for hearing before Judge Pedro P. Echarte on March 8, 2024. Although all parties seek a quick sale, the Plaintiff Mortgagee in the Foreclosure Action benefits from the stay as it is earning 25% default interest.

12.     WHEREFORE, Defendant Rishi Kapoor requests the entry of an Order:

    a.   Finding that the Property and any monetary benefit Defendant Kapoor would personally receive from the sale of the Property are subject to the Asset Freeze;

    b.   Permitting 7233 Los Pinos, LLC to list the Property for sale with Boschetti Real Estate Group pursuant to the Listing Agreement attached as Exhibit B, subject to Court approval of a final offer to purchase the Property;

    c.   Permitting  Jennie Frank Kapoor to serve as the listing associate on the sale of the Property and to receive a commission on a sale pursuant to her agreement with Boschetti; and

    d.   Staying the Foreclosure Action for a period of time not to exceed six months, in order to permit 7233 Los Pinos, LLC to list and sell the Property subject to the Court's approval of a final offer to purchase.

**Local Rule 7.1(a)(3) Certification of Pre-Filing Conference**

Counsel for Mr. Kapoor has conferred with counsel for the Commission, the Receiver and her counsel, and the Plaintiff in the Foreclosure Action, who has entered its appearance in this case. Both the SEC and the Receiver oppose this Motion. The Plaintiff in the foreclosure action is

in active negotiations with Mr. Kapoor which may result in an agreement to stay the foreclosure sale for a period of time.

Respectfully submitted,

**SHAHADY & WURTENBERGER, P.A.**

*/s/ Fred A. Schwartz*
Fred A. Schwartz, Esq.
fschwartz@swlawyers.law
Florida Bar No. 360538
200 East Palmetto Park Road, Suite 103
Boca Raton, FL 33432
Direct: (561) 910-3064

John J. Shahady, Esq.
JShahady@swlawyers.law
Florida Bar No. 998990
7900 Peters Road, Suite B-200
Fort Lauderdale, FL 33324
(954) 376-5958

**RASKIN & RASKIN, P.A.**

Jane Serene Raskin
jraskin@raskinlaw.com
Florida Bar No. 848689
2525 Ponce De Leon Blvd., Suite 300
Coral Gables, FL  33134

*Attorneys for Defendant Kapoor*

## CERTIFICATE OF SERVICE

I hereby certify that on March 4, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

By: */s/ Fred A. Schwartz*
Fred A. Schwartz

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-cv-24903-CMA

SECURITIES AND EXCHANGE
COMMISSION,

       Plaintiff,

v.

RISHI KAPOOR, etc., et al,

       Defendants.

_____/

# <u>EXHIBIT A</u>

Kapoor's Motion to Stay

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CIVIL DIVISION

CASE NO:  2023-023102-CA-09

LOS PINOS ACQUISITION, LLC,
a Florida limited liability company,

      Plaintiff,

vs.

7233 LOS PINOS, LLC, a Florida limited
liability company; RISHI K. KAPOOR, an
individual; JENNIE E. FRANK, an individual;
KAPOOR LLC, a Florida  limited liability
company; AM STUDIO  DESIGN, LLC,
a Florida limited liability company;
ARRAS CORP. D/B/A ARRAS AIR
CONDITIONING, a Florida corporation;
THE PISO PROJECT LLC, a Florida
limited liability company; and, UNKNOWN
TENANTS IN POSSESSION NOS. 1 - 5,

      Defendants.

_____/

## DEFENDANTS' MOTION TO STAY PROCEEDINGS,
## AND FOR EXTENSION OF TIME

Defendants Rishi K. Kapoor ("Kapoor"), Jennie E. Frank, 7233 Los Pinos, LLC, and

Kapoor LLC (collectively, the "Kapoor Defendants"), move for the entry of an order temporarily

staying these proceedings pending the outcome of an asset freeze order entered December 27, 2023

in the United States District Court for the Southern District of Florida, and for an extension of time

to respond to the Complaint, and as grounds therefor state:

1.      This is a mortgage foreclosure action on a home owned by 7233 Los Pinos, LLC.

Kapoor LLC is the authorized member of 7233 Los Pinos, LLC. Kapoor LLC is owned by Kapoor

and his wife, Jennie E. Frank.

2.      On December 27, 2023, the Securities and Exchange Commission ("SEC") filed a lawsuit against Kapoor and others in the United States District Court for the Southern District of Florida, *Securities and Exchange Commission v. Rishi Kapoor, et al,* Case No. 23-24903-CV-Altonaga (the "SEC lawsuit"). On the same date, the District Court issued a Sealed Order, freezing the assets of Kapoor (the "Asset Freeze Order"). The Asset Freeze Order was unsealed on January 2, 2024. A copy of the Asset Freeze Order is attached hereto as Exhibit A.

3.      Pursuant to the Asset Freeze Order, Kapoor is restrained from "directly or indirectly, transferring, setting off, receiving, changing, selling, pledging, assigning, liquidating, or otherwise disposing of, or withdrawing any assets or property, including, but not limited to, cash…" *See* Exhibit A. In addition, any "person or entity holding any such funds or other assets, in the name of, for the benefit of,… Kapoor, shall hold and retain within its control and prohibit the withdrawal, removal, … or other disposal of any such funds…" *Id.*

4.      On January 5, 2024, in the SEC lawsuit, the SEC submitted a proposed Order Granting Plaintiff Securities and Exchange Commission's Expedited Motion for Appointment of Receiver, Asset Freeze, and Other Relief Against the Company Defendants (the "Receivership Order"), a copy of which is attached as Exhibit B. It is anticipated that the Receivership Order will be entered shortly by the federal court.

The Receivership Order provides:

## VIII.  **Stay of Litigation**

26.      As set forth in detail below, the following proceedings, excluding the instant proceeding and all police or regulatory actions and actions of the Commission related to the above-captioned enforcement action, are stayed until further Order of this Court:

All civil legal proceedings of any nature, including, but not limited to, bankruptcy proceedings, arbitration proceedings, foreclosure actions, default proceedings, or other actions of any nature involving: (a) the

Receiver, in his capacity as Receiver; (b) any Receivership Property, wherever located; (c) the Receivership Defendants, including subsidiaries and partnerships; or, (d) any of the Receivership Defendants' past or present officers, directors, managers, agents, or general or limited partners sued for, or in connection with, any action taken by them while acting in such capacity of any nature, whether as plaintiff, defendant, third-party plaintiff, third-party defendant, or otherwise (such proceedings are hereinafter referred to as "Ancillary Proceedings").

27.     The parties to any and all Ancillary Proceedings are enjoined from commencing or continuing any such legal proceeding, or from taking any action in connection with any such proceeding, including, but not limited to, the issuance or employment of process.

28.      All Ancillary Proceedings are stayed in their entirety, and all Courts having any jurisdiction thereof are enjoined from taking or permitting any action until further Order of this Court. Further, as to a cause of action accrued or accruing in favor of the Receivership Defendants against a third person or party, any applicable statute of limitation is tolled during the period in which this injunction against commencement of legal proceedings is in effect as to that cause of action.

Receivership Order at 12.

5.     This action may be considered an Ancillary Proceeding under the Receivership Order. It also is anticipated that the federal court will issue a separate order staying proceedings against Kapoor, individually.

6.     Until the Asset Freeze Order expires, or the District Court extends or vacates the Order, it is unknown whether or how Kapoor, his wife, and his entities, will be able to pay for their defense and otherwise proceed in this matter. Moreover, the entry of any judgment against Kapoor's assets would be a violation of the Asset Freeze Order.

WHEREFORE, based on the Asset Freeze Order and the proposed Receivership Order, the Kapoor Defendants move for the entry of an order temporarily staying these proceedings pending the District Court's entry of additional orders, and for an extension of time to respond to the Complaint for twenty (20) days after such stay is lifted.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 10th day of January, 2024 a copy of the foregoing was served through the ePortal to all counsel of record.

SHAHADY & WURTENBERGER. P.A.

/s/ Julie Feigeles
Julie Feigeles, Esq.
Florida Bar No.: 353604
7900 Peters Road, Ste. B-200
Fort Lauderdale, FL 33324
Tel: (954) 376-5961
feigeles@swlawyers.law

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 23-24903-CV-ALTONAGA

**SECURITIES AND EXCHANGE COMMISSION**,

      Plaintiff,

v.

**RISHI KAPOOR**, *et al*.,

      Defendants.

_____/

## SEALED ORDER

THIS CAUSE came before the Court upon Plaintiff, Securities and Exchange Commission's Emergency *Ex Parte* Motion for Asset Freeze and Other Relief Against Defendant Rishi Kapoor and Memorandum of Law [ECF No. 6], which seeks the following orders:

1.      an order freezing the assets of Defendant Rishi Kapoor ("Kapoor");

2.      an order requiring a sworn accounting by Kapoor; and

3.      an order prohibiting the destruction of documents by Kapoor.

The Court has considered the Complaint, the Motion, and the declarations and exhibits submitted in support of this Motion. The Court finds the Commission has made a sufficient and proper showing in support of the relief granted herein by presenting a *prima facie* case showing a reasonable approximation of the likely disgorgement award against Kapoor, which exceeds the amount of assets to be frozen. Accordingly, the Court finds good cause to believe that, unless it imposes an asset freeze, Kapoor could dissipate, conceal, or transfer from the jurisdiction of this Court assets that are likely subject to an order of disgorgement.

Accordingly, the Motion is **GRANTED**. The Court hereby orders the following:

# EXHIBIT A

**I.**

**ORDER FREEZING ASSETS**

**IT IS ORDERED** that

A.    Kapoor and his directors, officers, agents, servants, employees, attorneys, depositories, banks, insurance companies, and those persons in active concert or participation with any one or more of them, and each of them, who receive notice of this Order by personal service, mail, facsimile transmission or otherwise, be and hereby are, restrained from, directly or indirectly, transferring, setting off, receiving, changing, selling, pledging, assigning, liquidating, or otherwise disposing of, or withdrawing any assets or property, including, but not limited to, cash, free credit balances, fully paid for securities, crypto assets, and/or property pledged or hypothecated as collateral for loans, or charging upon or drawing from any lines of credit owned by, controlled by, or in the possession of Kapoor; and

B.    Any financial or brokerage institution, or other person or entity holding any such funds or other assets, in the name of, for the benefit of, or under the control of Kapoor, directly or indirectly, held jointly or singly, and wherever located, and which receives actual notice of this Order by personal service, facsimile, or otherwise, shall hold and retain within its control and prohibit the withdrawal, removal, transfer, disposition, pledge, encumbrance, assignment, set off, sale, liquidation, dissipation, concealment, or other disposal of any such funds or other assets, including, but not limited to, the following presently known accounts:

| Financial Institution | Name of Account | Account Number |
|---|---|---|
| Bank of America | Rishi Kapoor | X3191 |
| Bank of America | Rishi Kapoor | X0440 |
| JPMorgan Chase Bank | Rishi Kapoor and Jennie Frank | X0006 |
| Ally Bank | Rishi Kapoor | X5554 |
| Ally Bank | Rishi Kapoor | X8655 |

## II.

## SWORN ACCOUNTINGS

**IT IS FURTHER ORDERED** that within fifteen (15) days of the issuance of this Order,

Kapoor shall:

A.      make a sworn accounting to the Court and the Commission of all funds, whether in

the form of compensation, commissions, income (including payments for assets, shares, or

property of any kind), and other benefits (including the provision of services of a personal or

mixed business and personal nature) received, directly or indirectly, by any of the Company

Defendants[1];

B.      make a sworn accounting to the Court and the Commission of all assets, funds, or

other properties, whether real or personal, held by Kapoor or the Company Defendants, jointly

or individually, or for his or their direct or indirect beneficial interest, or over which he

maintains control, wherever situated, stating the location, value, and disposition of each such

asset, fund, and other property; and

C.      provide the Court and the Commission a sworn identification of all accounts

(including, but not limited to, bank accounts, savings accounts, securities accounts, and

deposits of any kind and wherever situation) in which Kapoor and/or the Company Defendants,

whether solely or jointly, directly or indirectly (including through a corporation, partnership,

---

[1] The Company Defendants include: Location Ventures, LLC; URBIN, LLC, Patriots United, LLC; Location Properties, LLC; Location Development, LLC; Location Capital, LLC; Location Ventures Resources, LLC; Location Equity Holdings, LLC; Location GP Sponsor, LLC; 515 Valencia Sponsor, LLC; LV Montana Sponsor, LLC; URBIN Founders Group, LLC; URBIN CG Sponsor, LLC; 515 Valencia Partners, LLC; LV Montana Phase I, LLC; Stewart Grove 1, LLC; Stewart Grove 2, LLC; Location Zamora Parent, LLC; URBIN Coral Gables Partners, LLC; URBIN Coconut Grove Partners, LLC; URBIN Miami Beach Partners, LLC; and URBIN Miami Beach II Phase 1, LLC.

relative, friend or nominee), either has an interest or over which it has the power or right to exercise control.

### III.

### <u>RECORDS PRESERVATION</u>

**IT IS FURTHER ORDERED** that Kapoor, his directors, officers, agents, servants, employees, attorneys, depositories, banks, and those persons in active concert or participation with any one or more of them, and each of them, be and they hereby are restrained and enjoined from, directly or indirectly, destroying, mutilating, concealing, altering, disposing of, or otherwise rendering illegible in any manner, any of the books, records, documents, correspondence, brochures, manuals, papers, ledgers, accounts, statements, obligations, files and other property of or pertaining to any of the Defendants, wherever located and in whatever form, electronic or otherwise, until further Order of the Court.

### IV.

### <u>OTHER RELIEF</u>

**IT IS FURTHER ORDERED** that this Order shall not apply to a receiver appointed by this Court over any of the Company Defendants for the purposes of marshaling and preserving any and all assets of the Company Defendants, and those assets of the Company Defendants that: (i) are attributable to funds derived from investors or clients of the Company Defendants; (ii) are held in constructive trust for the Company Defendants; (iii) were fraudulently transferred by the Company Defendants; and/or (iv) may otherwise be includable under such receivership as assets of the Company Defendants. In addition, this Order does not apply to property of an entity that has filed for bankruptcy and is not a Defendant.

**V.**

**RETENTION OF JURISDICTION**

**IT IS FURTHER ORDERED** that the Court shall retain jurisdiction over this matter, Kapoor, and the Company Defendants in order to implement and carry out the terms of all orders and decrees that may be entered and/or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court and will order other relief that the Court deems appropriate under the circumstances.

**DONE AND ORDERED** in Miami, Florida, this 27th day of December, 2023.

**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc:      counsel of record

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:23-cv-24903-CMA

SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff,

v.

RISHI KAPOOR;
LOCATION VENTURES, LLC;
URBIN, LLC;
PATRIOTS UNITED, LLC;
LOCATION PROPERTIES, LLC;
LOCATION DEVELOPMENT, LLC;
LOCATION CAPITAL, LLC;
LOCATION VENTURES RESOURCES, LLC;
LOCATION EQUITY HOLDINGS, LLC;
LOCATION GP SPONSOR, LLC;
515 VALENCIA SPONSOR, LLC;
LV MONTANA SPONSOR, LLC;
URBIN FOUNDERS GROUP, LLC;
URBIN CG SPONSOR, LLC;
515 VALENCIA PARTNERS, LLC;
LV MONTANA PHASE I, LLC;
STEWART GROVE 1, LLC;
STEWART GROVE 2, LLC;
LOCATION ZAMORA PARENT, LLC;
URBIN CORAL GABLES PARTNERS, LLC;
URBIN COCONUT GROVE PARTNERS, LLC;
URBIN MIAMI BEACH PARTNERS, LLC; and
URBIN MIAMI BEACH II PHASE 1, LLC,

        Defendants,

_____/

## ORDER GRANTING PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S EXPEDITED MOTION FOR APPOINTMENT OF RECEIVER, ASSET FREEZE, AND OTHER RELIEF AGAINST THE COMPANY DEFENDANTS

      **WHEREAS** Plaintiff Securities and Exchange Commission has filed a Motion for

# EXHIBIT B

Appointment of Receiver, Asset Freeze, and Other Relief Against the Company Defendants,[1] seeking (a) the appointment of a receiver over the Company Defendants, with full and exclusive power, duty, and authority to: administer and manage the business affairs, funds, assets, causes in action, and any other property of the Company Defendants; marshal and safeguard all of its assets; and take whatever actions are necessary for the protection of the investors; (b) an asset freeze against the Company Defendants; (c) an Order requiring sworn accountings by the Company Defendants; and (d) an Order prohibiting the destruction of records by the Company Defendants;

**WHEREAS** the Court finds that, based on the record in these proceedings, the appointment of a receiver in this action is necessary and appropriate for the purposes of marshaling and preserving all assets the Company Defendants ("Receivership Assets") that: (a) are attributable to funds derived from investors or clients of the Company Defendants; (b) are held in constructive trust for the Company Defendants; (c) were fraudulently transferred by the Company Defendants; and/or (d) may otherwise be includable as assets of the estates of the Company Defendants (collectively, the "Recoverable Assets");

**WHEREAS** the Court also finds that the Commission has made a sufficient and proper showing in support of the relief granted herein by presenting a *prima facie* case showing a

---

[1] The Company Defendants include: Location Ventures, LLC ("LV"), URBIN, LLC ("URBIN"), Patriots United, LLC ("Patriots United"); Location Properties, LLC ("L. Properties"); Location Development, LLC ("L. Development"); Location Capital, LLC ("L. Capital"); Location Ventures Resources, LLC ("L. Resources"); Location Equity Holdings, LLC ("L. Holdings"); Location GP Sponsor, LLC ("L. GP Sponsor"); 515 Valencia Sponsor, LLC ("515 Valencia Sponsor"); LV Montana Sponsor, LLC ("LV Montana Sponsor"); URBIN Founders Group, LLC ("URBIN Founders"); URBIN CG Sponsor, LLC ("URBIN CG Sponsor"); 515 Valencia Partners, LLC ("515 Valencia"); LV Montana Phase I, LLC ("LV Montana"); Stewart Grove 1, LLC ("Stewart Grove 1"); Stewart Grove 2, LLC ("Stewart Grove 2"); Location Zamora Parent, LLC ("L. Zamora Parent"); URBIN Coral Gables Partners, LLC ("URBIN Gables"); URBIN Coconut Grove Partners, LLC ("URBIN Grove"); URBIN Miami Beach Partners, LLC ("URBIN Miami Beach"); and URBIN Miami Beach II Phase 1, LLC ("URBIN Miami Beach II").

reasonable approximation of the likely disgorgement award against the Company Defendants, which exceeds the amount of assets to be frozen, and therefore finds good cause to believe that, unless it imposes an asset freeze, the Company Defendants could dissipate, conceal, or transfer from the jurisdiction of this Court assets that are likely subject to an order of disgorgement;

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.     This Court hereby takes exclusive jurisdiction and possession of the assets, of whatever kind and wherever situated, of the Company Defendants (the "Receivership Defendants").

2.     Until further Order of this Court, Andrés Rivera is hereby appointed to serve without bond as receiver (the "Receiver") for the estate of the Receivership Defendants, including any of its divisions, subsidiaries, affiliates, successors, assigns, and any fictitious business entities or business names created or used by these entities, or any of them.

**I.     <u>Asset Freeze</u>**

3.     Except as otherwise specified herein, all Receivership Assets and Recoverable Assets are frozen until further order of this Court. Accordingly, all persons and entities with direct or indirect control over any Receivership Assets and/or any Recoverable Assets, other than the Receiver, are hereby restrained and enjoined from directly or indirectly transferring, setting off, receiving, changing, selling, pledging, assigning, liquidating, or otherwise disposing of or withdrawing such assets. This freeze shall include, but is not limited to, Receivership Assets and/or Recoverable Assets that are on deposit with financial institutions such as banks, brokerage firms, and mutual funds, including, but not limited to, the following presently known accounts:

| Financial Institution | Name of Account | Account Number |
|---|---|---|
| Bank of America | 515 Valencia Partners, LLC | X2161 |
| Bank of America | Location Capital, LLC | X8410 |
| Bank of America | Location Development, LLC | X5835 |
| Bank of America | Location Properties, LLC | X8258 |
| Bank of America | Stewart Grove 1, LLC | X2744 |
| Bank of America | URBIN Coconut Grove Partners, LLC | X3302 |
| Bank of America | URBIN Coral Gables Partners, LLC | X3014 |
| Bank of America | URBIN Miami Beach Partners, LLC | X5493 |
| Bank of America | URBIN, LLC | X3263 |
| First Citizens Bank | 515 Valencia Partners, LLC | X7583 |
| First Citizens Bank | URBIN Coconut Grove Partners, LLC | X0033 |
| First Citizens Bank | URBIN Coral Gables Partners, LLC | X6536 |
| First Citizens Bank | URBIN, LLC | X6544 |
| Professional Bank | URBIN Coral Gables Partners, LLC | X 1346 |
| Woodforest National Bank | 515 Valencia Partners, LLC | X1377 |
| Woodforest National Bank | 515 Valencia Partners, LLC | X1583 |
| Woodforest National Bank | Location Capital, LLC | X1450 |
| Woodforest National Bank | Location Development, LLC | X1393 |
| Woodforest National Bank | Location Properties, LLC | X1385 |
| Woodforest National Bank | Location Ventures Resources, LLC | X1459 |
| Woodforest National Bank | Stewart Grove 1, LLC | X6319 |
| Woodforest National Bank | URBIN Coconut Grove Partners, LLC | X0725 |
| Woodforest National Bank | URBIN Commodore Residential II SPE, LLC | X2879 |
| Woodforest National Bank | URBIN Miami Beach Partners, LLC | X1236 |
| Woodforest National Bank | URBIN, LLC | X6400 |

## II.   **General Powers and Duties of Receiver**

4.      The Receiver shall have all powers, authorities, rights, and privileges heretofore possessed by the officers, directors, managers, and general and limited partners of the Receivership Defendants under applicable state and federal law, by the governing charters, by-laws, articles, and/or agreements in addition to all powers and authority of a receiver at equity, and all powers conferred upon a receiver by the provisions of 28 U.S.C. §§ 754, 959, and 1692, and Fed. R. Civ. P. 66.

5.      The trustees, directors, officers, managers, employees, investment advisors,

4

accountants, attorneys, and other agents of the Receivership Defendants are hereby dismissed and the powers of any general partners, directors, and/or managers are hereby suspended. Such persons and entities shall have no authority with respect to the Receivership Defendants' operations or assets, except to the extent as may hereafter be expressly granted by the Receiver. The Receiver shall assume and control the operation of the Receivership Defendants and shall pursue and preserve all of its claims.

6.     No person holding or claiming any position of any sort with the Receivership Defendants shall possess any authority to act by or on behalf of the Receivership Defendants.

7.     Subject to the specific provisions in Sections III through XIV, below, the Receiver shall have the following general powers and duties:

A.     To use reasonable efforts to determine the nature, location, and value of all property interests of the Receivership Defendants, including, but not limited to, monies, funds, securities, credits, effects, goods, chattels, lands, premises, leases, claims, rights, and other assets, together with all rents, profits, dividends, interest, or other income attributable thereto, of whatever kind, which the Receivership Defendants own, possess, has a beneficial interest in, or control directly or indirectly ("Receivership Property" or, collectively, the "Receivership Estates");

B.     To take custody, control, and possession of all Receivership Property and records relevant thereto from the Receivership Defendants; to sue for and collect, recover, receive, and take into possession from third parties all Receivership Property and records relevant thereto;

C.     To manage, control, operate, and maintain the Receivership Estates and hold in his possession, custody, and control all Receivership Property, pending further Order of this Court;

D.     To use Receivership Property for the benefit of the Receivership Estates, making payments and disbursements and incurring expenses as may be necessary or advisable in the ordinary course of business in discharging his duties as Receiver;

E.     To take any action which, prior to the entry of this Order, could have been taken by the officers, directors, partners, managers, trustees, and agents of the Receivership Defendants;

5

F.    To engage and employ persons in his discretion to assist him in carrying out his duties and responsibilities hereunder, including, but not limited to, accountants, attorneys, securities traders, registered representatives, financial or business advisers, liquidating agents, real estate agents, forensic experts, brokers, traders, or auctioneers;

G.    To take such action as necessary and appropriate for the preservation of Receivership Property or to prevent the dissipation or concealment of Receivership Property;

H.    The Receiver is authorized to issue subpoenas for documents and testimony consistent with the Federal Rules of Civil Procedure;

I.    To bring such legal actions based on law or equity in any state, federal, or foreign court as the Receiver deems necessary or appropriate in discharging his duties as Receiver;

J.    To pursue, resist, and defend all suits, actions, claims, and demands which may now be pending or which may be brought by or asserted against the Receivership Estates;

K.    Engage persons in the Receiver's discretion to assist the Receiver in carrying out the Receiver's duties and responsibilities, including, but not limited to, the United States Marshal's Service or a private security firm;

L.    To expand the receivership to include other entities, as permitted by law; and

M.    To take such other action as may be approved by this Court.

## III.    <u>Access to Information</u>

8.    The Receivership Defendants and the past and/or present officers, directors, agents, managers, general and limited partners, trustees, attorneys, accountants, and employees of the Receivership Defendants, as well as those acting in their place, are hereby ordered and directed to preserve and turn over to the Receiver forthwith all paper and electronic information of, and/or relating to, the Receivership Defendants and/or all Receivership Property; such information shall include but not be limited to books, records, documents, accounts, and all other instruments and papers.

6

9.     The Receivership Defendants and the Receivership Defendants' past and/or present officers, directors, agents, attorneys, managers, shareholders, employees, accountants, debtors, creditors, managers, and general and limited partners, and other appropriate persons or entities shall answer under oath to the Receiver all questions which the Receiver may put to them and produce all documents as required by the Receiver regarding the business of the Receivership Defendants, or any other matter relevant to the operation or administration of the receivership or the collection of funds due to the Receivership Defendants. In the event that the Receiver deems it necessary to require the appearance of the aforementioned persons or entities, the Receiver shall make its discovery requests in accordance with the Federal Rules of Civil Procedure.

10.     The Receivership Defendants are required to assist the Receiver in fulfilling his duties and obligations. As such, it must respond promptly and truthfully to all requests for information and documents from the Receiver.

## IV.     Access to Books, Records, and Accounts

11.     The Receiver is authorized to take immediate possession of all assets, bank accounts, or other financial accounts, books and records, and all other documents or instruments relating to the Receivership Defendants. All persons and entities having control, custody, or possession of any Receivership Property are hereby directed to turn such property over to the Receiver.

12.     The Receivership Defendants, as well as its agents, servants, employees, attorneys, any persons acting for or on behalf of the Receivership Defendants, and any persons receiving notice of this Order by personal service, facsimile or electronic mail transmission, or otherwise, having possession of the property, business, books, records, accounts, or assets of the Receivership Defendants are hereby directed to deliver the same to the Receiver, his agents, and/or employees.

13.     All banks, brokerage firms, financial institutions, and other persons or entities which have possession, custody, or control of any assets or funds held by, in the name of, or for the benefit of, directly or indirectly, and of the Receivership Defendants that receive actual notice of this Order by personal service, facsimile or electronic mail transmission, or otherwise shall:

      A.     Not liquidate, transfer, sell, convey, or otherwise transfer any assets, securities, funds, or accounts in the name of or for the benefit of the Receivership Defendants except upon instructions from the Receiver;

      B.     Not exercise any form of set-off, alleged set-off, lien, or any form of self-help whatsoever, or refuse to transfer any funds or assets to the Receiver's control without the permission of this Court;

      C.     Within five (5) business days of receipt of that notice, file with the Court and serve on the Receiver and counsel for the Commission a certified statement setting forth, with respect to each such account or other asset, the balance in the account or description of the assets as of the close of business on the date of receipt of the notice; and,

      D.     Cooperate expeditiously in providing information and transferring funds, assets, and accounts to the Receiver or at the direction of the Receiver.

## V.    <u>Access to Real and Personal Property</u>

14.     The Receiver is authorized to take immediate possession of all personal property of the Receivership Defendants, wherever located, including, but not limited to, electronically stored information, computers, laptops, hard drives, external storage drives, and any other such memory, media, or electronic storage devices, books, papers, data processing records, evidence of indebtedness, bank records and accounts, savings records and accounts, brokerage records and accounts, certificates of deposit, stocks, bonds, debentures, and other securities and investments, contracts, mortgages, furniture, office supplies, and equipment.

15.     The Receiver is authorized to take immediate possession of all real property of the Receivership Defendants, wherever located, including, but not limited to, all ownership and leasehold interests and fixtures. Upon receiving actual notice of this Order by personal service,

facsimile or electronic mail transmission, or otherwise, all persons other than law enforcement officials acting within the course and scope of their official duties, are (without the express written permission of the Receiver) prohibited from: (a) entering such premises; (b) removing anything from such premises; or (c) destroying, concealing, or erasing anything on such premises.

16.     In order to execute the express and implied terms of this Order, the Receiver is authorized to change door locks to the premises described above. The Receiver shall have exclusive control of the keys. The Receivership Defendants, or any other person acting or purporting to act on its behalf, are ordered not to change the locks in any manner, nor to have duplicate keys made, nor shall they have keys in their possession during the term of the receivership.

17.     The Receiver is authorized to open all mail directed to or received by or at the offices or post office boxes of the Receivership Defendants, and to inspect all mail opened prior to the entry of this Order, to determine whether items or information therein fall within the mandates of this Order.

## VI.     Notice to Third Parties

18.     The Receiver shall promptly give notice of his appointment to all known officers, directors, agents, employees, shareholders, creditors, debtors, managers, and general and limited partners of the Receivership Defendants as the Receiver deems necessary or advisable to effectuate the operation of the receivership.

19.     All persons and entities owing any obligation, debt, or distribution with respect to an ownership interest to the Receivership Defendants shall, until further ordered by this Court, pay all such obligations in accordance with the terms thereof to the Receiver and its receipt for such payments shall have the same force and effect as if the Receivership Defendants had received such

payment.

20.     In furtherance of his responsibilities in this matter, the Receiver is authorized to communicate with and/or serve this Order upon any person, entity, or government office that he deems appropriate to inform them of the status of this matter and/or the financial condition of the Receivership Estate. All government offices which maintain public files of security interests in real and personal property shall, consistent with such office's applicable procedures, record this Order upon the request of the Receiver or the Commission.

21.     The Receiver is authorized to instruct the United States Postmaster to hold and/or reroute mail which is related, directly or indirectly, to the business, operations, or activities of the Receivership Defendants (the "Receiver's Mail"), including all mail addressed to, or for the benefit of, the Receivership Defendants. The Postmaster shall not comply with, and shall immediately report to the Receiver, any change of address or other instruction given by anyone other than the Receiver concerning the Receiver's Mail. The Receivership Defendants shall not open any of the Receiver's Mail and shall immediately turn over such mail, regardless of when received, to the Receiver. All personal mail of the Receivership Defendants, and/or any mail appearing to contain privileged information, and/or any mail not falling within the mandate of the Receiver, shall be released to the named addressee by the Receiver. The foregoing instructions shall apply to any proprietor, whether individual or entity, of any private mailbox, depository, business or service, or mail courier or delivery service, hired, rented, or used by the Receivership Defendants. The Receivership Defendants shall not open a new mailbox or take any steps or make any arrangements to receive mail in contravention of this Order, whether through the U.S. mail, a private mail depository, or courier service.

22.     Subject to payment for services provided, any entity furnishing water, electric,

telephone, sewage, garbage, or trash removal services to the Receivership Defendants shall maintain such service and transfer any such accounts to the Receiver unless instructed to the contrary by the Receiver.

**VII.**   **Injunction Against Interference with Receiver**

23.    The Receivership Defendants and all persons receiving notice of this Order by personal service, facsimile, electronic mail, or otherwise, are hereby restrained and enjoined from directly or indirectly taking any action, or causing any action to be taken, without the express written agreement of the Receiver, which would:

A.    Interfere with the Receiver's efforts to take control, possession, or management of any Receivership Property; such prohibited actions include but are not limited to using self-help or executing or issuing or causing the execution or issuance of any court attachment, subpoena, replevin, execution, or other process for the purpose of impounding or taking possession of or interfering with or creating or enforcing a lien upon any Receivership Property;

B.    Hinder, obstruct, or otherwise interfere with the Receiver in the performance of his duties; such prohibited actions include but are not limited to concealing, destroying, or altering records or information;

C.    Dissipate or otherwise diminish the value of any Receivership Property; such prohibited actions include but are not limited to releasing claims or disposing, transferring, exchanging, assigning, or in any way conveying any Receivership Property, enforcing judgments, assessments, or claims against any Receivership Property or the Receivership Defendants, attempting to modify, cancel, terminate, call, extinguish, revoke, or accelerate (the due date) of any lease, loan, mortgage, indebtedness, security agreement, or other agreement executed by the Receivership Defendants or which otherwise affects any Receivership Property; or,

D.    Interfere with or harass the Receiver or interfere in any manner with the exclusive jurisdiction of this Court over the Receivership Estates.

24.    The Receivership Defendants shall cooperate with and assist the Receiver in the performance of his duties.

11

25.     The Receiver shall promptly notify the Court and Commission counsel of any failure or apparent failure of any person or entity to comply in any way with the terms of this Order.

## VIII.  **Stay of Litigation**

26.     As set forth in detail below, the following proceedings, excluding the instant proceeding and all police or regulatory actions and actions of the Commission related to the above-captioned enforcement action, are stayed until further Order of this Court:

> All civil legal proceedings of any nature, including, but not limited to, bankruptcy proceedings, arbitration proceedings, foreclosure actions, default proceedings, or other actions of any nature involving: (a) the Receiver, in his capacity as Receiver; (b) any Receivership Property, wherever located; (c) the Receivership Defendants, including subsidiaries and partnerships; or, (d) any of the Receivership Defendants' past or present officers, directors, managers, agents, or general or limited partners sued for, or in connection with, any action taken by them while acting in such capacity of any nature, whether as plaintiff, defendant, third-party plaintiff, third-party defendant, or otherwise (such proceedings are hereinafter referred to as "Ancillary Proceedings").

27.     The parties to any and all Ancillary Proceedings are enjoined from commencing or continuing any such legal proceeding, or from taking any action in connection with any such proceeding, including, but not limited to, the issuance or employment of process.

28.     All Ancillary Proceedings are stayed in their entirety, and all Courts having any jurisdiction thereof are enjoined from taking or permitting any action until further Order of this Court. Further, as to a cause of action accrued or accruing in favor of the Receivership Defendants against a third person or party, any applicable statute of limitation is tolled during the period in which this injunction against commencement of legal proceedings is in effect as to that cause of action.

## IX.    Managing Assets

29.    For the Receivership Estate, the Receiver shall establish one or more custodial accounts at a federally insured bank to receive and hold all cash equivalent Receivership Property (the "Receivership Funds").

30.    The Receiver's deposit account shall be entitled in his name as receiver, together with a reference to Location Ventures, LLC.

31.    The Receiver may, without further Order of this Court, transfer, compromise, or otherwise dispose of any Receivership Property, other than real estate, in the ordinary course of business, on terms and in the manner the Receiver deems most beneficial to the Receivership Estate, and with due regard to the realization of the true and proper value of such Receivership Property.

32.    Subject to Paragraph 33 immediately below, the Receiver is authorized to locate, list for sale or lease, engage a broker for sale or lease, cause the sale or lease, and take all necessary and reasonable actions to cause the sale or lease of all real property in the Receivership Estate, either at public or private sale, on terms and in the manner the Receiver deems most beneficial to the Receivership Estate, and with due regard to the realization of the true and proper value of such real property.

33.    Upon further Order of this Court, pursuant to such procedures as may be required by this Court and additional authority such as 28 U.S.C. §§ 2001 and 2004, the Receiver will be authorized to sell, and transfer clear title to, all real property in the Receivership Estate.

34.    The Receiver is authorized to take all actions to manage, maintain, and/or wind-down business operations of the Receivership Estate, including making legally required payments to creditors, employees, and agents of the Receivership Estate and communicating with vendors,

13

investors, governmental and regulatory authorities, and others as appropriate.

35.     The Receiver shall take all necessary steps to enable the Receivership Funds to obtain and maintain the status of a taxable "Settlement Fund," within the meaning of Section 468B of the Internal Revenue Code and of the regulations, when applicable.

## X.     **Investigate and Prosecute Claims**

36.     Subject to the requirement, in Section VIII above, that leave of this Court is required to resume or commence certain litigation, the Receiver is authorized, empowered, and directed to investigate, prosecute, defend, intervene in or otherwise participate in, compromise, and/or adjust actions in any state, federal, or foreign court or proceeding of any kind as may in his discretion, and in consultation with Commission counsel, be advisable or proper to recover and/or conserve Receivership Property.

37.     Subject to his obligation to expend receivership funds in a reasonable and cost-effective manner, the Receiver is authorized, empowered, and directed to investigate the manner in which the financial and business affairs of the Receivership Defendants were conducted and (after obtaining leave of this Court) to institute such actions and legal proceedings, for the benefit and on behalf of the Receivership Estate, as the Receiver deems necessary and appropriate; the Receiver may seek, among other legal and equitable relief, the imposition of constructive trusts, disgorgement of profits, asset turnover, avoidance of fraudulent transfers, rescission and restitution, collection of debts, and such other relief from this Court as may be necessary to enforce this Order. Where appropriate, the Receiver should provide prior notice to Counsel for the Commission before commencing investigations and/or actions.

38.     The Receiver hereby holds, and is therefore empowered to waive, all privileges, including the attorney-client privilege, held by the Receivership Defendants.

39.     The Receiver has a continuing duty to ensure that there are no conflicts of interest between the Receiver, his Retained Personnel (as that term is defined below), and the Receivership Estate.

## XI.     Bankruptcy Filing

40.     The Receiver may seek authorization of this Court to file voluntary petitions for relief under Title 11 of the United States Code (the "Bankruptcy Code") for the Receivership Defendants. If the Receivership Defendants are placed in bankruptcy proceedings, the Receiver may become, and may be empowered to operate each of the Receivership Estate as, a debtor in possession. In such a situation, the Receiver shall have all of the powers and duties as provided a debtor in possession under the Bankruptcy Code to the exclusion of any other person or entity. Pursuant to Paragraph 4 above, the Receiver is vested with management authority for the Receivership Defendants and may therefore file and manage a Chapter 11 petition.

41.     The provisions of Section VII above bar any person or entity, other than the Receiver, from placing the Receivership Defendants in bankruptcy proceedings.

## XII.     Liability of Receiver

42.     Until further Order of this Court, the Receiver shall not be required to post bond or give an undertaking of any type in connection with his fiduciary obligations in this matter.

43.     The Receiver and his agents, acting within scope of such agency ("Retained Personnel"), are entitled to rely on all outstanding rules of law and Orders of this Court and shall not be liable to anyone for their own good-faith compliance with any order, rule, law, judgment, or decree. In no event shall the Receiver or Retained Personnel be liable to anyone for their good-faith compliance with their duties and responsibilities as Receiver or Retained Personnel, nor shall the Receiver or Retained Personnel be liable to anyone for any actions taken or omitted by them

15

except upon a finding by this Court that they acted or failed to act as a result of malfeasance, bad faith, gross negligence, or in reckless disregard of their duties.

44.     This Court shall retain jurisdiction over any action filed against the Receiver or Retained Personnel based upon acts or omissions committed in their representative capacities.

45.     In the event the Receiver decides to resign, the Receiver shall first give written notice to the Commission's counsel of record and the Court of its intention, and the resignation shall not be effective until the Court appoints a successor. The Receiver shall then follow such instructions as the Court may provide.

## XIII.    <u>Recommendations and Reports</u>

46.     The Receiver is authorized, empowered, and directed to develop a plan for the fair, reasonable, and efficient recovery and liquidation of all remaining, recovered, and recoverable Receivership Property (the "Liquidation Plan").

47.     Within thirty (30) days after the end of each calendar quarter, the Receiver shall file and serve a full report and accounting of the Receivership Estate (the "Quarterly Status Report"), reflecting (to the best of the Receiver's knowledge as of the period covered by the report) the existence, value, and location of all Receivership Property, and of the extent of liabilities, both those claimed to exist by others and those the Receiver believes to be legal obligations of the Receivership Estate.

48.     The Quarterly Status Report shall contain the following:

A.      A summary of the operations of the Receiver;

B.      The amount of cash on hand, the amount and nature of accrued administrative expenses, and the amount of unencumbered funds in the estate;

C.      A schedule of all the Receiver's receipts and disbursements (attached as Exhibit A to the Quarterly Status Report), with one column for the quarterly

period covered and a second column for the entire duration of the receivership;

D.    A description of all known Receivership Property, including approximate or actual valuations, anticipated or proposed dispositions, and reasons for retaining assets where no disposition is intended;

E.    A description of liquidated and unliquidated claims held by the Receivership Estate, including the need for forensic and/or investigatory resources; approximate valuations of claims; and anticipated or proposed methods of enforcing such claims (including likelihood of success in: (i) reducing the claims to judgment; and, (ii) collecting such judgments);

F.    A list of all known creditors with their addresses and the amounts of their claims;

G.    The status of Creditor Claims Proceedings after such proceedings have been commenced; and,

H.    The Receiver's recommendations for a continuation or discontinuation of the receivership and the reasons for the recommendations.

49.    On the request of the Commission, the Receiver shall provide the Commission with any documentation that the Commission deems necessary to meet its reporting requirements, that is mandated by statute or Congress, or that is otherwise necessary to further the Commission's mission.

## XIV.    Fees, Expenses, and Accountings

50.    Subject to Paragraphs 52-58 immediately below, the Receiver need not obtain Court approval prior to the disbursement of Receivership Funds for expenses in the ordinary course of the administration and operation of the receivership. Further, prior Court approval is not required for payments of applicable federal, state, or local taxes.

51.    Subject to Paragraph 53 immediately below, the Receiver is authorized to solicit persons and entities ("Retained Personnel") to assist him in carrying out the duties and responsibilities described in this Order. The Receiver shall not engage any Retained Personnel

without first obtaining an Order of the Court authorizing such engagement.

52.    The Receiver and Retained Personnel are entitled to reasonable compensation and expense reimbursement from the Receivership Estate as described in the "Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission" (the "Billing Instructions") agreed to by the Receiver. Such compensation shall require the prior approval of the Court.

53.    Beginning for the third quarter of 2023, and within forty-five (45) days after the end of each calendar quarter, the Receiver and Retained Personnel shall apply to the Court for compensation and expense reimbursement from the Receivership Estates (the "Quarterly Fee Applications"). At least thirty (30) days prior to filing each Quarterly Fee Application with the Court, the Receiver will serve upon counsel for the Commission a complete copy of the proposed Application, together with all exhibits and relevant billing information in a format to be provided by Commission staff.

54.    All Quarterly Fee Applications will be interim and will be subject to cost benefit and final reviews at the close of the receivership. At the close of the receivership, the Receiver will file a final fee application, describing in detail the costs and benefits associated with all litigation and other actions pursued by the Receiver during the course of the receivership.

55.    Quarterly Fee Applications may be subject to a holdback in the amount of 20% of the amount of fees and expenses for each application filed with the Court. The total amounts held back during the course of the receivership will be paid out at the discretion of the Court as part of the final fee application submitted at the close of the receivership.

56.    Each Quarterly Fee Application shall:

    A.    Comply with the terms of the Billing Instructions agreed to by the Receiver; and,

      B.      Contain representations (in addition to the Certification required by the Billing Instructions) that: (i) the fees and expenses included therein were incurred in the best interests of the Receivership Estate; and, (ii) with the exception of the Billing Instructions, the Receiver has not entered into any agreement, written or oral, express or implied, with any person or entity concerning the amount of compensation paid or to be paid from the Receivership Estate, or any sharing thereof.

57.     At the close of the Receivership, the Receiver shall submit a Final Accounting in a format to be provided by Commission staff, as well as the Receiver's final application for compensation and expense reimbursement.

## XV.   Sworn Accounting

58.     Within forty-five (45) days of the issuance of this Order, the Receivership Defendants shall:

      A.      make a sworn accounting to this Court and the Commission of all assets, funds, or other properties, whether real or personal, held by Receivership Defendants, jointly or individually, or for their direct or indirect beneficial interest, or over which he or they maintain control, wherever situated, stating the location, value, and disposition of each such asset, fund, and other property; and

      B.      provide to the Court and the Commission a sworn identification of all accounts (including, but not limited to, bank accounts, savings accounts, securities accounts, and deposits of any kind and wherever situation) in which the Receivership Defendants, whether solely or jointly, directly or indirectly (including through a corporation, partnership, relative, friend or nominee), either has an interest or over which it has the power or right to exercise control.

## XVI.   Records Preservation

59.     The Receivership Defendants, their directors, officers, agents, servants, employees, attorneys, depositories, banks, and those persons in active concert or participation with any one or more of them, and each of them, be and they hereby are restrained and enjoined from, directly or indirectly, destroying, mutilating, concealing, altering, disposing of, or otherwise rendering illegible in any manner, any of the books, records, documents, correspondence, brochures,

manuals, papers, ledgers, accounts, statements, obligations, files and other property of or pertaining to any of the Defendants, wherever located and in whatever form, electronic or otherwise, until further Order of this Court.

## XVII. <u>Other Relief</u>

60. This Order shall not apply to the Receiver appointed by this Court over Receivership Defendants for the purposes of marshaling and preserving any and all assets of the Receivership Defendants, and those assets of the Receivership Defendants: (a) are attributable to funds derived from investors or clients of the Receivership Defendants; (b) are held in constructive trust for the Receivership Defendants; (c) were fraudulently transferred the Receivership Defendants; and/or (d) may otherwise be includable under such receivership as assets of Receivership Defendants. In addition, this Order does not apply to property of an entity that has filed for bankruptcy and is not a Receivership Defendant.

## XVIII. <u>Retention of Jurisdiction</u>

61. This Court shall retain jurisdiction over this matter, Defendants, and the Receivership Defendants in order to implement and carry out the terms of all Orders and Decrees that may be entered and/or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court, and will order other relief that this Court deems appropriate under the circumstances.

**DONE AND ORDERED** in Chambers in Miami, Florida this ____ day of January 2024.

_____
**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc:      counsel of record

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-cv-24903-CMA

SECURITIES AND EXCHANGE
COMMISSION,

              Plaintiff,

v.

RISHI KAPOOR, etc., et al,

              Defendants.

_____/

# **<u>EXHIBIT B</u>**

Listing Agreement

## Exclusive Right of Sale Listing Agreement

**BOSCHETTI**
REALTY GROUP

1 This Exclusive Right of Sale Listing Agreement ("Agreement") is between

2* _____ 7233 LOS PINOS, LLC _____ ("**Seller**")

3* and _____ BOSCHETTI REALTY GROUP _____ ("**Broker**").

4 **1. Authority to Sell Property: Seller** gives **Broker** the EXCLUSIVE RIGHT TO SELL the real and personal
5 property (collectively "Property") described below, at the price and terms described below, beginning
6* _____ February 16, 2024 _____ and terminating at 11:59 p.m. on _____ February 16, 2025 _____ ("Termination Date"). Upon
7 full execution of a contract for sale and purchase of the Property, all rights and obligations of this Agreement will
8 automatically extend through the date of the actual closing of the sales contract. **Seller** and **Broker** acknowledge
9 that this Agreement does not guarantee a sale. This Property will be offered to any person without regard to race,
10 color, religion, sex, handicap, familial status, national origin, or any other factor protected by federal, state, or local
11 law. **Seller** certifies and represents that she/he/it is legally entitled to convey the Property and all improvements.

12 **2. Description of Property:**
13* **(a) Street Address:** 7233 LOS PINOS BLVD, CORAL GABLES, FL 33143

14 _____

15* Legal Description: _____ COCOPLUM SEC 1 PB 99-39 LOT 5 BLK 9 LOT SIZE 17641 SQ FT _____

16* _____ ☐ See Attachment _____

17* **(b) Personal Property, including appliances:** _____

18* _____ ☐ See Attachment _____

19 **(c) Occupancy:**
20* Property ☐ is ☒ is not currently occupied by a tenant. If occupied, the lease term expires _____.

21 **3. Price and Terms:** The property is offered for sale on the following terms or on other terms acceptable to **Seller**:
22* **(a) Price:** $8,495,000.00
23* **(b) Financing Terms:** ☒ Cash ☒ Conventional ☐ VA ☐ FHA ☐ Other (specify) _____
24* ☐**Seller** Financing: **Seller** will hold a purchase money mortgage in the amount of $_____
25* with the following terms: _____
26* ☐Assumption of Existing Mortgage: Buyer may assume existing mortgage for $_____ plus
27* an assumption fee of $_____. The mortgage is for a term of _____ years beginning in
28* _____, at an interest rate of _____% ☐ fixed ☐ variable (describe) _____
29* Lender approval of assumption ☐ is required ☐ is not required ☐ unknown. **Notices to Seller:** (1) You may
30 remain liable for an assumed mortgage for a number of years after the Property is sold. Check with your
31 lender to determine the extent of your liability. **Seller** will ensure that all mortgage payments and required
32 escrow deposits are current at the time of closing and will convey the escrow deposit to the buyer at closing.
33 (2) Extensive regulations affect **Seller** financed transactions. It is beyond the scope of a real estate licensee's
34 authority to determine whether the terms of your **Seller** financing agreement comply with all applicable laws
35 or whether you must be registered and/or licensed as a loan originator before offering **Seller** financing. You
36 are advised to consult with a legal or mortgage professional to make this determination.
37* **(c) Seller Expenses: Seller** will pay mortgage discount or other closing costs not to exceed _____% of the
38 purchase price and any other expenses **Seller** agrees to pay in connection with a transaction.

39 **4. Broker Obligations: Broker** agrees to make diligent and continued efforts to sell the Property in accordance with
40 this Agreement until a sales contract is pending on the Property.

41 **5. Multiple Listing Service:** Placing the Property in a multiple listing service (the "MLS") is beneficial to **Seller**
42 because the Property will be exposed to a large number of potential buyers. As a MLS participant, **Broker** is
43 obligated to enter the Property into the MLS within one (1) business day of marketing the Property to the public
44 (see Paragraph 6(a)) or as necessary to comply with local MLS rule(s). This listing will be published accordingly in
45 the MLS unless **Seller** directs **Broker** otherwise in writing. (See paragraph 6(b)(i)). **Seller** authorizes **Broker** to
46 report to the MLS this listing information and price, terms, and financing information on any resulting sale for use
47 by authorized Board / Association members and MLS participants and subscribers unless **Seller** directs **Broker**
48 otherwise in writing.

Seller (_____) (_____) and Broker/Sales Associate (__MB__) (_____) acknowledge receipt of a copy of this page, which is Page 1 of 4.

©2020 Florida Realtors®

Serial#: 031313-800170-8115986

Form
Simplicity

49  **6. Broker Authority: Seller** authorizes **Broker** to:
50  **(a)** Market the Property to the Public (unless limited in Paragraph 6(b)(i) below):
51  **(i)** Public marketing includes, but is not limited to, flyers, yard signs, digital marketing on public facing
52  websites, brokerage website displays (i.e. IDX or VOW), email blasts, multi-brokerage listing sharing
53  networks and applications available to the general public.
54  **(ii) Public marketing also includes marketing the Property to real estate agents outside Broker's**
55  **office.**
56  **(iii)** Place appropriate transaction signs on the Property, except if Paragraph 6(b)(i) is checked below.
57  **(iv)** Use **Seller's** name in connection with marketing or advertising the Property.
58*  ☐ Display the Property on the Internet except the street address.
59  **(b)** Not Publicly Market to the Public/Seller Opt-Out:
60*  **(i)** ☐ **Seller** does not authorize **Broker** to display the Property on the MLS.
61  **(ii) Seller** understands and acknowledges that if **Seller** checks option 6(b)(i), a For Sale sign will not be
62  placed upon the Property and
63  **(iii) Seller** understands and acknowledges that if **Seller** checks option 6(b)(i), **Broker** will be limited to
64  marketing the Property only to agents within **Broker's** office.
65  _____ / _____ **Initials of Seller**
66  **(c)** Obtain information relating to the present mortgage(s) on the Property.
67  **(d)** Provide objective comparative market analysis information to potential buyers.
68*  **(e)** (**Check if applicable**) ☐ Use a lock box system to show and access the Property. A lock box does not
69  ensure the Property's security. **Seller** is advised to secure or remove valuables. **Seller** agrees that the lock
70  box is for **Seller's** benefit and releases **Broker**, persons working through **Broker**, and **Broker's** local Realtor
71  Board / Association from all liability and responsibility in connection with any damage or loss that occurs.
72*  ☐ Withhold verbal offers. ☐ Withhold all offers once **Seller** accepts a sales contract for the Property.
73  **(f)** Act as a single agent of **Seller**.
74  **(g) Virtual Office Websites:** Some real estate brokerages offer real estate brokerage services online. These
75  websites are referred to as Virtual Office Websites ("VOWs"). An automated estimate of market value or
76  reviews and comments about a property may be displayed in conjunction with a property on some VOWs.
77  Anyone who registers on a VOW may gain access to such automated valuations or comments and reviews
78  about any property displayed on a VOW. Unless limited below, a VOW may display automated valuations or
79  comments and reviews about this Property.
80*  ☐ **Seller** does not authorize an automated estimate of the market value of the listing (or a hyperlink to such
81  estimate) to be displayed in immediate conjunction with the listing of this Property.
82*  ☐ **Seller** does not authorize third parties to write comments or reviews about the listing of the Property (or
83  display a hyperlink to such comments or reviews) in immediate conjunction with the listing of this Property.

84  **7. Seller Obligations:** In consideration of **Broker's** obligations, **Seller** agrees to:
85  **(a)** Cooperate with **Broker** in carrying out the purpose of this Agreement, including referring immediately to
86  **Broker** all inquiries regarding the Property's transfer, whether by purchase or any other means of transfer.
87  **(b)** Recognize **Broker** may be subject to additional MLS obligations and potential penalties for failure to comply
88  with them.
89  **(c)** Provide **Broker** with keys to the Property and make the Property available for **Broker** to show during
90  reasonable times.
91  **(d)** Inform **Broker** before leasing, mortgaging, or otherwise encumbering the Property.
92  **(e)** Indemnify **Broker** and hold **Broker** harmless from losses, damages, costs, and expenses of any nature,
93  including attorney's fees, and from liability to any person, that **Broker** incurs because of (1) **Seller's**
94  negligence, representations, misrepresentations, actions, or inactions; (2) the use of a lock box; (3) the
95  existence of undisclosed material facts about the Property; or (4) a court or arbitration decision that a broker
96  who was not compensated in connection with a transaction is entitled to compensation from **Broker**. This
97  clause will survive **Broker's** performance and the transfer of title.
98  **(f)** Perform any act reasonably necessary to comply with FIRPTA (Section 1445 of the Internal Revenue Code).
99  **(g)** Make all legally required disclosures, including all facts that materially affect the Property's value and are not
100  readily observable or known by the buyer. **Seller** certifies and represents that **Seller** knows of no such
101  material facts (local government building code violations, unobservable defects, etc.) other than the following:
102*  _____
103  **Seller** will immediately inform **Broker** of any material facts that arise after signing this Agreement.
104  **(h)** Consult appropriate professionals for related legal, tax, property condition, environmental, foreign reporting
105  requirements, and other specialized advice.

Seller (_____) and Broker/Sales Associate ( **MB** ) (_____) acknowledge receipt of a copy of this page, which is Page 2 of 4.

Form Simplicity

8. **Compensation: Seller** will compensate **Broker** as specified below for procuring a buyer who is ready, willing, and able to purchase the Property or any interest in the Property on the terms of this Agreement or on any other terms acceptable to **Seller. Seller** will pay **Broker** as follows (plus applicable sales tax):

   (a) _____6%__ of the total purchase price plus $_____ OR $_____, no later than the date of closing specified in the sales contract. However, closing is not a prerequisite for **Broker's** fee being earned.

   (b) _____ ($ or %) of the consideration paid for an option, at the time an option is created. If the option is exercised, **Seller** will pay **Broker** the Paragraph 8(a) fee, less the amount **Broker** received under this subparagraph.

   (c) _____ ($ or %) of gross lease value as a leasing fee, on the date **Seller** enters into a lease or agreement to lease, whichever is earlier. This fee is not due if the Property is or becomes the subject of a contract granting an exclusive right to lease the Property.

   (d) **Broker's** fee is due in the following circumstances: (1) If any interest in the Property is transferred, whether by sale, lease, exchange, governmental action, bankruptcy, or any other means of transfer, regardless of whether the buyer is secured by **Seller, Broker**, or any other person. (2) If **Seller** refuses or fails to sign an offer at the price and terms stated in this Agreement, defaults on an executed sales contract, or agrees with a buyer to cancel an executed sales contract. (3) If, within _____ days after Termination Date ("Protection Period"), **Seller** transfers or contracts to transfer the Property or any interest in the Property to any prospects with whom **Seller, Broker**, or any real estate licensee communicated regarding the Property before Termination Date. However, no fee will be due **Broker** if the Property is relisted after Termination Date and sold through another broker.

   (e) **Retained Deposits:** As consideration for **Broker's** services, **Broker** is entitled to receive _____% (50% if left blank) of all deposits that **Seller** retains as liquidated damages for a buyer's default in a transaction, not to exceed the Paragraph 8(a) fee.

9. **Cooperation with and Compensation to Other Brokers: Notice to Seller:** The buyer's broker, even if compensated by **Seller** or **Broker**, may represent the interests of the buyer. **Broker's** office policy is to cooperate with all other brokers except when not in **Seller's** best interest and to offer compensation in the amount of ☒ _____3%__ of the purchase price or $_____ to a single agent for the buyer; ☒ _____3%__ of the purchase price or $_____ to a transaction broker for the buyer; and ☐ _____% of the purchase price or $_____ to a broker who has no brokerage relationship with the buyer. ☐ None of the above. (If this is checked, the Property cannot be placed in the MLS.)

10. **Brokerage Relationship:**

**SINGLE AGENT NOTICE**

**FLORIDA LAW REQUIRES THAT REAL ESTATE LICENSEES OPERATING AS SINGLE AGENTS DISCLOSE TO BUYERS AND SELLERS THEIR DUTIES.**

As a single agent, _____BOSCHETTI REALTY GROUP_____ and its associates owe to you the following duties:

1. Dealing honestly and fairly;
2. Loyalty;
3. Confidentiality;
4. Obedience;
5. Full Disclosure;
6. Accounting for all funds;
7. Skill, care, and diligence in the transaction;
8. Presenting all offers and counteroffers in a timely manner, unless a party has previously directed the licensee otherwise in writing; and
9. Disclosing all known facts that materially affect the value of residential real property and are not readily observable.

_____   **2/16/2024**
Signature                                          Date

_____   _____
Signature                                          Date

Seller (____)(____) and Broker/Sales Associate ( MB ) (____) acknowledge receipt of a copy of this page, which is Page 3 of 4.

ERS-17sa   Rev 5/2020                                                              ©2020 Florida Realtors®

Serial#: 031313-800170-8115986

157    **11. Conditional Termination:**  At **Seller's** request, **Broker** may agree to conditionally terminate this Agreement. If
158    **Broker** agrees to conditional termination, **Seller** must sign a withdrawal agreement, reimburse **Broker** for all direct
159*   expenses incurred in marketing the Property, and pay a cancellation fee of $_____ plus
160    applicable sales tax. **Broker** may void the conditional termination, and **Seller** will pay the fee stated in Paragraph
161    8(a) less the cancellation fee if **Seller** transfers or contracts to transfer the Property or any interest in the Property
162    during the time period from the date of conditional termination to Termination Date and Protection Period, if
163    applicable.

164    **12. Dispute Resolution:**  This Agreement will be construed under Florida law. All controversies, claims, and other
165    matters in question between the parties arising out of or relating to this Agreement or the breach thereof will be
166    settled by first attempting mediation under the rules of the American Arbitration Association or other mediator
167    agreed upon by the parties. If litigation arises out of this Agreement, the prevailing party will be entitled to recover
168    reasonable attorney's fees and costs, unless the parties agree that disputes will be settled by arbitration as follows:
169*   **Arbitration:**  By initialing in the space provided, **Seller** (____) (____), Sales Associate (____), and **Broker** (____)
170    agree that disputes not resolved by mediation will be settled by neutral binding arbitration in the county in which
171    the Property is located in accordance with the rules of the American Arbitration Association or other arbitrator
172    agreed upon by the parties. Each party to any arbitration (or litigation to enforce the arbitration provision of this
173    Agreement or an arbitration award) will pay its own fees, costs, and expenses, including attorney's fees, and will
174    equally split the arbitrator's fees and administrative fees of arbitration.

175    **13. Miscellaneous:**  This Agreement is binding on **Seller's** and **Broker's** heirs, personal representatives,
176    administrators, successors, and assigns. **Broker** may assign this Agreement to another listing office. This
177    Agreement is the entire agreement between **Seller** and **Broker**. No prior or present agreements or representations
178    will be binding on **Seller** or **Broker** unless included in this Agreement. Electronic signatures are acceptable and
179    will be binding. Signatures, initials, and modifications communicated by facsimile will be considered as originals.
180    The term "buyer" as used in this Agreement includes buyers, tenants, exchangors, optionees, and other categories
181    of potential or actual transferees.

182*   **14. Additional Terms:** _____
183    _____
184    _____
185    _____
186    _____

187*   **Seller's Signature:** _____ Date: ___02.16.24____
188*   Home Telephone: _____ Work Telephone: _____ Facsimile: _____
189*   Address: ___7233 Los Pinos Blvd, Coral Gables, FL, 33143_____
190*   Email Address: _____
191*   **Seller's Signature:** _____ Date: ___02.16.24____
192*   Home Telephone: _____ Work Telephone: _____ Facsimile: _____
193*   Address: _____
194*   Email Address: ___7233 Los Pinos Blvd, Coral Gables, FL, 33143_____
195*   **Authorized Sales Associate or Broker:** _____ Date: __**2/16/2024**__
196*   Brokerage Firm Name: _____BOSCHETTI REALTY GROUP_____ Telephone: _____
197*   Address: _____5701 Sunset Dr, Suite #128, South Miami, FL 33143_____

198*   | Copy returned to **Seller** on _____ by ☐ email ☐ facsimile ☐ mail ☐ personal delivery. |

Florida REALTORS® makes no representation as to the legal validity or adequacy of any provision of this form in any specific transaction. This standardized form should not be used in complex transactions or with extensive riders or additions. This form is available for use by the entire real estate industry and is not intended to identify the user as REALTOR®. REALTOR® is a registered collective membership mark which may be used only by real estate licensees who are members of the NATIONAL ASSOCIATION OF REALTORS® and who subscribe to its Code of Ethics. The copyright laws of United States (17 U.S. Code) forbid the unauthorized reproduction of this form by any means including facsimile or computerized forms.

Seller (____) (____) and Broker/Sales Associate (__**MB**__) (____) acknowledge receipt of a copy of this page, which is Page 4 of 4.

ERS-17sa    Rev 5/2020        ©2020 Florida Realtors®

Serial#: 031313-800170-8115986

Form Simplicity

# EXHIBIT H

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 23-24903-CIV-JB**

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff,

v.

RISHI KAPOOR; *et al.*,

      Defendants.

_____/

## RECEIVER'S RESPONSE TO RISHI KAPOOR'S MOTION TO STAY STATE COURT PROCEEDINGS AND PERMIT SALE OF ASSET SUBJECT TO ASSET FREEZE

      Bernice C. Lee, as Receiver ("Receiver") over the companies listed herein (each a "Receivership Company" and collectively, the "Receivership Companies") [1] submits this response to Defendant Rishi Kapoor's Motion to Stay Court Proceedings and Permit Sale of Asset Subject to Asset Freeze ("Stay Motion") (DE#94).

      By the Stay Motion, Mr. Kapoor – the former principal of Location Ventures LLC and several related Receivership Companies – seeks for this Court to:

      (a)      stay a foreclosure proceeding against the real property located at 7233 Los Pinos Boulevard, Coral Gables, FL (the "Property") which is owned by 7233 Los Pinos,

---

[1] The "Receivership Companies" or "Receivership Defendants" include: Location Ventures, LLC, URBIN, LLC, Patriots United, LLC; Location Properties, LLC; Location Development, LLC; Location Capital, LLC; Location Ventures Resources, LLC; Location Equity Holdings, LLC; Location GP Sponsor, LLC; 515 Valencia Sponsor, LLC; LV Montana Sponsor, LLC; URBIN Founders Group, LLC; URBIN CG Sponsor, LLC; 515 Valencia Partners, LLC; LV Montana Phase I, LLC; Stewart Grove 1, LLC; Stewart Grove 2, LLC; Location Zamora Parent, LLC; URBIN Coral Gables Partners, LLC; URBIN Coconut Grove Partners, LLC; URBIN Miami Beach Partners, LLC; and URBIN Miami Beach II Phase 1, LLC.

LLC (which is not a Receivership Company)[2] and in which Mr. Kapoor and his wife Jennie Frank Kapoor currently reside, for a period of six months;

(b)    authorize 7233 Los Pinos, LLC to list the Property for sale with a broker, under a listing agreement for which Mrs. Kapoor would be the listing associate and would receive a share of the commission; and

(c)    find that the Property and any monetary benefit Mr. Kapoor "would personally receive from the sale of the Property" are subject to the Asset Freeze Order entered by this Court (DE#10).

The Receiver has repeatedly encouraged Mr. Kapoor to promptly sell the Property for fair market value in order to pay off the debt and escrow the proceeds pending a determination of entitlement. The Stay Motion takes some positive steps in that direction, but with several components to which the Receiver objects.

The Receiver does not believe that the Asset Freeze Order operates as a blanket stay of the foreclosure action with regard to the Los Pinos property, though it might arguably stay an actual sale of the property by the foreclosing creditor. The Asset Freeze Order clearly **_does_** apply to any voluntary disposition of property owned by, controlled by, or in the possession of Mr. Kapoor, and accordingly enjoins 7233 Los Pinos LLC from selling the Property. The Receiver nonetheless would not object to a sale of the Property for fair market value, provided that (1) the terms of sale are fully disclosed to the Receiver and approved in advance of sale; (2) no insider is participating in such sale in any capacity; (3) any net proceeds after satisfaction of valid non-insider liens are turned over to the receivership estate, or at a minimum, escrowed in Receiver's counsel's trust

---

[2] According to the Stay Motion, 7233 Los Pinos, LLC is owned by Kapoor, LLC, which is owned by Mr. Kapoor and his wife Jennie Frank Kapoor.

account pending a determination as to entitlement thereto in the Receivership action; and (4) the S.E.C. likewise consents to the sale and terms thereof. Mr. Kapoor's counsel has been advised of the Receiver's position.

The Stay Motion notes that the Receiver has not presently taken the position that the Property or the equity therein is Receivership Property, or that the foreclosure action against the Property is an "Ancillary Proceeding" under the Receivership Order. Mr. Kapoor has not acknowledged that the Los Pinos property is Receivership Property. The Receiver is investigating and reserves the right to assert claims to or against the Property, in which case the Receiver would assert that the foreclosure proceeding would be stayed under the Receivership Order as an Ancillary Proceeding.

The Receiver objects to approval of the listing agreement described in the Stay Motion, and in particular to Mrs. Kapoor being the listing associate or receiving any share of the broker's commission or any other compensation or remuneration in connection with a sale of the Property. As the spouse of Mr. Kapoor, and as a current occupant of the Property who is not paying the mortgage or paying rent to the owner, 7233 Los Pinos, LLC, Mrs. Kapoor is not "uniquely qualified and motivated to advocate for a sale beneficial to all potential interests" – she is an insider with interests that may directly conflict with completing a sale for fair market value in a reasonable period of time. She also has no experience whatsoever as a real estate agent – indeed, Mrs. Kapoor only obtained her real estate license a month ago. (See Exhibit "A"). Including her as the listing associate would appear to be nothing more than an end-run on the Asset Freeze Order. The Receiver has also requested information to support the proposed $8.495 million listing price and has not received a response. If the listing price is not supported by a reasonable assessment of the market value of the Property, then the listing may be counterproductive to facilitating a sale for

3

fair value in a reasonable period of time.

The Receiver is concerned that Mr. Kapoor's request for a finding that "any monetary benefit Defendant Kapoor would personally receive from the sale of the Property" is subject to the Asset Freeze also represents an attempted end-run on the Asset Freeze Order. Elsewhere in the Stay Motion, Mr. Kapoor prematurely opines on whether Mr. and Mrs. Kapoor's interest in the Property[3] would be subject to creditor claims. (DE#94 at ¶7). To the extent Mr. Kapoor is attempting to surreptitiously argue that only any monetary benefit that Mr. Kapoor individually would receive from the sale is subject to the Asset Freeze – as distinguished from a monetary benefit claimed by both Mr. and Mrs. Kapoor – the Receiver respectfully submits that *all* proceeds from any sale of the Property are subject to the Asset Freeze and should be escrowed pending a determination of any claims thereto.

To the extent a stay of the foreclosure proceeding were to be considered by this Court, the Receiver believes a six month period is excessive, particularly in light of the accrual of default rate interest as described in the motion. The Receiver would submit that, if anything, the foreclosure claim should be reduced to judgment in order to cut off the accrual of default rate interest, with 7233 Los Pinos, LLC given a reasonable time – 90-120 days – to consummate a sale, subject to approval by the Receiver, the S.E.C., and if appropriate, this Court.

Accordingly, the Receiver respectfully submits that the Court should: (1) deny approval of the listing agreement unless (a) Mrs. Kapoor is removed as listing associate and Boschetti Real Estate Group certifies that no insider has any interest in or will receive any compensation from the

---

[3] Mr. and Mrs. Kapoor do not have any legal or beneficial ownership interest in the Property. They are asserted to be the owners of Kapoor, LLC, which owns the membership interests in 7233 Los Pinos, LLC. The Receiver does not intend to address here the claims that may be asserted against Mr. Kapoor, 7233 Los Pinos, LLC, or the Property, as those issues are premature and not presently before the Court.

sale; and (b) the proposed listing price is supported to the Receiver's reasonable satisfaction; (2) subject to those conditions, authorize the listing of the Property for sale, subject to the consent of the Receiver and S.E.C., or, if appropriate, Court approval of a final offer to purchase the Property; (3) requiring, as a condition of approval of any sale, that all sale proceeds after payment of bona fide third-party liens are escrowed with Receiver's counsel pending a determination of entitlement thereto; (4) staying only the scheduling and conduct of a foreclosure sale in the Foreclosure Action for a period of no more than 120 days.

Respectfully submitted,

**KOZYAK TROPIN & THROCKMORTON, LLP**
2525 Ponce de Leon Boulevard, 9th Floor
Coral Gables, Florida 33134
Tel: (305) 372-1800
Fax: (305) 372-3508

By: /s/ *David L. Rosendorf*
    David L. Rosendorf
    Florida Bar No. 996823
    Email: dlr@kttlaw.com

*Counsel to Bernice C. Lee,*
*Court-Appointed Receiver*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been served via CM/ECF upon all counsel of record this 7th day of March, 2024.

By: /s/ *David L. Rosendorf*
    David L. Rosendorf

# EXHIBIT I

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-cv-24903-JB

SECURITIES AND EXCHANGE
COMMISSION,

                    Plaintiff,

v.

RISHI KAPOOR, *et al*.,

                    Defendants.

_____/

**DEFENDANT RISHI KAPOOR'S REPLY TO RESPONSES OF RECEIVER AND SEC
TO MOTION TO STAY STATE COURT PROCEEDINGS
AND PERMIT SALE OF ASSET SUBJECT TO ASSET FREEZE**

       Defendant Rishi Kapoor, through undersigned counsel, hereby files his Reply to the

Receiver's Response to Mr. Kapoor's Motion to Stay State Court Proceedings and Permit Sale of

Asset Subject to Asset Freeze [ECF No. 98] and to the Securities and Exchange Commission's

joinder therein [ECF No. 101].

       1.     The Receiver and the Commission object to Jennie Frank Kapoor, Mr. Kapoor's

wife, acting as the listing associate or receiving any commission in connection with a sale of the

Property. They argue that she is insufficiently experienced as she only recently obtained her real

estate license. This ignores the facts that Boschetti Real Estate Group ("Boschetti")—the listing

broker who would supervise, participate as co-listing agent, and profit from the marketing and sale

of the Property—is very experienced, highly reputable, listed and sold the Property when it was

purchased by the Kapoors, and has confidence in Mrs. Kapoor's training and aptitude to work with

them. The Receiver and the Commission next contend that Mrs. Kapoor is an "insider with

interests that may directly conflict with completing a sale for fair market value in a reasonable

period of time." This makes no sense. As a co-guarantor of the mortgage note facing foreclosure,

an owner of an undivided interest in the tenants by the entireties shares of the LLC that is the

ultimate owner of any equity in the Property, and a sales associate entitled to a commission, Mrs. Kapoor has every incentive to sell the Property in a reasonable period of time and at a fair market value—not to mention her desire to earn a living and establish a reputation as an honest and successful real estate agent. The suggestion that including her as the co-listing agent would be "an end-run on the Asset Freeze Order" is also misguided. A real estate commission on a private sale of the Property will be paid to someone, and the Receiver will have no claim to claw back that commission for the benefit of the Estate. Denying Mrs. Kapoor the opportunity to earn a portion of that commission does not impact any potential interest the Receiver might claim in the proceeds of the sale of the Property.

2.     The Receiver and the Commission unreasonably question the $8.495 M listing price in the Listing Agreement and request further "support" for it. The listing price was determined by Boschetti, an experienced real estate broker who is familiar with the relevant sales and market conditions and, beyond that, is well acquainted with the subject neighborhood and the Property, having listed and sold it in November 2021. The Receiver and Commission offer no basis for the counterintuitive suggestion that Boschetti would put aside its professional reputation and economic interest by listing the Property at an unsupported price.

3.     Finally, the Receiver and the Commission suggest that the Court should require that all excess sales proceeds after payment of liens be "escrowed with Receiver's counsel pending a determination of entitlement thereto." This is neither necessary nor warranted. Mr. Kapoor's suggestion that any proposed final offer to purchase the Property be submitted to the Court for pre-approval, together with a finding that the Asset Freeze Order applies to any proceeds from a sale that flow to Mr. Kapoor adequately protects any potential interest the Receiver might claim.[1] If

---

[1] Mr. Kapoor's proposal was not an "attempted end-run on the Asset Freeze Order" as suggested by the Receiver. As explained in the Motion, Mr. Kapoor acknowledges that the Property is an "asset owned in part by Mr. Kapoor . . . subject to the Asset Freeze" despite the fact that the shares

and when a sale takes place, and if any proceeds flow to 7233 Los Pinos or Kapoor LLC, the parties and the Court can address the issue whether or to what extent, in light of *In re Romanogli*, 632 B.R. 807 (Bankr. S.D.Fla. 2021), the Receiver or the Commission can assert potential claims against proceeds ultimately owned by the Kapoors as tenants by the entirety.

Respectfully submitted,

**SHAHADY & WURTENBERGER, P.A.**

*/s/ Fred A. Schwartz*
Fred A. Schwartz, Esq.
fschwartz@swlawyers.law
Florida Bar No. 360538
200 East Palmetto Park Road, Suite 103
Boca Raton, FL 33432
Direct: (561) 910-3064

John J. Shahady, Esq.
JShahady@swlawyers.law
Florida Bar No. 998990
7900 Peters Road, Suite B-200
Fort Lauderdale, FL 33324
(954) 376-5958

**RASKIN & RASKIN, P.A.**

Jane Serene Raskin
jraskin@raskinlaw.com
Florida Bar No. 848689
2525 Ponce De Leon Blvd., Suite 300
Coral Gables, FL 33134

*Attorneys for Defendant Kapoor*

---

of 7233 Los Pinos LLC and Kapoor LLC are owned by the Kapoors as tenants by the entirety [ECF No. 94 at 1-2]. The same logic applies to any proceeds of the sale that flow to Los Pinos LLC or Kapoor LLC and Mr. Kapoor has no objection if the Court specifies that in its order.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on March 14, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

By: */s/ Fred A. Schwartz*
Fred A. Schwartz

# EXHIBIT J

```
         IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL
          CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

               CASE NO.:   2023-023102-CA-09

LOS PINOS ACQUISITION, LLC, a
Florida limited liability
company,

             Plaintiff,
vs.

7233 LOS PINOS, LLC, a Florida
limited liability company; RISHI
K. KAPOOR, an individual; JENNIE
E. FRANK, an individual; KAPOOR
LLC, a Florida limited liability
company; AM STUDIO DESIGN, LLC,
a Florida limited liability
company; ARRAS CORP. D/B/A ARRAS
AIR CONDITIONING, a Florida
corporation; THE PISO PROJECT
LLC, a Florida limited liability
company; and UNKNOWN TENANTS IN
POSSESSION NOS. 1-5,

             Defendants.
_____/


        TRANSCRIPT OF REMOTE HEARING PROCEEDINGS

              VOLUME 1 (Pages 1 - 16)


    DATE TAKEN:  February 13, 2024
    TIME:        9:20 a.m. - 9:33 a.m.
    PLACE:       REMOTELY LOCATED VIA ZOOM
    BEFORE:      PEDRO P. ECHARTE, JR., Circuit Judge

    This cause came on to be heard at the time and
place aforesaid, when and where the following
proceedings were stenographically reported by:

             Patricia A. Lanosa, RPR, FPR, CSR
             Registered Professional Reporter


JOB #348789
```

Page 2

APPEARANCES: (All appearing remotely)
On behalf of Plaintiff:
    THE ALDERMAN LAW FIRM
    9999 Northeast 2nd Avenue
    Suite 211
    Miami Shores, Florida  33138
    (305)200-5473
    BY:  JASON ALDERMAN, ESQUIRE
       TROY TOLENTINO, ESQUIRE
    ttolentino@thealdermanlawfirm.com
    jalderman@thealdermanlawfirm.com
On behalf of Defendants 7233 Los Pinos, LLC, Rishi
Kapoor, Jennie Frank and Kapoor, LLC:
    SHAHADY & WURTENBERGER, P.A.
    7900 Peters Road
    Suite B-200
    Fort Lauderdale, Florida  33324
    (954)376-5961
    BY:  JULIE FEIGELES, ESQUIRE
       FRED SCHWARTZ, ESQUIRE
    feigeles@swlawyers.law
    fschwartz@swlawyers.law
On behalf of Defendant Arras Air Conditioning:
    EILEEN CHAFETZ, P.A.
    4770 Biscayne Boulevard
    Suite 1400
    Miami, Florida 33137-3243
    (305)672-3100
    BY:  EILEEN CHAFETZ, ESQUIRE
    miamijuris@aol.com
On behalf of Defendant AM Studio Design, LLC:
    LAPIN & LEICHTLING
    255 Alhambra Circle
    Suite 600
    Coral Gables, Florida 33134
    (305)569-4105
    BY:  JEFFREY SCOTT LAPIN, ESQUIRE
    jlapin@ll-lawfirm.com
ALSO PRESENT:  Amy Steele Donner

Page 4
3

I N D E X

PAGE

CASE MANAGEMENT CONFERENCE

Argument By:

  Mr. Alderman          6,11

  Ms. Feigeles          7

  Mr. Schwartz         9,14

  Judge's Ruling       13-15

  Court Certificate     16

Page 5

1  Remote proceedings began at 9:20 a.m.:
2      THE COURT:  Good morning.  Case management
3  conference.  Help me out.
4      MR. ALDERMAN:  Jason Alderman, pinch
5  hitting for Amy Donner, and with me is my
6  associate, Troy Tolentino, on behalf of the
7  lender, Los Pinos Acquisition, LLC.
8      Do you want the appearances of the other
9  lawyers of record?
10     THE COURT:  Yes, please.  Just announce
11  your appearances, folks.
12     MS. CHAFETZ:  Eileen Chafetz on behalf of
13  Arras Air Conditioning.
14     MS. FEIGELES:  Julie Feigeles on behalf of
15  the defendants 7233 Los Pinos, LLC, Rishi
16  Kapoor, Jennie Frank and Kapoor, LLC.  And with
17  me is my colleague, Fred Schwartz, who is here
18  if necessary to answer some questions regarding
19  the status of the matter pending in the federal
20  court.
21     MR. ALDERMAN:  Your Honor, I said -- I'm
22  sorry.
23     MR. LAPIN:  Good morning, Jeff Lapin here
24  on behalf of the defendant, AM Studio Design,
25  LLC.

Page 6

1     MR. ALDERMAN:  Your Honor, as the
2  plaintiff I went ahead and set this CMC because
3  it is somewhat of a unique case, it's a
4  commercial foreclosure case.  But the
5  defendant, one of the defendants, Rishi Kapoor
6  is the subject of criminal investigations by
7  the FBI and the IRS, as well as sued by the SCC
8  who has come across and frozen most of his
9  company assets as part of a $90 million Ponzi
10  scheme.  Your former colleague, Alan Fine, was
11  the liquidating director prior to the SEC
12  overtaking and putting its own receiver in
13  here.
14     We have been unable to get the defendants
15  to answer the complaint or respond to the
16  complaint.  Instead they took a motion to stay
17  claiming that this case is somehow wrapped up
18  or related to the SCC receivership, which it's
19  not, it's a complete frivolous position.  But
20  be that as it may, they never would set their
21  motion to stay for hearing.
22     So I went ahead and set this CMC to get
23  hearing time on their motion to stay, as well
24  as our motion to appoint a receiver, which is
25  supported by one of the junior lienors, that's

Page 7

1  a construction material man that provided
2  air-conditioning, to have either Alan Fine or
3  Israel Reyes appointed as the receiver over the
4  property.
5      So, as far as we're concerned, we just
6  want to get some hearing time from Your Honor
7  and move the case forward.  And then I would
8  just add that the defendants are refusing to
9  sit for deposition or participate in discovery
10  in anyway.
11      MS. FEIGELES:  Your Honor, first of all,
12  there is a lot that Mr. Alderman just said that
13  is not supported by anything.  But the only
14  thing set for hearing today is the defendants'
15  motion for short stay of these proceedings, an
16  extension of time.  This case has not been
17  pending that long.
18      Just before the answer was due where the
19  response of the complaint was due from my
20  clients, the SCC filed this lawsuit at the end
21  of December and an asset freeze order was
22  entered.  And pursuant to the asset freeze
23  order, which was entered by Chief Judge
24  Altonaga in the federal court, Mr. Kapoor is
25  restrained from, quote:  Directly or indirectly

Page 8

1  transferring, setting off, receiving, changing
2  selling, pledging, assigning, liquidating or
3  otherwise disposing of or withdrawing any
4  assets or property.
5      And in addition, pursuant to that same
6  asset freeze order:  Any, quote, person or
7  entity holding any such funds or other assets
8  in the name of or for the benefit of Kapoor,
9  shall hold and retain within its control and
10  prohibit the withdrawal, removal, or other such
11  funds or assets.
12      So it's our concern, Your Honor, that
13  based on the asset freeze order which is still
14  in place, Mr. Kapoor cannot do anything with
15  this asset.  He and his wife own -- the
16  corporate defendant that owns this house they
17  live in.
18      THE COURT:  I'm sorry, the asset freeze
19  affects this litigation exactly how?
20      MS. FEIGELES:  Because it affects the
21  asset, which is the subject of the foreclosure
22  proceeding.  The asset is held by -- you're
23  shaking your head.
24      THE COURT:  I'm shaking my head.  We're
25  going forward with the litigation to the extent

Page 9

1  I'm not able to do anything with the asset,
2  that's an entirely different story.  But this
3  litigation is going forward.  Why would I
4  stay --
5      MR. SCHWARTZ:  May I jump in?  There is
6  another order Ms. Feigeles hasn't gotten to
7  yet, which is a subsequent order signed by
8  Judge Altonaga in the middle of February, where
9  she says "All legal proceedings of any nature,
10  including, but not limited to, bankruptcy
11  proceedings, arbitration proceedings,
12  foreclosure actions, or any other actions of
13  any nature involving" -- and I'm jumping down
14  -- "Any of the receivership defendants past or
15  present officers, directors, managers, or
16  general limited partners sued for in connection
17  with any action by them while acting in such
18  capacity of any nature."
19      Mr. Kapoor is a former officer, director
20  of various corporations that are involved in
21  the freeze.  So that sentence refers to him but
22  it's only limited to actions taken by them
23  while acting in such capacity.
24      The SCC in its complaint claims that
25  Mr. Kapoor took a few million dollars of excess

Page 10

1  compensation.  That excess compensation, which
2  was allegedly -- we don't think it was excess,
3  we're going to defend against that claim.  But
4  the claim is that the excess compensation that
5  he took was done during the course of his
6  employment with these companies.  And, further,
7  the SCC has claimed that any use of those funds
8  was improper because they were, quote, in
9  effect stolen funds.
10      He used those funds, Your Honor, to make
11  mortgage payments to Mr. Akerman's client,
12  which payments may be subject to clawbacks by
13  the receiver.  The receiver has been in place
14  for a few weeks and is still getting a handle
15  on what is going on in the case.  And we've
16  asked the receiver for access to the QuickBooks
17  and Sage records, the bookkeeping records, and
18  all of the documents that the receiver has so
19  we can figure out what the effect of what
20  Mr. Kapoor did with the money he received from
21  the company is, trace those funds, et cetera.
22      Further, Judge, we have a hearing set
23  before Judge Altonaga on February 28th, wherein
24  we're going to seek clarification from
25  Judge Altonaga, as to whether this paragraph,

Page 11

1 paragraph 26 of our order, which stays all of
2 these actions, has on a number of Mr. Kapoor's
3 assets purchased with funds that he got from
4 the company that the SCC says are improperly
5 obtained funds.
6     For that reason, in addition to what
7 Ms. Feigeles argued as to the question of the
8 asset freeze, but really involved -- enveloped
9 -- involved -- I'm sorry -- involving all of
10 the claims of this lawsuit, we feel that the
11 matters should be stayed for a short period of
12 time until we go before Chief Judge Altonaga to
13 ascertain the exact scope of the order and
14 whether it applies to the foreclosure that you
15 have when she says "all foreclosure actions are
16 stayed."
17     Forgive me for jumping in. And Julie
18 forgive me for usurping your time. I
19 apologize.
20     MR. ALDERMAN: Very brief reply?
21     THE COURT: What are the motions you want
22 scheduled for hearing?
23     MR. ALDERMAN: So, we want our motion to
24 appoint receiver with expedited discovery,
25 because they're refusing to sit for depo. I

Page 12

1 just need two depositions of the defendants.
2 We have a motion for default. Because when you
3 actually read their motion to stay, Judge, the
4 real genesis of the stay was that these lawyers
5 did not know whether or not they would get paid
6 for their work because of the tainted nature of
7 the money. That's what this is really about.
8 Okay, because they had months to go to the
9 court for a clarification.
10     This entity is expressly not one of the
11 receivership defendants. They didn't give the
12 SCC receiver notice of this hearing. I'll
13 represent to you as an officer of the court
14 that the receiver is not taking a position that
15 this case is subject to that receivership
16 order. The only interest that receiver has in
17 this property is if there is equity in the
18 property through a sale. It goes to the
19 victims. Okay. And in every case in which the
20 receiver does claim an interest in the
21 litigation, they file a notice of stay in the
22 pending action to put everybody on notice.
23     This is about stolen -- make sure they can
24 get paid and not take tainted funds. And
25 Mr. Kapoor --

Page 13

1     THE COURT: Mr. Alderman, here's what I am
2 going to do. We are going to schedule the
3 motion to stay here for a special set half-hour
4 hearing.
5     Have you filed a written response in
6 opposition?
7     MR. ALDERMAN: I have, an extensive
8 written response.
9     THE COURT: I didn't see it. When was
10 that filed?
11     MR. ALDERMAN: It's uploaded in courtMAP.
12 We filed it last night.
13     THE COURT: Oh, okay. Well, I haven't
14 seen it. I'll be looking at that. I see it
15 now. I'm going to schedule this for a
16 half-hour special set hearing. Thereafter, we
17 will schedule your motion to appoint a
18 receiver. I know you threw out two names. I
19 am not going to limit myself to the names you
20 threw out. And I'm inclined to consider to
21 appointing someone like Melanie Damian, if I
22 grant your motion.
23     MR. ALDERMAN: I would only add, I don't
24 know if Ms. Damian would be conflicted out,
25 because she may be the -- her sister -- I know

Page 14

1 Melanie.
2     THE COURT: Oh, okay.
3     MR. ALDERMAN: Her sister may be the
4 magistrate on the Altonaga proceedings. I'm
5 fine with Melanie. Melanie or Peter.
6     THE COURT: I would consider appointing
7 either one of them. So, if there is a
8 conflict, let me know at the time of the
9 hearing and I will appoint someone appropriate.
10     MS. FEIGELES: Your Honor, what are we
11 specially setting for a half an hour?
12     THE COURT: Your motion for stay.
13     MS. FEIGELES: Oh, okay.
14     MR. SCHWARTZ: Your Honor, will you
15 consider setting that -- and, again, I dispute
16 the fact that we're worried about being paid.
17 We're actually being paid by funds --
18     THE COURT: I'm not interested in hearing
19 this argument at this time, Mr. Schwartz. I'm
20 scheduling the motion for hearing. What did
21 you want to say?
22     MR. SCHWARTZ: Can you schedule it
23 subsequent to the hearing of Judge Altonaga?
24     THE COURT: When did you say?
25     MR. SCHWARTZ: February 28th, Your Honor.

Page 15

1      MR. ALDERMAN:  We're fine with that,
2  Judge.  I think that makes sense.
3      THE COURT:  I'll schedule that at my
4  convenience after February 28th.
5      MR. ALDERMAN:  Thank you, Your Honor.
6      MR. SCHWARTZ:  Thank you, Your Honor.
7      (Proceedings concluded at 9:33 a.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 16

COURT CERTIFICATE

STATE OF FLORIDA

COUNTY OF MIAMI-DADE

        I, PATRICIA A. LANOSA, Registered

    Professional Reporter, certify that I was

    authorized to and did stenographically report

    the foregoing proceedings and that the

    transcript is a true and complete record of my

    stenographic notes.

        Dated this 15th day of February, 2024.

        PATRICIA A. LANOSA, RPR, FPR, CSR

        Registered Professional Reporter

# EXHIBIT K

| | |
|---|---|
| **From:** | David L Rosendorf |
| **To:** | Mark S. Roher (mroher@markroherlaw.com) |
| **Cc:** | Bernice C Lee; Jason Alderman; Steve Schneiderman; O"Brien, Russell |
| **Subject:** | 7233 Los Pinos LLC |
| **Date:** | Monday, April 1, 2024 5:45:00 PM |
| **Attachments:** | 2023-12-28 DE10 23-24903 Order Granting Asset Freeze.pdf |
| | 14T3661-2024-03-04 DE94 Motion to Stay.PDF |
| | 14T5066-2024-03-07 DE98 Response to Mo.PDF |

Mark –

I'm writing regarding the bankruptcy filed by you on behalf of 7233 Los Pinos LLC and following up on your call last week. As you know, I represent my partner Bernice Lee as the Receiver over Location Ventures LLC and several related companies. Mr. Kapoor, LV and several other entities are defendants in an SEC action commenced in late December, in which an Asset Freeze Order was entered 12/28/23 (attached) based on the "prima facie case showing a reasonable approximation of the likelihood disgorgement award against Kapoor[.]" Mr. Kapoor, who signed the Petition and Case Management Summary on behalf of 7233 Los Pinos LLC, has already acknowledged in filings made in the SEC case that the Property owned by 7233 Los Pinos LLC, in which he asserts an ownership interest, is subject to the Asset Freeze. (See DE#94 Paragraph 2). He has also acknowledged that funds derived from LV were used to make mortgage payments, and that it is likely that those funds will be subject to disgorgement by the SEC and/or clawback claims by the Receiver. However, neither the Receiver nor the SEC were included in the debtor's creditor list.

It would certainly appear that the filing of the bankruptcy orchestrated by Mr. Kapoor is a violation of the Asset Freeze Order. In any event, I think it is beyond any argument that the Asset Freeze Order remains in effect and is exempt from the automatic stay as an exercise of the SEC's police and regulatory powers. Accordingly, even if 7233 Los Pinos' bankruptcy filing is not immediately dismissed as an unauthorized violation of the Asset Freeze Order, or otherwise as a bad faith filing, there is nothing that the debtor can do with the Property in the bankruptcy case without seeking relief from the Asset Freeze Order in the SEC proceeding.

You may not be aware, but as the attached motion reflects, Mr. Kapoor already filed a motion in the SEC case asking that court (1) to determine that the Property is subject to the Asset Freeze; (2) to permit 7233 Los Pinos LLC to list the property with Mr. Kapoor's wife, Jennie Frank Kapoor as the listing associate who would receive a commission on a sale; and (3) to stay the lender's pending foreclosure proceeding for six months. Moreover, the Receiver has already responded to that motion and has repeatedly made clear that the Receiver does not oppose the sale of the Property for fair market value, provided that (1) the Receiver has the opportunity to approve any such sale; (2) Mrs. Kapoor is removed as listing agent, and no insider will receive any compensation from the sale; (3) the proposed listing price is supported to the Receiver's reasonable satisfaction; and (4) any sale proceeds after payment of bona fide third-party liens are escrowed pending a determination of entitlement thereto.

In other words, a process has already been proposed for the sale of the Property and the resolution of claims to the  proceeds. It does not appear that there is anything that can be accomplished by a bankruptcy other than adding an additional, unnecessary layer of administrative expense to the process. As I'm sure you know, it is extremely unlikely that the bankruptcy court, with its rules on disinterestedness, is going to be any more likely to allow Mr. Kapoor's wife to receive a commission on the sale of the Property than the SEC court.

I'd strongly encourage you to consider voluntarily dismissing the bankruptcy case before the parties incur what are likely to be substantial fees getting to the same place. Let's set up a call if you'd like to discuss.

David L. Rosendorf, Esq. | Partner

KOZYAK TROPIN & THROCKMORTON

2525 Ponce de Leon Blvd., FL 9, Miami, FL 33134

Phone 305.372.1800 | Direct 305.377.0651 | Email dlr@kttlaw.com

# EXHIBIT L

| | |
|---|---|
| **From:** | David L Rosendorf |
| **To:** | mroher@markroherlaw.com; "Jason Alderman" |
| **Cc:** | "Linda Leali"; Bernice C Lee |
| **Subject:** | RE: Subpoena Response- Production of Appraisal |
| **Date:** | Wednesday, April 3, 2024 3:22:00 PM |
| **Attachments:** | 14T5066-2024-03-07 DE98 Response to Mo.PDF |
| | image006.png |
| | image007.png |
| | image008.png |

Mark –

The Receiver's position is as we set forth in Receiver's response to Mr. Kapoor's Motion to stay the Los Pinos foreclosure proceedings and permit the sale of the property:

*The Receiver nonetheless would not object to a sale of the Property for fair market value, provided that (1) the terms of sale are fully disclosed to the Receiver and approved in advance of sale; (2) no insider is participating in such sale in any capacity; (3) any net proceeds after satisfaction of valid non-insider liens are turned over to the receivership estate, or at a minimum, escrowed in Receiver's counsel's trust account pending a determination as to entitlement thereto in the Receivership action; and (4) the S.E.C. likewise consents to the sale and terms thereof.*

*…*

*Accordingly, the Receiver respectfully submits that the Court should: (1) deny approval of the listing agreement unless (a) Mrs. Kapoor is removed as listing associate and Boschetti Real Estate Group certifies that no insider has any interest in or will receive any compensation from the sale; and (b) the proposed listing price is supported to the Receiver's reasonable satisfaction; (2) subject to those conditions, authorize the listing of the Property for sale, subject to the consent of the Receiver and S.E.C., or, if appropriate, Court approval of a final offer to purchase the Property; (3) requiring, as a condition of approval of any sale, that all sale proceeds after payment of bona fide third-party liens are escrowed with Receiver's counsel pending a determination of entitlement thereto; (4) staying only the scheduling and conduct of a foreclosure sale in the Foreclosure Action for a period of no more than 120 days.*

To reiterate, and update in light of the bankruptcy filing:

The Receiver will consent to the sale of the Los Pinos Property at fair market value under the following conditions:

(1) the bankruptcy is dismissed;
(2) the terms of any sale are fully disclosed to and approved by the Receiver in advance of sale, and/or approved by the SEC court by motion;
(3) no insider is participating in the sale in any capacity (that means Ms. Kapoor is not a listing agent and neither she nor any other insider receives any commission or other compensation from the sale);
(4) all net proceeds after satisfaction of valid non-insider liens are escrowed with Receiver's counsel pending a determination as to entitlement in the SEC action;
(5) the SEC also consents to these terms.

This could be accomplished by an agreed order on the motion presently pending in the SEC court provided that affected parties agree.

There are other details that probably need to be discussed and resolved – listing price, time to obtain a

binding offer and complete a sale, etc. – but what I've set out here are the basics and they've been repeatedly communicated to Mr. Kapoor.

- David

David L. Rosendorf, Esq. | Partner

KOZYAK TROPIN & THROCKMORTON

2525 Ponce de Leon Blvd., FL 9, Miami, FL 33134

Phone 305.372.1800 | Direct 305.377.0651 | Email dlr@kttlaw.com

---

**From:** mroher@markroherlaw.com <mroher@markroherlaw.com>
**Sent:** Wednesday, April 3, 2024 12:26 PM
**To:** 'Jason Alderman' <Jalderman@thealdermanlawfirm.com>
**Cc:** 'Linda Leali' <lleali@lealilaw.com>; David L Rosendorf <dlr@kttlaw.com>; Bernice C Lee <blee@kttlaw.com>
**Subject:** RE: Subpoena Response- Production of Appraisal

**CAUTION:** [This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.]

David, I was able to speak with Jason.

Can you and I have a quick 5 minute follow up call today please and schedule it?

**Mark S. Roher, Esq.**

Law Office of Mark S. Roher, P.A.
1806 N. Flamingo Road, Suite 300
Pembroke Pines, FL 33028 (Main Office)
-and-
5660 Strand Court, Unit #A51
Naples, FL 34110-3343 (Satellite Office)

Phone:  (954) 353-2200
Fax:  (877) 654-0090
Email:  mroher@markroherlaw.com
Web:  www.markroherlaw.com



# EXHIBIT M

| **From:** | mroher@markroherlaw.com |
|---|---|
| **To:** | David L Rosendorf; "Jason Alderman" |
| **Cc:** | "Linda Leali"; Bernice C Lee |
| **Subject:** | RE: Subpoena Response- Production of Appraisal |
| **Date:** | Thursday, April 4, 2024 9:32:02 AM |
| **Attachments:** | image001.png |
| | image002.png |
| | image003.png |

**CAUTION:** [This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.]

David and Jason:

The Debtor is agreeable to the terms contained in David's email below, subject to agreeing to other terms relating specifically to Jason's client's claim and foreclosure specific issues.

Ms. Kapoor will not receive any compensation or commission from the sale, but she does want to be involved in the sale process because she does own the membership interests of the entity that owns the home.

Jason, would you like to schedule a call or meeting?

There will need to be a detailed stipulation that I can draft once I iron out the details with Jason.


**Mark S. Roher, Esq.**

Law Office of Mark S. Roher, P.A.
1806 N. Flamingo Road, Suite 300
Pembroke Pines, FL 33028 (Main Office)
-and-
5660 Strand Court, Unit #A51
Naples, FL 34110-3343 (Satellite Office)

Phone:  (954) 353-2200
Fax:  (877) 654-0090
Email:  mroher@markroherlaw.com
Web:  www.markroherlaw.com



# EXHIBIT N

From: David L Rosendorf
To: mroher@markroherlaw.com
Cc: Bernice C Lee
Subject: RE: Subpoena Response- Production of Appraisal
Date: Monday, April 15, 2024 10:14:00 AM
Attachments: 14V007704-Agreed Order Granting in Part.DOCX
image005.png
image006.png
image007.png

Mark –

See attached. Expectation is that this would be entered, and then the bankruptcy dismissal order would be plain vanilla, and the terms of this order go into effect upon dismissal.

- David

David L. Rosendorf, Esq. | Partner

KOZYAK TROPIN & THROCKMORTON

2525 Ponce de Leon Blvd., FL 9, Miami, FL 33134

Phone 305.372.1800 | Direct 305.377.0651 | Email dlr@kttlaw.com

---

From: mroher@markroherlaw.com <mroher@markroherlaw.com>
Sent: Monday, April 15, 2024 8:40 AM
To: David L Rosendorf <dlr@kttlaw.com>
Subject: FW: Subpoena Response- Production of Appraisal

CAUTION: [This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.]

Can you pleas send me the proposed orders to be submitted in the SEC action and bk dismissal order as discussed? Thanks.

**Mark S. Roher, Esq.**
Law Office of Mark S. Roher, P.A.
1806 N. Flamingo Road, Suite 300
Pembroke Pines, FL 33028 (Main Office)
-and-
5660 Strand Court, Unit #A51
Naples, FL 34110-3343 (Satellite Office)

Phone: (954) 353-2200
Fax: (877) 654-0090
Email: mroher@markroherlaw.com
Web: www.markroherlaw.com




Please consider the environment before printing this e-mail.

CONFIDENTIALITY NOTE
The information contained in this electronic mail transmission and its attachments may be confidential and protected from disclosure. If the reader of this message is not the intended recipient (or an individual responsible for delivery of the message to such person), you are strictly prohibited from copying, disseminating or distributing this communication. If you have received this communication in error, please notify the sender immediately and destroy all electronic, paper or other versions. The sender does not waive confidentiality in the event of any inadvertent transmission to an unauthorized recipient. No representation is made by the sender that this communication is virus-free. The recipient alone is responsible for taking appropriate measures to ensure that the e-mail is virus-free.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 23-24903-CIV-JB**

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff,

v.

RISHI KAPOOR; *et al.*,

      Defendants.

_____/

**ORDER GRANTING IN PART RISHI KAPOOR'S MOTION TO STAY**
**STATE COURT PROCEEDINGS AND PERMIT SALE**
**OF ASSET SUBJECT TO ASSET FREEZE**

      **THIS CAUSE** came before the Court upon Defendant Rishi Kapoor's Motion to Stay State

Court Proceedings and Permit Sale of Asset Subject to Asset Freeze. ECF#94. Upon due

consideration of the Motion, being advised that the relief set forth in this order is unopposed, it is

hereby **ORDERED AND ADJUDGED** that Defendant Rishi Kapoor's Motion, ECF#94, is

**GRANTED** in part as stated herein:

      1.    Rishi Kapoor shall direct the dismissal of the bankruptcy case filed by 7233 Los Pinos,

LLC ("7233 Los Pinos"), with prejudice for a period of at least 180 days.

      2.    Upon dismissal of the bankruptcy case in accordance with Paragraph 1, the Asset

Freeze Order, ECF#10, is modified in part solely to provide that 7233 Los Pinos shall be permitted

to sell its property located at 7233 Los Pinos, Blvd., Coral Gables, FL 33134 (the "Property")

subject to the terms herein.

      3.    The terms of any sale shall be fully disclosed to and approved by the Receiver and the

Securities and Exchange Commission ("SEC") in advance of sale or approved by this Court if no

such agreement is reached.

      4.    The proposed listing price for the sale of the Property shall be supported to the Receiver's reasonable satisfaction.

      5.    No insider of the Debtor (including but not limited to Jennie Frank Kapoor and Rishi Kapoor) shall be the listing agent or otherwise participate in the sale. Nor shall any insider of the Debtor (including but not limited to Jennie Frank Kapoor and Rishi Kapoor) be permitted to receive any commission or other compensation from the sale of the Property.

      6.    All net proceeds from the sale of the Property, after satisfaction of valid non-insider liens, shall be escrowed with Receiver's counsel pending a determination as to entitlement by this Court.

      7.    Nothing in this order is intended to or shall be construed as having the effect of altering any claims, rights or interests of the Receiver, the SEC, or any other person or entity with regard to the Property or the proceeds thereof, or any defenses thereto.

      **DONE AND ORDERED** in Miami, Florida this _____ day of April, 2024.


                                        _____

                                        **JACQUELINE BECERRA**
                                        **UNITED STATES DISTRICT JUDGE**

cc:    counsel of record

# EXHIBIT O

| | |
|---|---|
| **From:** | Fred A. Schwartz, Esq. |
| **To:** | David L Rosendorf |
| **Cc:** | O"Brien, Russell; Bernice C Lee; Jane Raskin; Luis Salazar |
| **Subject:** | Re: Subpoena Response- Production of Appraisal |
| **Date:** | Monday, April 15, 2024 5:28:12 PM |

**CAUTION:** [This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.]

David,

Rishi's new Bankruptcy counsel will follow-up later this week. However, without at least 1, 2, & 4, i do not see any progress occurring.

Fred

**FRED A. SCHWARTZ, Esq.**
**PARTNER**
**SHAHADY & WURTENBERGER, P.A.**
200 East Palmetto Park Road Suite 103
Boca Raton, FL 33432
Direct:   (561)-910-3064
Cellular: (561)504-8534
Email:  fschwartz@swlawyers.law
MAY THE SCHWARTZ BE WITH YOU

---

**From:** David L Rosendorf <dlr@kttlaw.com>
**Sent:** Monday, April 15, 2024 12:43 PM
**To:** Fred A. Schwartz, Esq. <fschwartz@swlawyers.law>
**Cc:** O'Brien, Russell <OBrienRu@sec.gov>; Bernice C Lee <blee@kttlaw.com>; Jane Raskin <jraskin@raskinlaw.com>; Mark S. Roher (mroher@markroherlaw.com) <mroher@markroherlaw.com>; Luis Salazar <luis@salazar.law>
**Subject:** Re: Subpoena Response- Production of Appraisal

Fred -

#3 and #4 are compete non-starters. If you want to take those off your list I will share my thoughts on #1 and #2.

David L. Rosendorf, Esq. | Partner
KOZYAK TROPIN & THROCKMORTON
2525 Ponce de Leon Blvd., FL 9, Miami, FL 33134
Phone 305.372.1800 | Direct 305.377.0651 | Email dlr@kttlaw.com

On Apr 15, 2024, at 11:19 AM, Fred A. Schwartz, Esq. <fschwartz@swlawyers.law> wrote:

**CAUTION:** [This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.]

David

Mark Roher forwarded this to me and Rishi for review.  I have not yet spoken to Rishi about it, but I would recommend him accepting it with 4 provisos:

1.  We agree on a listing price in the Order.
2.  No dismissal of the Chapter 11 is filed before this Order is signed.
3.  Paragraph 5 allows Jennie to participate in the sale and leaves the determination of whether she is entitled to a commission or worked pro bono to the later determination of Judge Beccera.
4.  Paragraph 6 provides that 50% of the net proceeds of any sale shall be immediately released to Jennie, the balance will be escrowed until the Court determines whether it can be legally reached by the SEC or Receiver for any future disgorgement or claw back due to TBE.


**FRED A. SCHWARTZ, Esq.**
**PARTNER**
**SHAHADY & WURTENBERGER, P.A.**
200 East Palmetto Park Road Suite 103
Boca Raton, FL 33432
Direct:   (561)-910-3064
Cellular: (561)504-8534
Email:   fschwartz@swlawyers.law
MAY THE SCHWARTZ BE WITH YOU

---

**From:** Mark S. Roher, Esq. <mroher@markroherlaw.com>
**Sent:** Monday, April 15, 2024 10:19 AM
**To:** Rishi Kapoor <therishikapoor@gmail.com>; Fred A. Schwartz, Esq. <fschwartz@swlawyers.law>; Julie Feigeles <Feigeles@swlawyers.law>
**Subject:** Fwd: Subpoena Response- Production of Appraisal


**Mark S. Roher, Esq.**

Law Office of Mark S. Roher, P.A.

1806 N. Flamingo Rd. Suite 300

Pembroke Pines, FL 33028

Phone:  (954) 353-2200

Email:  mroher@markroherlaw.com

Web:  www.markroherlaw.com



**Please Note New Mailing Address**

# Please consider the environment before printing this e-mail.

**CONFIDENTIALITY NOTE**
The information contained in this electronic mail transmission and its attachments may be confidential and protected from disclosure. If the reader of this message is not the intended recipient (or an individual responsible for delivery of the message to such person), you are strictly prohibited from copying, disseminating or distributing this communication. If you have received this communication in error, please notify the sender immediately and destroy all electronic, paper or other versions. The sender does not waive confidentiality in the event of any inadvertent transmission to an unauthorized recipient. No representation is made by the sender that this communication is virus-free. The recipient alone is responsible for taking appropriate measures to ensure that the e-mail is virus-free.

Begin forwarded message:

> **From:** David L Rosendorf <dlr@kttlaw.com>
> **Date:** April 15, 2024 at 10:14:47 AM EDT
> **To:** mroher@markroherlaw.com
> **Cc:** Bernice C Lee <blee@kttlaw.com>
> **Subject: RE: Subpoena Response- Production of Appraisal**

Mark –

See attached. Expectation is that this would be entered, and then the bankruptcy dismissal order would be plain vanilla, and the terms of this order go into effect upon dismissal.

- David

David L. Rosendorf, Esq. | Partner

<image004.jpg>

KOZYAK TROPIN & THROCKMORTON
2525 Ponce de Leon Blvd., FL 9, Miami, FL 33134

**Phone** 305.372.1800 | **Direct** 305.377.0651 | **Email** dlr@kttlaw.com

---

**From:** mroher@markroherlaw.com <mroher@markroherlaw.com>
**Sent:** Monday, April 15, 2024 8:40 AM
**To:** David L Rosendorf <dlr@kttlaw.com>
**Subject:** FW: Subpoena Response- Production of Appraisal

**CAUTION:** [This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.]

Can you pleas send me the proposed orders to be submitted in the SEC action and bk dismissal order as discussed?  Thanks.

**Mark S. Roher, Esq.**

Law Office of Mark S. Roher, P.A.
1806 N. Flamingo Road, Suite 300
Pembroke Pines, FL 33028 (Main Office)
-and-
5660 Strand Court, Unit #A51
Naples, FL 34110-3343 (Satellite Office)

Phone:  (954) 353-2200
Fax:  (877) 654-0090
Email:  mroher@markroherlaw.com
Web:  www.markroherlaw.com

<image005.png>

<image006.png>

<image007.png>

**Please consider the environment before printing this e-mail.**

**CONFIDENTIALITY NOTE**

The information contained in this electronic mail transmission and its attachments may be confidential and protected from disclosure. If the reader of this message is not the intended recipient (or an individual responsible for delivery of the message to such person), you are strictly prohibited from copying, disseminating or distributing this communication. If you have received this communication in error, please notify the sender immediately and destroy all electronic, paper or other versions. The sender does not waive confidentiality in the event of any inadvertent transmission to an unauthorized recipient. No representation is made by the sender that this communication is virus-free. The recipient alone is responsible for taking appropriate measures to ensure that the e-mail is virus-free.

<14V807704-Agreed Order Granting in Part.DOCX>

# EXHIBIT P

## OPERATING AGREEMENT OF KAPOOR LLC

This Operating Agreement (the "Agreement") of Kapoor LLC, a Florida limited liability company (the "Company"), is made as of October 27, 2021 (the "Effective Date") by and between the Company and its sole member, Rishi Kapoor (the "Member").

## BACKGROUND

The Company was formed pursuant to Articles of Organization (the "Articles") filed with the Secretary of State of Florida and accepted of record on August 12, 2021.

This Agreement sets forth the agreement among the parties as to the internal affairs of the Company and the conduct of its business. The parties, intending to be legally bound, agree as follows:

## ARTICLE I.
### Effective Date of Agreement; Enforceability.

On the Effective Date and thereafter until the parties amend this Agreement, all rights, duties and liabilities of the Company and of the Member shall be as set forth herein and as otherwise provided by applicable law. All prior operating agreements, if any, are hereby revoked.

## ARTICLE II.
### Company's Name, Purpose, etc.

The Company's name, purpose, registered agent, registered office and duration shall be as set forth in the Articles.

## ARTICLE III.
### Members of the Company on Date of the Company's Formation, Capital Contributions and Distributions.

The Member of the Company and its capital contributions to the Company are as set forth on Exhibit A. The Member may, but is not obligated to, make additional capital contributions to the Company. The Company may make distributions at such times and in such amounts as determined by the Member.

## ARTICLE IV.
### Principal place of business of the Company.

The Company's principal place of business shall be as set forth in the Articles, or as modified from time to time by the Member.

## ARTICLE V.
### Member Managed

Except as otherwise provided herein, the management of the business and internal affairs of the Company shall be vested in the Member. All actions and decisions of the Company shall be made by the Member.

## ARTICLE VI.
### Taxation of the Company and Member.

The Company shall elect to be treated as a disregarded entity based on the fact that it is wholly owned by the Member.

1

### ARTICLE VII.
#### Annual Accounting period of the Company; Method of Accounting.

The Company's annual accounting period for financial and tax purposes shall be the calendar year and the Company shall use whatever method of accounting (accrual, cash or hybrid) deemed appropriate by the Member from time to time.

### ARTICILE VIII.
#### Miscellaneous Provisions.

(i)        Entire agreement. This Agreement contains the entire agreement between the parties concerning its subject matter, and it replaces all earlier agreements between them, whether written or oral, concerning its subject matter.

(ii)        Amendments. No amendment of this Agreement shall be valid unless approved in writing by the Member.

(iii)        Governing law. This Agreement shall be governed by the laws of the State of Florida.

(iv)        Severability. If any provisions of this Agreement or the application thereof to any person or circumstance shall be invalid or unenforceable to any extent, the remainder of the Agreement and the application of such provisions to other persons or circumstances shall not be affected thereby, and the intent of this Agreement shall be enforced to the greatest extent permitted by law.

(v)        Captions. Captions in this Agreement are for convenience only and shall be deemed irrelevant in construing its provisions. This Agreement may be executed via electronic and PDF signatures.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement under seal as of the date first above written:

**THE MEMBER**

**Rishi Kapoor**

2

# EXHIBIT A

## KAPOOR LLC
## SCHEDULE OF MEMBERS AND CAPITAL CONTRIBUTIONS

### MEMBERS

| NAME | ADDRESS | INITIAL CAPITAL CONTRIBUTION |
|---|---|---|
| Rishi Kapoor | 299 Alhambra Circle Suite 510 Coral Gables, Florida 33134 | $10.00 |

3

# EXHIBIT Q

# Electronic Articles of Organization
# For
# Florida Limited Liability Company

**L21000363426**
**FILED 8:00 AM**
**August 12, 2021**
**Sec. Of State**
bcoates

## Article I

The name of the Limited Liability Company is:

KAPOOR LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

299 ALHAMBRA CIRCLE
SUITE 510
CORAL GABLES, FL. US  33134

The mailing address of the Limited Liability Company is:

299 ALHAMBRA CIRCLE
SUITE 510
CORAL GABLES, FL. UN  33134

## Article III

The name and Florida street address of the registered agent is:

ROMY K KAPOOR
299 ALHAMBRA CIRCLE
SUITE 510
CORAL GABLES, FL.   33134

Having been named as registered agent and to accept service of process for the above stated limited liability company at the place designated in this certificate, I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes relating to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.

Registered Agent Signature:   ROMY K KAPOOR

# Article IV

The name and address of person(s) authorized to manage LLC:

**L21000363426**
**FILED 8:00 AM**
**August 12, 2021**
**Sec. Of State**
bcoates

    Title:  MGR
    RISHI K KAPOOR
    299 ALHAMBRA CIRCLE
    CORAL GABLES, FL.  33134  US

## Signature of member or an authorized representative

Electronic Signature: ROMY K KAPOOR

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.